**Slip Op. 21-30**

**UNITED STATES
COURT OF INTERNATIONAL TRADE**

────────────

**Court No. 20-00008**

────────────

NEW AMERICAN KEG, d/b/a
AMERICAN KEG COMPANY,

*Plaintiff*,

v.

UNITED STATES,

*Defendant*,

and

NINGBO MASTER INTERNATIONAL
TRADE CO., LTD., AND GUANGZHOU
JINGYE MACHINERY CO, LTD,

*Defendant-Intervenors*.

────────────

Before: M. Miller Baker, Judge

**OPINION AND ORDER**

[Plaintiff's motion for judgment on the agency record
is granted in part and denied in part.]

Dated: March 23, 2021

*Whitney M. Rolig*, *Andrew W. Kentz*, and *Nathaniel
Maandig Rickard*, Picard Kentz & Rowe LLP of Wash-
ington, DC, on the briefs for Plaintiff.

**Court No. 20-00008**                                        **Page 2**

*Ashley Akers*, Trial Attorney, Commercial Litigation Branch, *Ethan P. Davis*, Acting Assistant Attorney General, *Jeanne P. Davidson*, Director, and *Patricia M. McCarthy*, Assistant Director, Civil Division, U.S. Department of Justice of Washington, DC, on the brief for Defendant. Of counsel on the brief was *Vania Wang*, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce of Washington, DC.

*Gregory S. Menegaz*, *J. Kevin Horgan*, and *Alexandra H. Salzman*, deKieffer & Horgan, PLLC, of Washington, DC, on the brief for Defendant-Intervenors.

*Baker*, Judge: Last week, the nation and much of the world celebrated St. Patrick's Day. Some of those celebrations involved green beer, often tapped from steel kegs. This case is about steel kegs (but without the green beer).

After an investigation, the Commerce Department recently determined that imported Chinese beer kegs were being dumped in the U.S., i.e., sold within the U.S. at below what would be the normal sales price if China had a market economy. Based on that determination, Commerce imposed a hefty antidumping duty on Chinese kegs in general but exempted one major Chinese exporter that was individually investigated and two smaller exporters.

As to the major exporter that Commerce investigated, a domestic keg manufacturer objected that the Department's errors in calculating labor costs and verifying information allowed the exporter to escape

antidumping duties. As to the two smaller exporters, the domestic manufacturer objected to Commerce's determination that they were free from Chinese government control and therefore could enjoy whatever antidumping rate Commerce assigned to the investigated major exporter.

Commerce denied those objections. The domestic manufacturer then brought this action challenging Commerce's decision, prompting the investigated Chinese exporter and one of the smaller exporters to intervene as defendants. After full briefing on the domestic manufacturer's motion for judgment on the agency record, the Court now grants the motion as to the investigated exporter's labor costs and verification issues. As to the issue of the two smaller exporters' eligibility for a separate rate, the Court grants the domestic manufacturer's motion as to one but denies it as to the other. Finally, the Court remands for further proceedings consistent with this opinion.

## Statutory and Regulatory Background

### A. Antidumping orders generally

#### 1. Commerce and ITC investigations

The federal antidumping statute provides a mechanism for imposing remedial duties on merchandise sold, or likely to be sold, in the United States at "less than its fair value." 19 U.S.C. § 1673(1). That mechanism allows an "interested party," as defined in the

Tariff Act of 1930,[1] to file a petition with Commerce and the International Trade Commission alleging that a U.S. domestic industry is materially injured or threatened with material injury by imports that are being, or are likely to be, sold in the U.S. at less than fair value. U.S. Int'l Trade Comm'n, Publication 4540, *Antidumping and Countervailing Duty Handbook* at I-3 (14th ed. June 2015), *available at* https://www.usitc.gov/trade_remedy/documents/handbook.pdf (accessed Mar. 22, 2021).

Commerce then investigates whether the petition contains sufficient allegations of dumping and, if so, whether dumping is occurring, while the ITC investigates whether the relevant domestic industry is being, or is likely to be, materially injured. If both agencies find in the affirmative, Commerce publishes an antidumping order in the Federal Register imposing an antidumping duty "in an amount equal to the amount by which the normal value exceeds the export price (or the constructed export price) for the merchandise." 19 U.S.C. § 1673.[2] The antidumping duty is in addition

---

[1] The statute provides that an "interested party" described in subparagraph (C), (D), (E), (F), or (G) of Section 771(9) of that Act (codified at 19 U.S.C. § 1677(9)) may file a petition on behalf of a domestic industry. *See* 19 U.S.C. § 1673a(b)(1). The specified subparagraphs refer to various domestic entities involved in the production of a "domestic like product." *Id.* § 1677(9)(C)–(G).

[2] "Normal value" essentially refers to the price at which the subject merchandise is sold in the country from which it is exported. *RHP Bearings Ltd. v. United States*, 288 F.3d 1334, 1337 (Fed. Cir. 2002). For example, the normal value

to any other duty imposed on the subject merchandise.
*Id.*

## 2. Selection of respondents

In theory, the goal of an antidumping investigation
is to determine the extent to which every individual
foreign exporter's U.S. selling price for the subject
merchandise is lower than its "normal value," as re-
quired by statute: "In determining weighted average
dumping margins . . . , [Commerce] shall determine
the individual weighted average dumping margin for
each known exporter and producer of the subject mer-
chandise." 19 U.S.C. § 1677f-1(c)(1). The goal is theo-
retical because the statute then sets forth an exception
to the general rule when there are numerous export-
ers.

For such cases where "it is not practicable to make
individual weighted average dumping margin deter-
minations . . . because of the large number of exporters
or producers involved in the investigation," Commerce
may determine margins "for a reasonable number of
exporters or producers" by limiting its investigation to
either a statistically valid sample of exporters or pro-
ducers or "exporters and producers accounting for the
largest volume of the subject merchandise from the ex-
porting country that can be reasonably examined." *Id.*
§ 1677f-1(c)(2).

-----

of a widget exported from Country Q is the price at which
that widget is sold in Country Q.

When Commerce invokes the statutory exception, it selects "mandatory respondents" for individual examination. As the term implies, mandatory respondents are required to respond to Commerce's information requests during an investigation. Commerce determines individual antidumping rates for the mandatory respondents, 19 U.S.C. § 1673d(c)(1)(B)(i)(I).[3]

### 3. Verification

A critical aspect of Commerce's antidumping investigation involves "verification" of mandatory respondents. The statute provides that Commerce "shall verify all information relied upon in making . . . a final determination in an investigation." 19 U.S.C. § 1677m(i)(1). Commerce's implementing regulations provide that the Department will visit (1) producers, exporters, or importers; (2) their affiliates; or (3) unaffiliated purchasers "in order to verify the accuracy and completeness of submitted factual information" and that the personnel making such visits "will request access to all files, records, and personnel which the Secretary considers relevant to factual information submitted." 19 C.F.R. § 351.307(d)(1)–(3).

---

[3] As to exporters and producers *not* individually investigated, Commerce determines an "all-others rate" to apply. *See* 19 U.S.C. § 1673d(c)(1)(B)(i)(II). The "all-others rate" is to be "an amount equal to the weighted average of the estimated weighted average dumping margins established for exporters and producers individually investigated," *id.* § 1673d(c)(5)(A), subject to certain exceptions not relevant here.

"Verification is like an audit, the purpose of which is to test information provided by a party for accuracy and completeness." *Bomont Indus. v. United States*, 733 F. Supp. 1507, 1508 (CIT 1990) (cleaned up). Commerce has latitude in how it conducts verification, and there is no requirement to verify all information submitted by a respondent. *U.S. Steel Corp. v. United States*, 953 F. Supp. 2d 1332, 1348 (CIT 2013).

## B. Antidumping investigations involving non-market economies

When, as here, an antidumping investigation involves products produced in a non-market economy,[4] the statutory and regulatory scheme requires Commerce to undertake additional areas of inquiry. Two such inquiries relevant here are whether an exporter is subject to a general rate applicable to the country and determining what the "normal" price for the product in question would be if the country had a market economy.

### 1. "Separate rate" versus "country-wide rate" in non-market economies

In general, when Commerce makes an affirmative determination that dumped goods are coming from a non-market economy country, Commerce applies a rebuttable presumption that every exporter or producer

---

[4] A "non-market economy" is defined as "any foreign country that [Commerce] determines does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise." 19 U.S.C. § 1677(18)(A).

within that country is government-controlled and is therefore subject to a single country-wide dumping margin. *See* 19 C.F.R. § 351.107(d); *see also Changzhou Hawd Flooring Co. v. United States*, 947 F.3d 781, 792 (Fed. Cir. 2020).

Because the presumption is rebuttable, a company may ask Commerce to apply a separate rate if the company demonstrates "sufficient independence from state control." *Changzhou Wujin Fine Chem. Factory Co. v. United States*, 701 F.3d 1367, 1370 (Fed. Cir. 2012). A successful separate rate applicant thus escapes the country-wide antidumping rate.

The company seeking the separate rate must "affirmatively demonstrate" its independence. *Sigma Corp. v. United States*, 117 F.3d 1401, 1405 (Fed. Cir. 1997). To that end, Commerce requires exporters or producers who wish to receive a separate rate to submit a "separate rate application" "and to demonstrate an absence of both *de jure* and *de facto* government control over their export activities." ECF 28, at 621.[5]

As Commerce explained in its final decision here, if the Department determines that a company from a nonmarket economy is independent from government control, the Department will assign an antidumping rate based on its investigation of the company rather than apply the country-wide rate. *See* ECF 17-5, at 4. If Commerce does not investigate a company that is

---

[5] In this opinion, pagination references in citations to the Court record are to the pagination found in the ECF header at the top of each page.

otherwise eligible for a separate rate, then the Department will generally assign an antidumping rate based on the average rate of companies so investigated. *Id*.[6]

## 2. Valuing "factors of production" in investigations involving non-market economies

As noted above, the antidumping statute requires that Commerce determine the subject merchandise's "normal value" and then compare that value to the export price or constructed export price. 19 U.S.C. § 1677b(a). When goods subject to antidumping investigation are produced in a country with a non-market economy, the statute requires Commerce to assume that home-market sales are not reliable indicators of normal value because the economy is presumed to be under state control. *Taian Ziyang Food Co. v. United States*, 637 F. Supp. 2d 1093, 1105 (CIT 2009).

For merchandise imported from a country deemed to have a non-market economy, the statute requires Commerce to

_____

[6] Essentially, the "separate rate" applied to eligible producers and exporters from non-market economy countries is analogous to the "all-others rate" applied to non-investigated companies from market economy countries. *See Changzhou Hawd Flooring Co. v. United States*, 848 F.3d 1006, 1011 (Fed. Cir. 2017) (noting that Commerce applies the statutory mechanism for determining the "all-others rate" of noninvestigated entities from market economy countries to determine the "separate rate" for eligible entities from non-market economy countries); *see also above* note 3.

determine the normal value of the subject merchandise on the basis of the value of the factors of production utilized in producing the merchandise and to which shall be added an amount for general expenses and profit plus the cost of containers, coverings, and other expenses. . . . [T]he valuation of the factors of production shall be based on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by [Commerce].

19 U.S.C. § 1677b(c)(1).

"Factors of production" is a term of art for the different things that go into manufacturing a product, such as raw materials, electricity, and labor. All these things cost money, so theoretically the product's price should reflect these costs. The statute requires Commerce to determine what the producer would have spent to prepare the subject merchandise if the country of origin had a market economy rather than a non-market economy. *See Lasko Metal Prods., Inc. v. United States*, 810 F. Supp. 314, 316–17 (CIT 1992) ("With respect to [non-market economy] goods, the statute's goal is to determine what the cost of producing such goods would be in a market economy."), *aff'd*, 43 F.3d 1442 (Fed. Cir. 1994); *see also Baoding Yude Chem. Indus. Co. v. United States*, 170 F. Supp. 2d 1335, 1345 (CIT 2001) (explaining that the task is not to construct the cost of producing the subject merchandise in a particular market economy, but rather to use data from comparable market-economy countries to construct what the cost of production would have been

in the actual country of origin if it were a market economy country).

The statute requires that, in making the valuation described above, Commerce "shall utilize, to the extent possible, the prices or costs of factors of production in one or more market economy countries that are— (A) at a level of economic development comparable to that of the nonmarket economy country, and (B) significant producers of comparable merchandise." 19 U.S.C. § 1677b(c)(4).

The market economy country, or countries, from which Commerce uses data to value the factors of production is known as the "surrogate country." Commerce's administrative regulations provide further guidance as to how Commerce selects the "surrogate country" for such valuations. "In determining whether a country is at a level of economic development comparable to the nonmarket economy . . . , the Secretary will place primary emphasis on *per capita* GDP as the measure of economic comparability." 19 C.F.R. § 351.408(b). In addition, "the Secretary normally will value all factors in a single surrogate country." *Id.* § 351.408(c)(2).[7] Based on that preference for a single

---

[7] This provision contains an exception for labor, which it states is to be valued according to 19 C.F.R. § 351.408(c)(3). However, despite its continued inclusion in the Code of Federal Regulations, § 351.408(c)(3) was invalidated in 2010, *Dorbest Ltd. v. United States*, 604 F.3d 1363, 1372 (Fed. Cir. 2010), and no party has argued that Commerce should have applied it in this case. Instead, since 2011, Commerce typically values non-market economy respondents' labor rates "using industry-specific labor costs

surrogate country, when available data come from several countries that are both at a level of economic development comparable to the nonmarket economy country and significant producers of comparable merchandise, Commerce examines all those countries' data to determine which set it deems best and then selects that country as the primary surrogate country. *Jiaxing Bro. Fastener Co. v. United States*, 822 F.3d 1289, 1294 (Fed. Cir. 2016).

## Factual and Procedural Background

### A. Commerce's investigation and assessment of duties

This case stems from an antidumping investigation that Commerce undertook at the request of New American Keg, which does business under the name American Keg Company and is the plaintiff in this case. American Keg describes itself as the sole U.S. producer of refillable stainless steel kegs and claims that by 2018, it faced imminent closure due to foreign competition. ECF 21, at 12. American Keg contends that unfairly traded imports were a major cause of its struggles and, accordingly, in 2018 the company filed antidumping duty petitions against kegs from China, Germany, and Mexico. *Id*. This case involves the kegs imported from China.

---

prevailing in the primary surrogate country." *Antidumping Methodologies in Proceedings Involving Non-Market Economies: Valuing the Factor of Production: Labor*, 76 Fed. Reg. 36,092, 36,094 (Dep't Commerce June 21, 2011).

In response to American Keg's petitions, Commerce commenced an antidumping investigation covering the period from January 1, 2018, through June 30, 2018. *Refillable Stainless Steel Kegs from the People's Republic of China, the Federal Republic of Germany, and Mexico: Initiation of Less-Than-Fair-Value Investigations*, 83 Fed. Reg. 52,195 (Dep't Commerce Oct. 16, 2018).

Commerce selected Ningbo Master International Trade Co., Ltd. ("Ningbo Master"), as one of two mandatory respondents. *Id.* at 50–54.[8] Ningbo Master filed its own separate rate application,[9] as did (as relevant here) two other Chinese keg exporters—Guangzhou Jingye Machinery Co., Ltd. ("Jingye"), and Guangzhou Ulix Industrial & Trading Co, Ltd. ("Ulix"). *Id.* at 612, 621–24.

Commerce preliminarily determined that Chinese kegs were being, or were likely to be, dumped in the United States. *Refillable Stainless Steel Kegs from the People's Republic of China: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Affirmative Determination of Critical Circumstances, in Part, Postponement of Final Determination, and Extension of Provisional Measures*, 84 Fed.

---

[8] The other entity selected as a mandatory respondent declined to participate in Commerce's investigation, thus leaving Ningbo Master as the sole mandatory respondent.

[9] Ningbo Master filed its own separate rate application because even though it was a mandatory respondent, it was subject to the China-wide rate unless it demonstrated its independence from the Chinese government.

**Court No. 20-00008**                                    **Page 14**

Reg. 25,745, 25,745–46 (Dep't Commerce June 4,
2019). In so doing, Commerce preliminarily set a hefty
China-wide rate of 79.71 percent. *Id.*

Commerce also preliminarily found that Ningbo
Master, Jingye, and Ulix were entitled to separate rate
status, thus sparing them from the hefty China-wide
rate. ECF 28, at 622–24. Based on its investigation of
Ningbo Master, Commerce preliminarily set its rate at
2.01 percent. *Id.* at 624. And because Ningbo Master
was the only mandatory respondent that cooperated
with the investigation, Commerce preliminarily set
separate rates for Jingye and Ulix (which were not in-
vestigated) using Ningbo Master's 2.01 percent rate.
*Id.*

Subsequently, Commerce conducted verification in
China, where Ningbo Master presented information it
characterized as "minor corrections" to its prior sub-
missions. ECF 21, at 15; ECF 23, at 13–14. Commerce
accepted that information, but as discussed below, the
parties disagree over whether Commerce properly ver-
ified it.

Following verification, Commerce confirmed its
preliminary decision that steel kegs imported from
China were being, or were likely to be, sold in the
United States at less than fair value. *Refillable Stain-
less Steel Kegs from the People's Republic of China: Is-
sues and Decision Memorandum for the Final Affirm-
ative Determination of Sales at Less Than Fair Value*

(Oct. 17, 2019), ECF 17-5, at 1.[10] This final decision set the China-wide antidumping rate at 77.13 percent. ECF 17-5, at 4. The validity of this China-wide rate is not challenged here.

Commerce's final decision also reaffirmed its preliminary decision that Ningbo Master, Jingye, and Ulix were entitled to separate rate status. *Id*. at 3. But in a change from its preliminary decision, Commerce also reduced Ningbo Master's rate to zero. *Id*. at 4. The latter determination had the ripple effect of reducing the rate for the successful separate rate applicants Jingye and Ulix to zero as well. *Id*.

In the meantime, the ITC concurrently found "that the establishment of an industry in the United States is materially retarded . . . by reason of imports of refillable stainless steel kegs from . . . China." *Refillable Stainless Steel Kegs from the Federal Republic of Germany and the People's Republic of China: Antidumping Duty Orders*, 84 Fed. Reg. 68,405, 68,405–06 (Dep't Commerce Dec. 16, 2019). Commerce accordingly imposed antidumping duties consistent with the values set forth in the October 2019 final decision. *Id*. at 68,407; *see also* 84 Fed. Reg. at 57,011.

---

[10] The results of this final decision were published in the Federal Register. *See Refillable Stainless Steel Kegs from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part*, 84 Fed. Reg. 57,010, 57,010 (Dep't Commerce Oct. 24, 2019).

## B. This litigation

American Keg's complaint alleges that it is a domestic manufacturer and producer of "a domestic like product" to that which was the subject of Commerce's final decision, ECF 8, at 2, and asserts seven counts for relief under 19 U.S.C. § 1516a(a)(2)(B)(i) challenging certain aspects of that decision.[11] American Keg asks the Court to "[h]old that the portions of Commerce's Final Determination described herein are not supported by substantial evidence on the record and are otherwise not in accordance with law," ECF 8, at 14, and to remand the matter to Commerce for further proceedings, *id.*

---

[11] Count I alleges that Commerce's decision to rely on Malaysian data as surrogate values for labor costs in calculating Ningbo Master's rate was not supported by substantial evidence or otherwise not in accordance with law due to data reflecting forced labor in Malaysia. ECF 8, at 9 ¶ 37. Count II alleges that Commerce should not have accepted nor relied on Ningbo Master's "minor corrections" submitted at verification because they resulted in a *de minimis* dumping margin. *Id.* at 10 ¶¶ 39–40. Counts III and IV are not relevant here as American Keg has opted to drop them. *See* ECF 31, at 2 ("Plaintiff has chosen not to pursue or seek judgment with respect to Counts III and IV . . . ."). Count V contends that Commerce's decision to grant separate rate status to Jingye was incorrect because Jingye failed to rebut the presumption of government control. ECF 8, at 12 ¶¶ 48–49. Count VI makes a similar allegation as to Ulix. *Id.* at 12 ¶¶ 51–52. Finally, Count VII asserts that to the extent Commerce erred in calculating Ningbo Master's rate as alleged in Counts I and II, Commerce also erred in applying that rate to Jingye and Ulix insofar as they are eligible for separate rate status. *Id.* at 13 ¶ 54.

Ningbo Master and Jingye intervened as a matter of right to defend Commerce's decision. ECF 16. American Keg thereafter filed the pending Rule 56.2 motion for judgment on the agency record. ECF 21; *see also* USCIT R. 56.2. The government (ECF 23) and the intervenors (ECF 25) oppose. As no party has requested oral argument, the Court decides the motion on the papers.

## Jurisdiction and Standard of Review

The Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1581(c).

In actions such as this brought under 19 U.S.C. § 1516a(a)(2), "[t]he court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). That is, the question is not whether the Court would have reached the same decision on the same record—rather, it is whether the administrative record as a whole permits Commerce's conclusion.

> Substantial evidence has been defined as more than a mere scintilla, as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. To determine if substantial evidence exists, we review the record as a whole, including evidence that supports as well as evidence that fairly detracts from the substantiality of the evidence.

*Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003) (cleaned up).

Questions involving the verification procedures Commerce employs are reviewed for an abuse of discretion. *Micron Tech., Inc. v. United States*, 117 F.3d 1386, 1396 (Fed. Cir. 1997).

## Discussion

American Keg's motion for judgment on the agency record in effect presents three principal issues: (1) whether substantial evidence supports Commerce's use of Malaysian labor data as a surrogate for Ningbo Master's labor costs in the face of record evidence of forced labor in Malaysia; (2) whether substantial evidence supports Commerce's verification of Ningbo Master's corrections; and (3) whether substantial evidence supports Commerce's grant of separate rate status to Jingye and Ulix. The Court addresses these issues in turn.

## I. Labor surrogate value[12]

In view of China's status as a non-market economy country,[13] the statute required Commerce to assess the "factors of production" used in producing kegs to

---

[12] This discussion corresponds to Commerce's findings in ECF 17-5, at 7–12.

[13] Commerce previously deemed China as a non-market economy country and reaffirmed that position in 2017. *See* ECF 28, at 616 (citing *Antidumping Duty Investigation of Certain Aluminum Foil from the People's Republic of China: Affirmative Preliminary Determination of Sales at Less-Than-Fair Value and Postponement of Final Determination*, 82 Fed. Reg. 50,858, 50,861 (Dep't Commerce Nov. 2, 2017)).

determine their "normal value," and further required that the Department base that valuation "on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by [Commerce]." 19 U.S.C. § 1677b(c)(1). As one of the factors of production is labor costs, Commerce had to determine which country with a market economy could function as a surrogate for determining Ningbo Master's labor costs in China.

### A. Commerce's findings

In this case, consistent with the statutory requirements, Commerce identified Brazil, Kazakhstan, Malaysia, Mexico, Romania, and Russia "as countries that are at the same level of economic development as China" and sought comments from interested parties. ECF 28, at 617. Both American Keg and Ningbo Master recommended Malaysia as the primary surrogate country for this investigation. *Id.*

Nevertheless, American Keg objected to using Malaysia as the *sole* surrogate country, arguing that Malaysian labor data are "unreliable and aberrational" because they reflect "child and forced labor practices." *Id.* at 620. American Keg instead argued that Commerce should have relied on labor data from Brazil. ECF 17-5, at 7. In its final decision, Commerce rejected American Keg's position and found "that there is insufficient evidence on the record to find that the Malaysia labor rate is aberrational or unreliable such that we should reject it in favor of other labor rate information on the record." *Id.* at 9.

Commerce explained that the Department considers the "quality, specificity, and contemporaneity of the [surrogate value] data" and "prefer[s] to value all [factors of production] based on data from the primary surrogate country." *Id*. Commerce stated that the record reflected labor surrogate values from three countries—Malaysia, Mexico, and Brazil. The Mexican value was specific to "[m]anufacture of thick gauge metal tanks," but Commerce rejected it for this case because it was from two years prior to the relevant period of review and came from a source Commerce had previously deemed problematic. *Id*. at 9–10. It appears no party objects to that decision. That left the Malaysian and Brazilian labor data for consideration.

Commerce found that both the Malaysian and Brazilian labor data related generically to "manufacturing" and further found that the Malaysian data were contemporaneous with the period of investigation while the Brazilian data—like the Mexican data—were from two years earlier. *Id*. at 9. "Thus, the only reason we might select the Brazil [surrogate value] over the Malaysia [surrogate value] is if record evidence demonstrates that the Malaysia [surrogate value] is aberrational, distorted, or unreliable." *Id*. at 10.

American Keg argued that the evidence demonstrated that the Malaysian data were aberrational, contending that evidence of forced labor within the Malaysian industry's electrical and electronics sector should be extrapolated to Malaysian manufacturing as a whole. *Id*. Commerce, in response, found that "the record is not clear regarding the extent to which forced

labor is a factor in Malaysia's manufacturing sector."
*Id.*

Commerce ultimately decided to use the Malaysian labor data to value factors of production "because it is from the primary surrogate country, is contemporaneous with the [period of investigation], and the record does not indicate that the Brazil [surrogate value] is the best information available when compared to the Malaysia [surrogate value] due to the presence of forced labor in one subsector of Malaysia's manufacturing sector." *Id.* at 12.

## B. Analysis

American Keg cites four reports it characterizes as demonstrating that "forced labor is widespread throughout Malaysia's [electrical and electronics] sector and distorts sector wages" and that "the [electrical and electronics] sector comprises such a significant portion of Malaysia's overall manufacturing sector that these labor abuses render the wage rate for overall manufacturing aberrational and unreliable." ECF 21, at 26. American Keg further argues that Commerce "did not seriously engage" with this evidence, and that the Court must remand to require the agency to do so. *Id.* at 27.

The Court considers in turn each of the three bases upon which Commerce rejected American Keg's argument that the Malaysian labor data are unreliable. *First*, Commerce found that the administrative record did not "demonstrate how pervasive forced labor may be" in Malaysia's electrical and electronics industry.

ECF 17-5, at 11. *Second*, it appears that Commerce
doubted whether the record supported American Keg's
contention that Malaysia's electrical and electronics
industry "accounts for a significant part of Malaysia's
manufacturing sector." *Id*. at 11. *Finally*, in what
amounts to an alternative ground, Commerce con-
cluded that even if forced labor is as pervasive in the
Malaysian electrical and electronics industry as Amer-
ican Keg contends, and even if the workforce in that
industry comprises one-third of Malaysia's total man-
ufacturing workforce as American Keg also contends,
it would simply indicate that forced labor implicates
less than ten percent of the Malaysian manufacturing
work, and that such a figure would not render the Ma-
laysian surrogate value unreliable. *Id.*

1. **What does the record demonstrate re-
garding the extent of forced labor in
Malaysia's electrical and electronics
industry?**

American Keg's evidence of forced labor in the Ma-
laysian electrical and electronics industry consisted of
a report by a private entity, Verité, as well as three
governmental reports. Commerce first addressed the
Verité report, *see* ECF 17-5, at 10–11, and then ad-
dressed the three governmental reports as a group, *id*.
at 11.

a. **The Verité report**

Verité describes itself as "a global [non-governmen-
tal organization] with a mission to ensure that people
around the world work under safe, fair, and legal

conditions." ECF 28, at 243. In 2014, it issued a highly-detailed 245-page report funded by the U.S. Labor Department entitled "Forced Labor in the Production of Electronic Goods in Malaysia: A Comprehensive Study of Scope and Characteristics." *See id*. at 242–44.[14]

For this report, Verité's researchers conducted a combination of desk and field research, including interviewing 501 electronics workers. *Id*. at 250. In interpreting the data collected, Verité followed the International Labor Organization's survey guidelines to estimate forced labor. *Id*. In applying those guidelines, Verité stated that it "erred consistently on the side of caution, choosing to define forced labor narrowly to ensure that the positive findings were always based on solid, unambiguous evidence." *Id*. Verité further explained its methodology and external constraints on its research as follows:

- Verité used "purposive targeted sampling to achieve a nonprobability sample that reflected the population of electronics workers as

---

[14] Verité used the International Labor Organization definition of forced labor:

> [W]ork for which a person has not offered himself or herself voluntarily . . . and which is performed under the menace of any penalty . . . applied by an employer or third party to the worker. The coercion may take place during the worker's recruitment process to force him or her to accept the job, or, once the person is working, to force him/her to do tasks which were not part of what was agreed at recruitment or to prevent him/her from leaving the job.

ECF 28, at 317.

**Court No. 20-00008** **Page 24**

accurately as possible" and it "is confident in the robustness of the data presented, but including more participants would no doubt have made the research even stronger." *Id.* at 314.

- Verité's researchers were hampered by a "climate of pervasive surveillance" that discouraged workers from speaking with Verité researchers, and the Verité team members themselves "were frequently subject to the same modes of surveillance and threats of detention and deportation as the workers they sought to interview." *Id.* at 313.

- "Because it is likely that workers with the greatest vulnerability to exploitation and/or forced labor were also likely to have been especially cautious about participating in the research, Verité's positive findings of forced labor and forced labor indicators among those participants are probably low estimates." *Id.* at 314.

The report further stated that due to this cautious methodology and the surveillance and threats that obstructed researchers' work, "the positive findings of forced labor reported below are likely lower than the actual rates of forced labor in the Malaysian electronics industry and should be viewed as a minimum estimate." *Id.*

The report's principal findings included the following:

- "Forced labor is present in the Malaysian electronics industry" and can be characterized "as widespread." *Id.* at 251.

- "[F]orced labor in the sector is strongly associated with the plight of foreign workers." *Id.* at 421.

- Twenty-eight percent of *all* workers—a "minimum estimate" based on conservative criteria— in the study sample were found to be in situations of forced labor. *Id.* at 251.

- "Forced labor is linked to recruitment fee charging and the indebtedness that follows." *Id.* Such fees were "often excessive" and "pervasive" in the context of foreign workers. *Id.*

- "Recruitment-related debt compelled workers to work." *Id.* at 252.

- "Forced labor is also linked to deceptive recruitment." Twenty-two percent of foreign workers were misled about the terms and conditions of their employment, and these workers "had little ability to change or refuse their jobs upon arrival." *Id.*

- Passport retention "was widely experienced" by foreign workers and constrained "their freedom of movement." *Id.*

- When the study's definition of passport retention was broadened beyond the narrow International Labor Organization definition, "the aggregate forced labor finding rose appreciably: Fifty-eight percent of all respondents, or 66% of all foreign workers, were found to be in forced labor." *Id.* at 255.

- It was difficult for foreign workers to leave before the end of their work contracts. *Id.* at 253.

- "Vulnerability to forced labor is a prominent feature of the Malaysian electronics workforce," with 73% of workers in the study exhibiting "forced labor characteristics of some kind, a finding which suggests that the risk of forced labor in the industry is extremely high." *Id.* at 254.

- The study found "conclusive evidence of forced labor in the sample" that "lend[s] a sense of pervasiveness" to the "previous, largely qualitative research on the subject." *Id.* at 256.

- The "indicators of forced labor" reflect "systemic, structural factors shaping the lives of foreign workers in the country." *Id.*

- Verité's "core research findings broadly corroborate the troubling patterns" of forced labor in Malaysia identified in four prior studies by other international and human rights organizations, two of which did not focus on the electronic industry. *Id.* at 320.

Commerce responded to the Verité study with the following three sentences:

> While the Verité Report states that its study "suggests that forced labor is present in the Malaysian electronics industry and can be characterized as widespread," the Verité Report indicates that it is based on a sample of 501 workers in Malaysia's E&E industry, and that 28 percent of the workers in its study were found to be in

situations of forced labor and an additional 46 percent of the workers in its study were deemed to be "on the threshold" of forced labor. *We cannot conclude that data developed from the sample are applicable across the E&E sector in a manner that indicates that a similar proportion of workers in Malaysia's E&E industry as a whole were in situations of forced labor as were identified in the study. Neither would it be appropriate to conclude that the findings of this report apply more broadly across the manufacturing sector.*

ECF 17-5, at 10–11 (emphasis added).

American Keg argues that Commerce's rejection of the Verité report based on the report's sample size was not based on any actual analysis. "At no time did Commerce acknowledge or contend with the report's detailed review of its research methodology or sampling approach." ECF 21, at 27. Nor did Commerce "offer any reasoned rebuttal" to Verité's statement that its findings of forced labor "are probably low estimates." *Id.* at 28 (quoting ECF 28, at 314).

In response, the government contends that there was no reason for Commerce to "employ statistical analyses of" the Verité report when the report itself states that because "the research employed nonprobability sampling, . . . the data are not representative in a statistical sense." ECF 23, at 25 (quoting ECF 28, at 314 (government's alterations omitted)).

The government's post-hoc hypothesis does not excuse Commerce's summary dismissal of the Verité report based on its sample size. One can only guess *why* Commerce deemed the Verité sample size inadequate, and for that reason the Court must remand so the agency can explain its reasoning. *Cf. Nat'l Ass'n of Clean Water Agencies v. EPA*, 734 F.3d 1115, 1154 (D.C. Cir. 2013) ("Although [the] EPA does not need to fill the Federal Register with treatises on statistics, it must specify in greater detail *why* the equation it is using can accomplish the purpose for which [the] EPA is using the equation. This is not only required as part of [the] EPA's obligation to demonstrate the reasonableness of its estimates with substantial evidence, but also to prevent an agency from using opaque statistical justification to cover a deficiency in its dataset.").

On remand, Commerce must explain why the Verité sample size is inadequate, and in so doing it must address the material in the Verité report that fairly detracts from the Department's conclusion that the report's sample size is inadequate for purposes of determining whether "there is a reason to doubt" the Malaysian data. *Camau Frozen Seafood Processing Imp. Exp. Corp. v. United States*, 929 F. Supp. 2d 1352, 1356 (CIT 2013).

### b. The governmental reports

American Keg also points to three governmental reports in the record addressing forced labor in Malaysia.

Court No. 20-00008                                    Page 29

### i. *The Labor Department report*

In 2019, the Labor Department issued a report en-
titled "2018 List of Goods Produced by Child Labor or
Forced Labor." ECF 28, at 201.[15] This report identified
forced labor as present in the Malaysian electronics
and garment industries. ECF 28, at 217. Of additional
relevance here—given that American Keg contends
that Commerce should use labor data from Brazil ra-
ther than Malaysia—is the report's comparison of how
certain foreign workers make their way to Malaysia
and Brazil.

> In the case[] of the Nepal to Malaysia . . . corri-
> dor, where recruitment agencies are often used,
> the report found there was widespread non-com-
> pliance by licensed recruiters with legal and pol-
> icy frameworks; few penalties applied by author-
> ities; systemic illegal recruitment; and the abil-
> ity to legally charge recruitment fees. In the Par-
> aguay to Brazil corridor, the study found that in-
> formal networks of friends and family played a
> large role in helping workers find jobs and in or-
> ganizing travel and accommodation. Addition-
> ally, . . . travel between the two countries is in-
> expensive, and easy to arrange.

------

[15] The Labor Department issued this report pursuant to the
Trafficking Victims Protection Act, which requires the De-
partment to "develop and make available to the public a
list of goods from countries that the Bureau of Interna-
tional Labor Affairs has reason to believe are produced by
forced labor or child labor in violation of international
standards." 22 U.S.C. § 7112(b)(2)(C).

*Id.* at 222.

### ii. The State Department Report

In 2018, the State Department issued a study entitled "Trafficking in Persons Report." *See generally* ECF 28, at 228–39. This report indicates that

> [a]s reported over the past five years, Malaysia is a destination . . . for men, women, and children subjected to forced labor . . . . *The overwhelming majority of victims are among the estimated two million documented and an even greater number of undocumented migrant laborers in Malaysia. Foreign workers constitute more than 20 percent of the Malaysian workforce* and typically migrate voluntarily—often illegally—from Bangladesh, India, Nepal, Burma, Indonesia, the Philippines, and other Asian countries. Employers, employment agents, and informal labor recruiters subject some migrants to forced labor or debt bondage when they are unable to pay the fees for recruitment and associated travel. Outsourcing or contract labor companies may not have oversight of personnel issues or day-to-day working conditions, leading to heightened vulnerabilities to exploitative labor conditions and a reduced ability to resolve disputes for foreign workers. Agents in labor source countries may impose onerous fees on workers before they arrive in Malaysia, and additional administrative fees after arrival in some cases cause debt bondage. Large organized crime syndicates are responsible for some instances of trafficking.

*Id.* at 238 (emphasis added). The report also states that some foreign workers in the Malaysian electronics industry—among other industries—are "subjected to practices that indicate forced labor." *Id.*

### iii.   The Central Bank of Malaysia report

In 2018, the Central Bank of Malaysia issued a report entitled "Low Skilled Foreign Workers' Distortions to the Economy." *See* ECF 28, at 498–598. The report stated that foreign workers comprise more than 20 percent of Malaysia's workforce in manufacturing, agriculture, and construction sectors. *Id.* at 500. This "unchecked reliance on foreign workers . . . depresses overall pay." *Id.* at 498; *see also id.* at 500 ("Critically, the readily available pool of cheaper low-skilled foreign workers *distorts domestic* [labor] prices.") (emphasis added); *id.* at 501 ("Employment of cheaper foreign workers vis-à-vis locals allows employers to keep wages low . . . ."). The report concluded that "Malaysia would benefit from a clear shift away from an economy that is . . . *dependent upon cost suppression* as a source of competitive strength . . . ." *Id.* at 499 (emphasis added).

* * *

Commerce dismissed the relevance of these three reports, reasoning that they "do not address or demonstrate how pervasive forced labor may be in Malaysia's [electrical and electronics] industry." ECF 17-5, at 11. According to Commerce, neither these reports nor any other evidence in the administrative record indicates

"the extent to which forced labor occurs in Malaysia's [electrical] industry." *Id.*

American Keg argues that while these three governmental reports do not provide a quantitative analysis, they do document practices in the Malaysian electrical and electronics sector that depress wage rates. ECF 21, at 28. The government has no response other than to repeat Commerce's finding. ECF 23, at 24. Nor do Defendant-Intervenors have any response.

In reply, American Keg argues, and the Court agrees, that Commerce's perfunctory rejection of these three governmental reports does not withstand scrutiny. *See* ECF 26, at 7. These reports corroborate the Verité report's conclusion that "forced labor distorts both [electrical and electronics] wages and those for the broader manufacturing sector," *id.*, and fairly detract from Commerce's conclusion. On remand, Commerce must materially address the substance of these reports in conjunction with its reconsideration of the Verité report.

## 2. What does the record demonstrate regarding the extent to which the Malaysian manufacturing workforce is comprised of electrical and electronics industry workers?

Evidence from the Malaysian Department of Statistics in the administrative record states that employment in the country's electrical and electronics industry totaled 322,308 persons in 2016, ECF 28, at 527, and that employment in all manufacturing in 2016

totaled 1,032,897. *Id*. at 182. Basic arithmetic indicates that employment in Malaysia's electrical and electronics industry therefore must have comprised over 31 percent of the total Malaysian manufacturing labor force.

Commerce rejected this number on the basis that "the figures [American Keg] cites in its case brief come from two different sources which are not necessarily comparable." ECF 17-5, at 11. The government recharacterizes this as a rejection based on data sets for different years, *see* ECF 23, at 26, but that response errs at two levels. First, the relevant data sets were from the same year—2016. Second, the government mischaracterizes Commerce's rationale, which was based on the finding of "two different sources." *Id*. That rationale is not supported by substantial evidence, as American Keg's data came from a single source—the Malaysian Department of Statistics. On remand, Commerce must address this evidence in the record that employment in Malaysia's electrical and electronics industry comprised over 31 percent of the total Malaysian manufacturing labor force.

### 3. Does evidence of forced labor in 8.7 percent of the Malaysian manufacturing workforce render Malaysian wage data distorted?

Commerce finally decided that even if it assumed that (1) employment in Malaysia's electrical and electronics industry comprised over 31 percent of the total Malaysian manufacturing labor force, and (2) the proportion of workers affected by forced labor conditions

as reported by the Verité report were correct, "it would
indicate that less than one-tenth [8.7 percent] of the
workers in Malaysia's overall manufacturing sector
[are] implicated by forced labor." ECF 17-5, at 11.
Commerce concluded that in view of this number, "we
find that the record does not demonstrate that the
forced labor in Malaysia's [electrical and electronics
industry]" rendered the Malaysian labor data "aberra-
tional or distortive, such that it cannot be considered
the best information available *given the other infor-
mation on the record.*" *Id.* (emphasis added).

American Keg argues, and the Court agrees, that
Commerce did not actually analyze whether the Ma-
laysian data under this forced labor cloud constituted
the best available information on the record. Com-
merce instead relied on the facts that Malaysian data
were from the primary surrogate country and contem-
poraneous with the period of investigation. *Id.* at 13.
The preferences for a single surrogate country and
contemporaneity are acceptable tiebreakers, provided
Commerce undertakes a fair comparison of the com-
peting datasets. *See, e.g., Peer Bearing Company-
Changshan v. United States*, 804 F. Supp. 2d 1337,
1353 (CIT 2011) ("[T]he preference for use of data from
a single surrogate country could support a choice of
data as the best available information where the other
available data 'upon a fair comparison, are otherwise
seen to be fairly equal . . . .' "). In other words, it is not
enough for Commerce to say "the alternate data are
insufficient because they are from a different surro-
gate country" or "are from two years earlier"—rather,
when "there is reason to doubt the primary surrogate
country value, Commerce must address the conflicting

evidence on the record that may counsel against" Commerce's preference for a single surrogate country. *Camau Frozen Seafood*, 929 F. Supp. 2d at 1356. "Not addressing the conflicting evidence on the record . . . fails the substantial evidence test because it does not [consider] record evidence contrary to Commerce's determination." *Id.*

\* \* \*

The record here indicates that forced labor occurs to some degree among foreign workers in the Malaysia manufacturing workforce, and that Malaysia's heavy reliance on foreign workers depresses local wages to some extent. As a result, there is a non-frivolous question about whether, and, if so, to what extent, Malaysia's wage data that Commerce used to calculate Ningbo Master's rate are distorted or unreliable. Commerce has not explained—apart from its talismanic invocation of its single-country surrogate and contemporaneity preferences—why the Malaysian data under this forced labor cloud are preferable to the Brazilian dataset.

On remand, Commerce must do so. Insofar as Commerce opts on remand to use the Brazilian data rather than Malaysian data, it must reconsider Ningbo Master's dumping margin accordingly.[16]

---

[16] Due to the Court's resolution of the separate rate issue discussed below, any adjustments by Commerce to Ningbo Master's rate would also necessarily carry over to the rate for Jingye and, insofar as it remains a successful separate rate applicant after proceedings on remand, Ulix.

## II. Verification of Ningbo Master's corrections[17]

During verification, Ningbo Master submitted additional information that it and the government characterize as "minor corrections." *See* ECF 17-5, at 15–16 (government); ECF 25, at 14–20 (Ningbo Master). American Keg disputes that characterization and argues that Commerce "failed to verify" this new information that "was dispositive to the investigation." ECF 21, at 31.

According to American Keg, this issue matters because Commerce preliminarily assigned Ningbo Master a 2.01 percent dumping margin. ECF 17-5, at 15. By statute, any dumping margin of less than two percent is deemed *de minimis* and is to be disregarded. *See* 19 U.S.C. §§ 1673b(b)(3) (preliminary decisions), 1673d(a)(4) (final decisions). Thus, even a small change in Ningbo Master's dumping margin resulting from "corrections" supplied during verification might result in the company receiving a lower margin that would fall within the *de minimis* threshold—and, indeed, that is exactly what happened, because Ningbo Master received a zero percent final dumping margin following verification. *See* 84 Fed. Reg. at 57,011.

Furthermore, because Ningbo Master was the only separate rate respondent in this investigation to undergo individual examination, the rate assigned to Ningbo Master had a domino effect as to Jingye and

---

[17] This discussion corresponds to Commerce's findings in ECF 17-5, at 15–16.

Ulix because Commerce determined them to be eligible for separate rates. *See* ECF 17-5, at 4; 84 Fed. Reg. at 57,011.

## A. The verification record

Commerce's verification memorandum described various corrections that Ningbo Master submitted. *See* ECF 28, at 667. Most of these were non-substantive on their face, but American Keg zeroes in on a correction to material inputs affecting the factors of production, i.e., Ningbo Master's costs: "Ningbo Master found that it mistakenly included consumption amounts for July 2018, which is outside the [period of investigation], for several inputs: drawing oil, cleaning agent[,] and oil removal agent." *Id.* In short, with this correction, Ningbo Master was able to adjust its costs, which in turn could (and did) directly result in a lower dumping margin.[18]

Commerce's verification memorandum stated that Ningbo Master provided supporting documentation for its corrections and that Commerce "verified the corrections during the course of conducting the verification procedures." *Id.* at 667. Notably, the memorandum does not indicate *how* Commerce verified any of the corrections.

---

[18] After Ningbo Master submitted its corrections, Commerce asked the company to submit "a revised . . . factors-of-production database incorporating the changes," ECF 28, at 668, which confirms the significance of the correction to the company's costs.

Commerce's final decision states—in the passive voice, the last refuge for evading accountability—that Ningbo Master's corrections "were *subject to* verification," ECF 17-5, at 16 (emphasis added), but then states that "[a]t verification, [Commerce] *chose other inputs to examine* and we found no discrepancies." ECF 17-5, at 16 (emphasis added). Indeed, the verification memorandum confirms that Commerce chose to examine other material inputs during verification—not the corrected material inputs of drawing oil, cleaning agent, and oil removal agent that American Keg identifies as dispositive. *See* ECF 28, at 671–74 (identifying in granular detail the specific "material inputs" verified and manner of verification).

## B. Analysis

American Keg argues that "Commerce failed to verify those changes in any way" and contends that "Commerce neglected to verify or confirm that the claimed consumption adjustments were accurate." ECF 21, at 32 (citing ECF 28, at 647; ECF 28, at 671–74). American Keg further argues that in view of Commerce's statutory obligation to "verify all information relied upon," 19 U.S.C. § 1677m(i), the Department was required to verify the corrections insofar as they were dispositive. Here, neither the government nor Ningbo Master disputes that the corrections to the material inputs of the factors of production were dispositive in allowing Ningbo Master to clear the *de minimis* threshold.

Consistent with the Court's understanding of the record, the government all but admits that Commerce

didn't verify Ningbo Master's corrections because (in the government's view) there was no requirement to do so. *See* ECF 22, at 22 (arguing that "Commerce verified the record that it determined was appropriate and found no discrepancies. No more was required."). According to the government, because Ningbo Master's corrections "*were subject to* Commerce's verification"—meaning, in theory they could have been verified had Commerce opted to do so—the Department satisfied its verification obligations. *Id.* (emphasis added).

Ningbo Master, on the other hand, argues that "the verifiers did closely verify the minor corrections as presented on site," ECF 25, at 14, but cites nothing in the record demonstrating that proposition beyond the verification memorandum's statement that Commerce verified the corrections, *id.* at 14–15 (citing ECF 28, at 667). As discussed above, that statement is belied by both Commerce's final decision—which indicates that the Department chose to verify "*other* inputs"—and the report's granular description of Commerce's verification of inputs that did not include the corrected inputs of drawing oil, cleaning agent, and oil removal agent. *See* ECF 28, at 671–74.

The government and Ningbo Master correctly argue that Commerce has wide discretion in determining what record information to verify, and that the Department is under no obligation to verify every piece of information supplied to it. *See* ECF 22, at 30–31 (government); ECF 24, at 16–17 (Ningbo Master). Given that wide latitude, the Court's limited role is to "evaluate for reasonableness the way in which Commerce

chose to interpret the verification requirement." *Micron Tech., Inc. v. United States*, 117 F.3d 1386, 1397 (Fed. Cir. 1997).

Here, Commerce preliminarily decided to impose a 2.01 percent antidumping margin on Ningbo Master—on the knife's edge of the *de minimis* threshold of two percent. On the first day of Commerce's verification in China, Ningbo Master presented the Department with its list of "minor corrections" that included—in addition to such trivial corrections as the name of the port of entry, *see* ECF 28, at 667—changes in *values* of material inputs to the factors of production that adjusted the company's costs. Neither the government nor Ningbo Master disputes American Keg's contention—which the record confirms—that this adjustment flipped the investigation's outcome by lowering Ningbo Master's margin beneath the *de minimis* threshold. *See* ECF 21, at 16 (American Keg's contention); ECF 28, at 734 (stating that Commerce modified the preliminary decision by using new databases that incorporated Ningbo Master's corrective material in order to make the final decision); ECF 17-5, at 15 (summarizing parties' arguments that Ningbo Master's preliminary margin of 2.01 percent could easily move below *de minimis* threshold if Commerce accepted corrections); 84 Fed. Reg. at 57,011 (stating that Ningbo Master's margin was *de minimis* and thus was set at zero).

Because (1) Ningbo Master's corrections to its material inputs of drawing oil, cleaning agent, and oil removal agent were dispositive to the outcome of Commerce's final decision, and (2) Ningbo Master tendered

these corrections *after* Commerce's preliminary decision, the Court concludes that Commerce unreasonably failed to verify those corrections and thereby abused its discretion. *Cf. Smith Corona Corp. v. United States*, 771 F. Supp. 389, 398 (CIT 1991) ("Verification tests the facts upon which conclusions are to be drawn and indicates whether they will reflect an acceptable degree of certainty," and therefore Commerce has "a statutory obligation to properly verify those facts which it finds dispositive.").

While the Court recognizes that Commerce need not verify everything in the administrative record, *see U.S. Steel*, 953 F. Supp. 2d at 1348, the Court concludes that at least in the circumstances presented here, it was unreasonable for Commerce to take Ningbo Master's corrections on faith. A respondent that waits until after Commerce issues a preliminary decision has the opportunity and the motive to engage in informed gamesmanship in response to that decision. To reasonably guard against that possibility, Commerce should—to borrow an expression from President Reagan—trust but verify such corrections at least where, as here, such corrections are dispositive.

On remand, Commerce must reconsider its verification of Ningbo Master's corrections to its material inputs and, if necessary, recalculate Ningbo Master's rate. In addition, because other successful separate rate applicants automatically receive the same rate that Commerce calculates for Ningbo Master as the mandatory respondent, insofar as Commerce recalculates that rate, the Department must also assign it to the successful separate rate applicants.

### III.   Separate rate eligibility for Jingye and Ulix[19]

American Keg asks the Court to remand Commerce's decision to grant separate rate status to respondents Jingye and Ulix, contending that they failed to rebut the presumption that they are under state control. *See* ECF 21, at 35–37.

Insofar as the Court can determine, there are three separate documents in the record in which Commerce addressed the separate rate issue: (1) a preliminary decision memorandum, ECF 28, at 610 *et seq.*; (2) a subsequent separate rate memorandum, *id.* at 737 *et seq.*; and (3) the final issues and decision memorandum, ECF 17-5.[20] While the preliminary decision was just that—preliminary—the separate rate memorandum referred back to it. *See* ECF 28, at 739 ("The petitioner's arguments provide no evidentiary basis for reversing our decision in the *Preliminary Determination* that Jingye is eligible for a separate rate.") and 740 ("[W]e *continue to find* that the information on the record demonstrates that Ulix's [sic] is not affiliated with its U.S. customer [and] we *continue to find* that Ulix is eligible for a separate rate.") (emphasis added).

The first document conflated Commerce's analysis as to both entities, while the latter two documents

---

[19] This discussion corresponds to Commerce's findings in ECF 17-5, at 21–23.

[20] In this opinion, the Court refers to the preliminary decision memorandum as the "preliminary decision" and the issues and decision memorandum as the "final decision."

addressed each entity separately. Accordingly, in or-
der to track Commerce's analysis, the Court first sum-
marizes the preliminary decision applicable to both en-
tities and then discusses each applicant separately.

## A. The preliminary decision's discussion of both separate rate applicants

Commerce's preliminary decision did not address
any evidence relating specifically to Jingye or Ulix. In-
stead, it conflated the discussion of both entities and
asserted in conclusory fashion that both had estab-
lished the absence of *de jure* and *de facto* state con-
trol—the dual tests that Commerce requires separate
rate applicants to satisfy.

Before this Court, American Keg appears to dispute
whether both Jingye and Ulix established the absence
of *de facto* state control.[21] As to that issue, Commerce
found as follows:

> The evidence placed on the record of this inves-
> tigation supports a preliminary finding of an ab-
> sence of *de facto* government control based on
> record statements and supporting documenta-

---

[21] American Keg's opening brief asserts that Commerce
overlooked "material omissions and discounted evidence
fairly detracting from its ultimate conclusion that these
companies were free of *de facto and de jure* government
control," ECF 21, at 37, but American Keg makes no fur-
ther reference to "*de jure* government control" or the appli-
cable test for such control. Thus, the Court concludes that
American Keg has abandoned any challenge to Commerce's
determination that Jingye and Ulix were free from *de jure*
state control.

tion showing that the companies: (1) set their own prices independent of the government and without the approval of a government authority; (2) have the authority to negotiate and sign contracts and other agreements; (3) maintain autonomy from the government in making decisions regarding the selection of management; and (4) retain the proceeds of their respective export sales and make independent decisions regarding disposition of profits or financing of losses.

*Id.* at 623–24.[22] The only relevant citation in support of this paragraph was a vague blanket citation in a footnote to "Jingye's and Ulix's separate rate applications dated November 21, 2018." *Id.* at 624 n.93.

Commerce further stated that "the evidence placed on the record of this investigation with respect to [Jingye and Ulix] demonstrates an absence of government control . . . . Accordingly, we preliminarily grant[ ] separate rates to the separate rate applicants . . . ." *Id.* at 624.

## B. Ulix

The parties appear to agree that whether Ulix demonstrated the absence of *de facto* state control turns on whether the record "establishes that Ulix conducted an independent price negotiation with its

---

[22] The parties agree, and therefore the Court assumes, that a separate rate applicant must demonstrate the four criteria identified by Commerce above to establish the absence of *de facto* state control.

unaffiliated U.S. customer." ECF 17-5, at 23. As discussed below, the parties further narrow the question to whether Ulix has demonstrated that its U.S. customer is unaffiliated, without any discussion or mention whatsoever of whether Ulix independently sets its own prices. Because the parties have so narrowed the question, the Court assumes that resolution of American Keg's challenge to Commerce's separate rate determination as to Ulix turns on whether the U.S. customer is unaffiliated.[23]

## 1. Separate rate memorandum

Commerce's separate rate memorandum summarized the parties' arguments as to Ulix but failed to cite any evidence. Commerce then stated its findings as to Ulix as follows:

> The record does not support a finding that there exists an affiliation between Ulix and its U.S. customer that the petitioner purports exists. The record establishes that the owner of the unaffiliated U.S. customer also owns another U.S. company. However, the record establishes that there is no relationship between Ulix[ ]and the individual who owns both [U.S. companies] and thus there is no basis to find affiliation between Ulix and its U.S. customer or its U.S. customer's affiliate. We agree with Ulix that the fact that

---

[23] The parties fail to clearly tie this "unaffiliated customer" standard to Commerce's four-part test for *de facto* control, *see above* note 22. Nevertheless, because the parties agree as to the applicable standard, the Court will apply it.

the companies share part of their names is not an indicator of affiliation. We continue to find that the information on the record demonstrates that Ulix's [sic] is not affiliated with its U.S. customer. Accordingly, we continue to find that Ulix is eligible for a separate rate.

ECF 28, at 740. This paragraph lacked any citations to the administrative record, any discussion of American Keg's evidence, or any explanation of why the agency found that evidence unconvincing.

### 2.  Final decision

Commerce's final decision summarized the parties' arguments as to Ulix and then stated as follows:

We continue to find that the evidence placed on the record of this investigation supports a finding of the absence of de facto government control of Ulix based on record statements and supporting documents. Specifically, we find that the record establishes that Ulix conducted an independent price negotiation with its unaffiliated U.S. customer. Accordingly, we continue to grant a separate rate to applicant Ulix. Because of the proprietary nature of the reasoning behind our position, see the Separate Rate Analysis Memorandum for a full discussion of the issue.

ECF 17-5, at 23. Here, Commerce cited specific portions of Ulix's evidence but did so without analysis. Commerce still did not cite any of American Keg's evidence.

### 3. The parties' arguments

The government's argument defending Commerce's findings as to Ulix is essentially confined to the following two sentences in its brief:

> Commerce determined that the record does not support the conclusion that Ulix and its U.S. customer were affiliated. Specifically, Commerce explained that "the record establishes that Ulix conducted an independent price negotiation with its unaffiliated U.S. customer," and the record supports a normal customer relationship between Ulix and its U.S. customer.

ECF 23, at 35 (citations to the administrative record omitted).

American Keg, on the other hand, argues that the record contains ample evidence demonstrating that Ulix *may* be affiliated with the U.S. customer in question but that Commerce never addressed any of that evidence and Ulix responded solely with arguments, rather than actual evidence. ECF 21, at 37–41. In response, the government argues that American Keg's position in this case amounts to demanding that Commerce prove a negative. ECF 23, at 36–37.[24]

---

[24] Although Ulix participated in the administrative proceedings before Commerce, it chose not to intervene here to defend Commerce's decision.

### 4. Analysis

In reviewing Commerce's decision, "the Court must consider, *inter alia*, whether the Department has examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Adv. Tech. & Materials Co. v. United States*, 35 CIT 1380, 1387 (2011) (cleaned up) (citing *Motor Veh. Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). "The agency must offer an explanation of the decision that is clear enough to enable judicial review, and cannot leave vital questions, raised by comments which are of cogent materiality, completely unanswered." *Id.* (cleaned up) (citing *United States v. Nova Scotia Food Prods.*, 568 F.2d 240, 252 (2d Cir. 1977)).

Given these principles, it is not enough for Commerce simply to "determine," as it did here, that the record does not support a particular conclusion without addressing the evidence both in support of and in derogation of that conclusion, and it is likewise not enough for Commerce to "continue to find" something that is unsupported by a discussion of the evidence in the first instance. Although Commerce need not address every single piece of evidence, "it must address significant arguments and evidence which seriously undermines its reasoning and conclusions." *Altx, Inc. v. United States*, 167 F. Supp. 2d 1353, 1374 (CIT 2001).

Here, Commerce simply failed to address American Keg's evidence that the U.S. customer was affiliated

with Ulix. That evidence fairly detracts from Commerce's conclusion and, therefore, must be addressed on remand. "An agency determination may not be sustained without considering contradictory evidence or evidence from which conflicting inferences could be drawn." *DAK Ams. LLC v. United States*, 456 F. Supp. 3d 1340, 1352 (CIT 2020) (cleaned up) (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). The Court must therefore remand for Commerce to provide such an explanation. *Cf. Adv. Tech. & Materials Co. v. United States*, 885 F. Supp. 2d 1343, 1362 (CIT 2012) (remanding for Commerce to address petitioner's separate rate arguments).

Although the government argues that "American Keg would have the Court hold that Commerce's determination is not supported by substantial evidence because Commerce did not identify evidence that an affiliation did not exist," ECF 23, at 36, the Court's remand is not based on Commerce's failure to *identify* evidence to support its conclusion, but rather on Commerce's failure to *address the evidence in the administrative record* to explain why it found American Keg's submissions unconvincing. That is, while Commerce claimed to have "considered and analyzed the record evidence," *id.*, the Court is required to remand because the administrative record does not reflect that Commerce actually did so.[25] Again, this is why it matters

---

[25] Similarly, the government attempts to wave away American Keg's arguments by stating that "the evidence of a 'potential affiliation' is nothing more than unsubstantiated speculation." ECF 23, at 37. While it is true that a "potential affiliation" is not the same thing as a proven affiliation between Ulix and its American customer, it is also true

that Commerce's preliminary decision failed to discuss the evidence: To the extent the later decisions were based on the preliminary decision, they cannot stand on their own when the preliminary decision was deficient—Commerce cannot simply point back to a deficient preliminary decision and say that it "continues" to make the same finding.

## C. Jingye

Before Commerce, American Keg argued that the record demonstrated that Jingye was an affiliate or successor-in-interest to another Chinese company, Guangzhou Heshun Machinery Co., Ltd. ("GZ Heshun"), and that as a result Commerce was obligated to investigate whether GZ Heshun was controlled by the Chinese government for purposes of Jingye's separate rate status.

### 1. Separate rate memorandum

Commerce's separate rate memorandum addressed Jingye as follows:

> Finally, we disagree with [American Keg] that Jingye failed to provide information regarding . . . GZ Heshun Keg. In this instance, additional information was not required as Jingye is the separate rate applicant; the record established that GZ Heshun Keg had no legal ties to Jingye and it ceased operations in 2015, well before the

---

that if American Keg introduced evidence demonstrating a potential affiliation, Commerce was obligated to do more than ignore it.

[period of investigation] in this investigation. The petitioner's arguments provide no evidentiary basis for reversing our decision in the *Preliminary Determination* that Jingye is eligible for a separate rate. Accordingly, as demonstrated by the record, we continue to find an absence of *de jure* and *de facto* government control under the criteria identified in *Sparklers* and *Silicon Carbide*, and, therefore, continue to grant a separate rate to Jingye.

ECF 28, at 739 (footnote references omitted). As support for the second sentence, Commerce cited its final decision (ECF 17-5) and referred to it as containing "Commerce's consistent position with respect to this issue." The Court discusses that document below.

## 2. Final decision

Commerce's final decision included a summary of the parties' contentions about Jingye and then stated as follows:

We continue to find that the evidence on the record of this investigation supports a finding of the absence of *de facto* and *de jure* government control for Jingye based on record statements and supporting documentation. . . .

With respect to GZ Heshun Keg, the record demonstrates that this company is a separate legal entity from Jingye. GZ Heshun Keg applied for a registration cancellation in August 2015 and ceased operations before the [period of investigation]. Because Jingye is the exporter and

separate rate applicant during the [period of investigation], we determined it unnecessary to examine GZ Heshun Keg and its management for evidence of government control. . . . Accordingly, we continue to find Jingye has demonstrated its eligibility for a separate rate.

ECF 17-5, at 22 (footnote reference omitted). Commerce cited Jingye's supplemental questionnaire response in support of its separate rate application as documentation for the finding that Heshun ceased operations.

### 3. The parties' arguments

American Keg argues that Commerce failed to address evidence in the administrative record that "left open the possibility that Jingye may be subject to government control through its relationship with Guangzhou Heshun Machinery Co., Ltd." ECF 21, at 41. In support of this theory, which the Court understands to implicate Commerce's presumption of *de facto* governmental control, American Keg asserts two related lines of attack.

First, American Keg argues that the administrative record shows that "Jingye was an affiliate of or successor-in-interest to GZ Heshun," *id.*, such that Jingye needed to produce evidence documenting GZ Heshun's ownership, *id.* at 42–43. According to American Keg, the record shows that (1) Jingye's contact e-mail was the e-mail address for a sales employee of GZ Heshun, who was also sales manager for Jingye, *see id.* at 41; (2) Jingye promoted itself as "emerging" from GZ

Heshun and advertised production standards certifications antedating Jingye's 2014 incorporation, *id*.; (3) Jingye succeeded as supplier to one of GZ Heshun's customers, *id*.; and (4) GZ Heshun continued to maintain an online marketing presence after its ostensible 2015 dissolution, *id*. at 42. American Keg further complains that in response to a question about the "nature" of Jingye's relationship with GZ Heshun and whether the latter was involved in the former's operations in the U.S., Jingye offered no information beyond GZ Heshun ceasing operations in 2015. *Id*.

Second, American Keg argues that the record demonstrates a [[          ]] relationship between the owner of GZ Heshun and officers of Jingye. ECF 20, at 41–42. Specifically, American Keg points to the fact that the owner of GZ Heshun was the [[

          ]]. *Id*. at 42. American Keg further argues that Commerce should have inquired into whether GZ Heshun's owner had any *de facto* involvement in Jingye's operations because the record is silent as to whether GZ Heshun's owner had or has a relationship with the Chinese government. *Id*. at 43.

The government repeats Commerce's reasoning, arguing that because GZ Heshun is both defunct and legally independent of Jingye, any relationship that GZ Heshun's management may have had with the Chinese government is irrelevant. ECF 23, at 37–39. The government further argues that the [[          ]] relationship that GZ Heshun's owner has to Jingye's [[

          ]] is irrelevant. ECF 22, at 38.

For its part, Jingye—in addition to repeating the government's arguments—observes that the record indicates the company certified to Commerce that "none of Jingye's shareholders, managers, or director members has any relationship with" the Chinese government at any level. ECF 25, at 21. Jingye further characterizes as "extreme" the proposition that Commerce is required to probe the governmental ties of third parties that have a connection with owners or management of a separate rate applicant. *Id*. at 22.

## 4. Analysis

As noted above, the parties agree as to the applicable four-part test for *de facto* control. As described by American Keg, that test asks

1. Whether the prices are set by, or are subject to the approval of, a government agency,

2. Whether the respondent has authority to negotiate and sign contracts and other agreements,

3. Whether the respondent has autonomy from the government in making decisions regarding the selection of management, and

4. Whether the respondent retains the proceeds of its export sales and makes independent decisions regarding the disposition of profits or financing losses.

ECF 21, at 36.

Commerce determined that the defunct GZ Heshun was irrelevant to whether Jingye was subject to *de facto* control under this four-part test. Here, American Keg has not explained how the defunct GZ Heshun is relevant *under that test*, even if Jingye—a separate entity—is the successor-in-interest. The Court concludes that Commerce could reasonably find, in view of the applicable four-part *de facto* control test, that this information was irrelevant to its determination on that issue.

Similarly, the Court concludes that Commerce could reasonably find that questions about the [[

]] relationship between the former owner of GZ Heshun and [[                                    ]] Jingye are irrelevant *under the applicable test*, as American Keg has not explained how that information could have any relevance. The relevant question before Commerce was whether Jingye "has autonomy from the government in making decisions regarding the selection of management"—not whether *third parties* somehow indirectly connected to Jingye have such autonomy. On the relevant question, the record here indicates that "none of Jingye's shareholders, managers, or director members has any relationship with" the Chinese government at any level. ECF 25, at 21.

In short, Commerce's decision that Jingye is eligible for separate rate status is supported by substantial evidence, and American Keg's arguments to the contrary do not persuade the Court otherwise. The Court therefore sustains that determination.

\* \* \*

## Order

For all the foregoing reasons, the Court remands this matter to Commerce for further proceedings consistent with this opinion. Accordingly, it is hereby

**ORDERED** that New American Keg's motion for judgment on the agency record is **GRANTED IN PART and DENIED IN PART**, and it is further

**ORDERED** that Commerce's decision to rely on surrogate value data from Malaysia to value the labor factor of production in calculating Ningbo Master's rate is **REMANDED** for further consideration consistent with the foregoing opinion and for recalculation of Ningbo Master's separate rate if necessary; and it is further

**ORDERED** that Commerce's ostensible verification of corrective material submitted by Ningbo Master is likewise **REMANDED** for further consideration consistent with the foregoing opinion and recalculation of Ningbo Master's separate rate if necessary; and it is further

**ORDERED** that Commerce's decision to grant separate rate status to Guangzhou Ulix Industrial & Trading Co., Ltd., is **REMANDED** for further consideration consistent with the foregoing opinion; and it is further

**ORDERED** this case will proceed with the following schedule:

**Court No. 20-00008**                                    **Page 57**

1.  Commerce must file its remand determina-
    tion on or before 120 days after the date of
    entry of this opinion and order;

2.  Commerce must file the administrative rec-
    ord on or before 14 days after the date on
    which it files the remand determination; and

3.  The Court will issue a scheduling order after
    Commerce files the administrative record.

Dated:  March 23, 2021        /s/ *M. Miller Baker*
        New York, NY          M. Miller Baker, Judge