A-570-093
Remand
Slip Op. 21-30
POI: 1/1/2018-6/30/2018
~~Proprietary Document~~
E&C/OI:  TES
**PUBLIC VERSION**

*New American Keg v. United States*,
**Court No. 20-00008, Slip Op. 21-30 (CIT March 23, 2021)**

**FINAL RESULTS OF REDETERMINATION
PURSUANT TO COURT REMAND**

## I.    SUMMARY

The Department of Commerce (Commerce) prepared these final results of redetermination pursuant to the remand order of the U.S. Court of International Trade (CIT or the Court) in *New American Keg v. United States*, Court No. 20-00008, Slip Op. 21-30 (CIT March 23, 2021) (*Remand Order*).  These final results of redetermination concern *Refillable Stainless Steel Kegs from the People's Republic of China:  Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part*, 84 FR 57010 (October 24, 2019) (*Final Determination*), and accompanying Issues and Decision Memorandum (IDM).

In the *Remand Order*, the Court remanded the *Final Determination* to Commerce to: 1) explain why the Malaysian labor data are preferable to the Brazilian labor data or reconsider the dumping margin of Ningbo Master International Trade Co., Ltd. (Ningbo Master) using the Brazilian data;[1] 2) reconsider its verification of Ningbo Master's corrections to its material inputs and, if necessary, recalculate Ningbo Master's rate and assign Ningbo Master's rate to the successful separate rate applicants;[2] and 3) explain why it found the evidence in American Keg's

---

[1] *See Remand Order* at 35.
[2] *Id.* at 41.

submissions regarding whether Guangzhou Ulix Industrial & Trading Co., Ltd. (Guangzhou Ulix), was eligible for a separate rate to be unconvincing.[3]  In addition, the Court sustained Commerce's determination that Guangzhou Jingye Machinery Co., Ltd. (Jingye), is eligible for separate rate status.[4]

## II.   BACKGROUND

In the *Final Determination*, Commerce determined that "there is insufficient evidence on the record to find that the Malaysia labor rate is aberrational or unreliable such that we should reject it in favor of other labor rate information on the record."[5]  Commerce also determined that it was appropriate to accept the minor corrections which Ningbo Master presented at the start of verification.[6]  Commerce further determined that Guangzhou Ulix was eligible for a separate rate.[7]

On May 12, 2021, we released the Draft Results to interested parties for comment.[8]  On May 19, 2021, we received comments from American Keg Company (petitioner)[9] and Ningbo Master.[10]

## III.   ANALYSIS

*Labor Surrogate*

In the *Remand Order*, the Court remanded the *Final Determination* to explain why the Malaysian labor data are preferable to the Brazilian labor data or reconsider the dumping margin

---

[3] *Id.* at 49-50.
[4] *Id.* at 55.
[5] *See Final Determination* IDM at Comment 1.
[6] *Id.* at Comment 4.
[7] *Id.* at Comment 11.
[8] *See* Draft Results of Remand Redetermination, *New American Keg v. United States*, Consolidated Court No. 20-00008, Slip Op. 21-30, dated May 12, 2021 (Draft Results).
[9] *See* Petitioner's Letter, "Refillable Stainless Steel Kegs from the People's Republic of China:  Comments on Draft Results of Redetermination Pursuant to Court Remand," dated May 19, 2021 (Petitioner's Comments).
[10] *See* Ningbo Master's Letter, "Refillable Stainless Steel Kegs from China, Remand Proceeding - Comments on Draft Remand Results," dated May 19, 2021 (Ningbo Master's Comments).

of Ningbo Master using the Brazilian data.[11]  In its ruling, the Court ruled that "Commerce must explain why the Verité sample size is inadequate, and in so doing it must address the material in the Verité report that fairly detracts from the Department's conclusion that the report's sample size is inadequate for purposes of determining whether "there is a reason to doubt" the Malaysian data."[12]  The Court further ruled that "Commerce must materially address the substance of {the U.S. Department of Labor report, the U.S. Department of State report, and the Central Bank of Malaysia report} in conjunction with its reconsideration of the Verité report."[13]  In addition, the Court ruled that "Commerce must address {the} evidence in the record that employment in Malaysia's electrical and electronics industry comprised over 31 percent of the total Malaysian manufacturing labor force."[14]  Finally, the Court ruled that Commerce must explain, "apart from its talismanic invocation of its single-country surrogate and contemporaneity preferences—why the Malaysian data under this forced labor cloud are preferable to the Brazilian dataset."[15]

We evaluated the record evidence and reconsidered our determination that the Malaysian data are the best available information.  As a general rule, when evaluating whether potential surrogate value (SV) data provide the "best available information" in accordance with section 773(c) of the Act, Commerce considers several factors, including whether the surrogate value is publicly available, contemporaneous with the POR, represents a broad-market average, from an approved surrogate country, tax and duty-exclusive, and specific to the input.[16]  Further, as

---

[11] *See Remand Order* at 35.
[12] *Id.* at 28.
[13] *Id.* at 32.
[14] *Id.* at 33.
[15] *Id.* at 35.
[16] *See Final Results of Redetermination Pursuant to Court Remand, Tri Union Frozen Products, Inc. et. al., v. United States*, Consol. Court No. 14-00249, Slip Op. 17-71 (CIT June 13, 2017) (*Vietnam Shrimp Second Redetermination*) at 8-9, *aff'd* by *Tri Union Frozen Prods., Inc. v. United States*, 254 F. Supp. 3d 1290 (CIT 2017).

Commerce stated in the *Preamble*, in selecting surrogate values, "aberrational surrogate input values should be disregarded."[17]

We have previously found that labor "is a FOP largely and universally dependent on numerous factors, such as, but not limited to, labor rights, child and women's rights, health care costs, costs of living, environmental conditions, pension and retirement laws, and political pressures, which, arguably, may not be as relevant in valuing other FOPs" and that "there is a natural tension between certain analyses which {Commerce} normally applies to other FOPs and the application of those analyses specifically to a labor FOP."[18]  Although Commerce's practice with respect to claims of aberration via child or forced labor does not enable the petitioner to demonstrate quantitatively that labor data is aberrational, Commerce acknowledged "that additional considerations may affect a determination as to whether potential surrogate value data constitute the best available information."[19]

In this case, the Verité Report found that "28% of workers {were} found to be in forced labor," that "46% of study respondents were deemed to be on the threshold of forced labor, due to the presence of one or more forced labor indicators, and that "73% of workers in the study exhibited forced labor characteristics of some kind, a finding which suggests that the risk of forced labor in the industry is extremely high."[20]  The Verité Report concluded that "forced labor is present in the Malaysian electronics industry in more than isolated incidents, and can indeed be characterized as widespread."[21]

---

[17] *Id*. at 9 (citing *Antidumping Duties; Countervailing Duties; Final Rule*, 62 FR 27295, 27366 (May 19, 1997) (*Preamble*)).
[18] *Id*. at 8.
[19] *Id*.
[20] *See* American Keg's Letter, "Refillable Stainless Steel Kegs from the People's Republic of China:  Rebuttal and Other Surrogate Value Information," dated March 1, 2019 at Exhibit 3 (Verité Report) at 9.
[21] *Id*.

Although the Verité Report stated that "{b}ecause the research employed nonprobability sampling, the data are not representative in a statistical sense," it also explained that its ability to meet optimal quota targets for various subpopulations within the overall sample was only "somewhat limited" and, in spite of these limitations, it was "confident in the robustness of the data presented."[22]  Furthermore, the Verité Report stated that:

> "Interpretation of the data was guided by the International Labor Organization's survey guidelines to estimate forced labor.  Throughout the process of applying the ILO framework, Verité erred consistently on the side of caution, choosing to define forced labor narrowly to ensure that positive findings were always based on solid, unambiguous evidence – even when this meant leaving additional evidence aside that might also have contributed to a forced labor determination. For this and other reasons discussed throughout the report, the positive findings of forced labor reported below are very likely lower than the actual rates of forced labor in the Malaysian electronics industry and should be viewed as a minimum estimate."[23]

Based on the above, we re-evaluated our previous determination that we "cannot conclude that data developed from the sample are applicable across the {electrical and electronics (E&E)} sector in a manner that indicates that a similar proportion of workers in Malaysia's E&E industry as a whole were in situations of forced labor as were identified in the study."[24]  We conclude that although the data in the sample may not be statistically representative of the Malaysian E&E sector as a whole, the fact that more than a quarter of participants in the study were found to be in forced labor and nearly three quarters of the participants exhibited forced labor characteristics, combined with the fact that the Verité Report used conservative measures in conducting its study, suggest that forced labor is, in fact, more widespread throughout the Malaysian E&E sector as a whole.

---

[22] *See* Verité Report at 73.
[23] *Id*. at 9-10.
[24] See Final Determination IDM at 10-11.

Other evidence on the record supports this finding.  For example, the Labor Report indicates that forced labor is used in the electronics and garments industries in Malaysia.[25] Similarly, the State Report indicates that, in Malaysia, "{s}ome migrant workers … in the electronics and garment industries, and in homes as domestic workers are subjected to practices that can indicate forced labor, such as passport retention, contract violations, restricted movement, wage fraud, and imposition of significant debts by recruitment agents or employers."[26]

Moreover, the record indicates that the Malaysian E&E subsector employs a substantial proportion of the total workers in the Malaysian manufacturing sector.  Specifically, the Malaysian Ministry of International Trade and Industry reported that 322,308 people were employed in the Malaysian E&E subsector in 2016,[27] which constitutes over 31 percent of the 1,032,897 people employed in the Malaysian manufacturing sector in the same year.[28]  Thus, because 28 percent of employees in the Malaysian E&E subsector, at minimum, were employed in conditions of forced labor in the most recent period for which we have data available on the record, we conclude that at least 8.7 percent of employees in the Malaysian manufacturing sector were employed in conditions of forced labor.  Moreover, because 73 percent of employees in the Malaysian E&E subsector exhibited forced labor characteristics of some kind, we conclude that over 22 percent of employees in the Malaysian manufacturing sector exhibited such characteristics.

---

[25] *See* American Keg's Letter, "Refillable Stainless Steel Kegs from the People's Republic of China:  Rebuttal and Other Surrogate Value Information," dated March 1, 2019 at Exhibit 1 (Labor Report) at 9.

[26] *Id.* at Exhibit 2 (State Report) at 289.

[27] *See* American Keg's Letter, "Refillable Stainless Steel Kegs from the People's Republic of China:  Rebuttal and Other Surrogate Value Information," dated March 1, 2019 at Exhibit 8 at "F. Employment" section.

[28] *See* Ningbo Master's Letter, "Refillable Stainless Steel Kegs from China – Preliminary Surrogate Value Submission," dated February 19, 2019 at Exhibit SV-4 at 7.

Based on the above, and the reliability of the sources of these studies and the number of studies, we determine that, given that the evidence on this record shows that forced labor is widespread throughout the Malaysian E&E subsector and given that subsector's size in terms of number of employees relative to the Malaysian manufacturing sector, the demonstrated forced labor from this record evidence outweighs our single country and contemporaneity rationale, and therefore we find the Malaysian labor SV is not the best available information on the record.

With respect to the Mexican labor SV from INEGI, we explained in the IDM that, because we cannot ascertain whether the Mexico SV represents full labor costs, we determine that it would be inappropriate to rely on the Mexico SV to value Ningbo Master's labor FOPs in this investigation.[29]

This leaves two remaining labor SVs on the record: International Labor Comparisons (ILC) data for Brazil and Mexico from 2016.[30]  For the reasons discussed in Comment 1, below, we selected the Mexican labor SV from ILC to value Ningbo Master's labor FOPs. Accordingly, we inflated the Mexican labor SV from ILC to the POI and recalculated Ningbo Master's margin for these final results of redetermination.  Moreover, because the margin for separate rate applicants is based on the margin calculated for Ningbo Master, we revised the margin for the separate rate applicants using Ningbo Master's recalculated margin.[31]

---

[29] *See Final Determination* IDM at 9-10; *see also* Comment 1, below.
[30] *See* Petitioner's Letter, "Petitions for the Imposition of Antidumping Duties on Imports of Refillable Stainless Steel Kegs from Germany, Mexico, and the People's Republic Of China and Countervailing Duties on Imports of Refillable Stainless Steel Kegs from the People's Republic Of China," dated September 20, 2018 (Petition) at Volume II, Exhibit PRC-AD-11.
[31] We observe that, in the context of the verification minor corrections, the Court ordered that "because other successful separate rate applicants automatically receive the same rate that Commerce calculates for Ningbo Master as the mandatory respondent, insofar as Commerce recalculates that rate, the Department must also assign it to the successful separate rate applicants."  *See Remand Order* at 41.  Although that order was in the context of a different issue, the same logic applies here.

*Verification Minor Corrections*

In the *Remand Order*, the Court remanded the *Final Determination* for Commerce to reconsider its verification of Ningbo Master's corrections to its material inputs and, if necessary, recalculate Ningbo Master's rate and assign Ningbo Master's rate to the successful separate rate applicants.[32]  In its ruling, the Court found that, because Ningbo Master's corrections were dispositive to the outcome of Commerce's final decision and Ningbo Master tendered these corrections after Commerce's preliminary determination, Commerce unreasonably failed to verify those corrections and thereby abused its discretion.[33]

As the Court acknowledged, Commerce has wide discretion in determining what record information to verify, and that Commerce is under no obligation to verify every piece of information supplied to it.[34]  In this investigation, the correction to Ningbo Master's inputs consisted of the removal of consumption that occurred after the POI which it had mistakenly included.[35]  Ningbo Master supported this correction by providing lists of the invoices of the materials consumed as well as copies of all the invoices which occurred after the POI, which support the values indicated in the lists and in the summary table Ningbo Master provided.[36]

Thus, for example, with respect to drawing oil, Ningbo Master's reported FOP was derived from a total consumption of [      ] kilograms and Ningbo Master's documentation demonstrated that [      ] of those kilograms were purchased after the POI.[37]  Thus, while we did not specifically verify the remaining [      ] kilograms which Ningbo Master reported as its total

---

[32] *See Remand Order* at 41.
[33] *Id*.
[34] *Id.* at 39.
[35] *See* Memorandum, "Verification of the Questionnaire Responses of Ningbo Master International Trade Co., Ltd. in the Antidumping Investigation of Refillable Stainless Steel Kegs from the People's Republic of China," dated July 25, 2019 at 2 and VE-1.
[36] *Id*. at VE-1.
[37] *Id*.

consumption of drawing oil during the POI, in light of the fact that the documentation Ningbo Master submitted demonstrated that [     ] kilograms of drawing oil were shipped in July 2018 and given that we found no material discrepancies with respect to any of the material inputs we specifically chose for verification,[38] we saw no reason to pursue this further at verification.

In accordance with the *Remand Order*, we reconsidered our verification of these inputs. While we are unable to conduct in-person verification as a result of the COVID-19 pandemic, we issued a questionnaire in lieu of on-site verification[39] similar to those we have issued in other cases during the pandemic.[40]  Ningbo Master responded on April 15, 2021.[41]  Ningbo Master's response contained complete documentation for all consumption of the three inputs which were subject to the correction, and which it tied to its audited financial statement.[42]  We reviewed this documentation and observed no discrepancies.  Accordingly, we consider that Ningbo Master's revised FOPs for these three inputs to have been verified and we are continuing to accept Ningbo Master's revisions for these final results of redetermination.

*Ulix Separate Rate*

In the *Remand Order*, the Court remanded the *Final Determination* for Commerce to explain why it found the evidence in American Keg's submissions regarding whether Guangzhou Ulix was eligible for a separate rate to be unconvincing.[43]  In its ruling, the Court found that "Commerce simply failed to address American Keg's evidence that the U.S. customer was

---

[38] *Id*. at 18-21.
[39] *See* Commerce's Letter, "Refillable Stainless Steel Kegs from the People's Republic of China:  Questionnaire in Lieu of Verification," dated April 8, 2021.
[40] *See, e.g.*, *Certain Vertical Shaft Engines Between 99cc and Up to 225cc, and Parts Thereof, from the People's Republic of China:  Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part*, 86 FR 14077, 14078 (March 12, 2021).
[41] *See* Ningbo Master's Letter, "Refillable Stainless Steel Kegs from China, Remand Proceeding - Response to Questionnaire in Lieu of Verification," dated April 15, 2021.
[42] *Id*.
[43] *See Remand Order* at 49-50.

affiliated with Ulix.  That evidence fairly detracts from Commerce's conclusion and, therefore, must be addressed on remand."[44]

In this investigation, we requested that separate rate applicants provide, among other items, documentation relating to the "first sale by invoice date of subject merchandise to an unaffiliated customer in the United States during the {POI} for a commercial transaction."[45] Guangzhou Ulix provided this documentation, indicating that the unaffiliated customer associated with this sale was [                    ].[46]

In response to a request for further information, Guangzhou Ulix provided an affidavit from the unaffiliated U.S. customer testifying that the independent price negotiation was conducted by telephone and that is signed and dated by the unaffiliated U.S. customer.[47]  This affidavit was signed by [

                    ].[48]

In response to this affidavit, the petitioner placed on the record 22 exhibits which demonstrated that [


                    ],[49] that [

---

[44] *Id.*
[45] *See* Guangzhou Ulix's Letter, "Refillable Stainless Steel Kegs from China:  Separate Rate Application," dated November 21, 2018 (Guangzhou Ulix SRA) at 4, which repeats the separate-rate application, which was made available to potential applicants on Commerce's web site at http://enforcement.trade.gov/nme/nme-sep-rate.html pursuant to *Refillable Stainless Steel Kegs from the People's Republic of China, the Federal Republic of Germany, and Mexico:  Initiation of Less-Than-Fair-Value Investigations*, 83 FR 52195, 52199 (October 16, 2018) (*Initiation Notice*).
[46] *See* Guangzhou Ulix SRA at 4.
[47] *See* Guangzhou Ulix's Letter, "Refillable Stainless Steel Kegs from China:  Third Supplemental Separate Rate Application Questionnaire Response," dated March 14, 2019 (Ulix SQR3) at Exhibit S3-1.
[48] *Id.*
[49] *See* American Keg's Letter, "Refillable Stainless Steel Kegs from the People's Republic of China:  Comments on Guangzhou Ulix Industrial & Trading Co., Ltd.'s March 14, 2019 3rd Supplemental Separate Rate Application Questionnaire Response," dated March 25, 2019 at Exhibits 1 and 2.

],[50] that

[

],[51] and that [

].[52]  The petitioner also placed on the record evidence indicating that

[                                                      ],[53] that [

],[54] and

that [                                                      ].[55]  Finally, the

petitioner placed on the record data from [          ] which indicates that [

],[56] and that [

].[57]

In response to the petitioner's submission, Guangzhou Ulix submitted rebuttal factual

information.[58]  In its submission, Guangzhou Ulix stated that there is "no equity or control

relationship between" Guangzhou Ulix and [                    ],[59] that "[

---

[50] *Id*. at Exhibits 3 through 10.
[51] *Id*. at Exhibits 12 and 13.
[52] *Id*. at Exhibit 14.
[53] *Id*. at Exhibit 15.
[54] *Id*. at Exhibits 16 and 17.
[55] *Id*. at Exhibits 18 and 19.
[56] *Id*. at Exhibit 21.
[57] *Id*. at Exhibit 22.
[58] *See* Guangzhou Ulix's Letter, "Refillable Stainless Steel Kegs from the People's Republic o/China – ULIX Rebuttal Comments," dated March 28, 2019.
[59] *Id*. at 1-2.

] {Guangzhou ULIX} has in the meantime conferred with [

],"[60] and that Guangzhou Ulix "has had

prior business relations with" [          ] but that it is not affiliated with [          ].[61]

Thus, the record establishes that [                              ] are affiliated and it

indicates that they may be affiliated with [          ].  However, there is no evidence on the record

to suggest that Guangzhou Ulix is affiliated with [                                    ].  All of

the information placed on the record by the petitioner relates to [

] and the nature of their affiliations.  None of this information, nor any other information

on the record of this investigation, indicates that there is any ownership or familial connection

between the owners of Guangzhou Ulix on the one hand and the owners of  [

] on the other.

Accordingly, because the record does not support a finding that Guangzhou Ulix is

affiliated with any of [                                    ], we continue to find that

Guangzhou Ulix properly submitted documentation relating to the first sale by invoice date of

subject merchandise to an unaffiliated customer in the United States during the POI for a

commercial transaction as requested in the separate rate application.

For the above reasons, we continue to find that Guangzhou Ulix is eligible for a separate

rate.

---

[60] *Id*. at 2.
[61] *Id*.

## IV.    COMMENTS ON DRAFT RESULTS OF REDETERMINATION

Comment 1:  Selection of Labor Surrogate Value

*Petitioner's Comments*

- Commerce should affirm its findings concerning the surrogate value for labor in the final remand redetermination.[62]
  - Commerce correctly determined that the Malaysian labor wage rate data do not constitute the best available information on this record.[63]
    - Commerce reasonably determined, based on substantial record evidence, that forced labor is, in fact, more widespread throughout the Malaysian E&E sector as a whole, and that over 22 percent of employees in the Malaysian manufacturing sector exhibited forced-labor characteristics.[64]
    - No party has alleged that data from either Brazil or Mexico, the only other potential surrogate countries for which labor wage data are available, are similarly flawed.[65]
  - Commerce correctly relied on labor wage rate data from Brazil.[66]
    - Brazil was at a level of economic development comparable to that of China and was a significant producer of comparable merchandise.[67]

---

[62] *See* Petitioner's Comments at 2-6.
[63] *Id*. at 3-4.
[64] *Id*.
[65] *Id*. at 4.
[66] *Id*. at 4-5.
[67] *Id*. at 4.

- ▪ The costs reflected in the Brazilian data source are based on the same industry-specific classifications as the ILO Chapter 6A data and reflect both direct and indirect costs as preferred by Commerce.[68]

- ▪ The only objection by an interested party to the Brazilian data during the investigation was Ningbo Master's contention that the Brazilian labor rate appears aberrantly high.[69]

- ▪ Ningbo Master offered no analysis on this point outside its observation that the value was the highest of the three sources on record.[70]

- o Commerce correctly declined to rely on labor wage rate data from Mexico.[71]

- ▪ No party appealed Commerce's previous determination that it could not ascertain whether the INEGI labor rate represents full labor costs and the *Remand Order* confirms that revisiting that determination is outside the scope of the Court's order.[72]

*Ningbo Master's Comments*

- • Commerce should not use the Brazilian data as a surrogate for labor.[73]

- o The Malaysian labor rate is reliable.[74]

- ▪ Commerce has not explained why 8.7 percent of employees implicated by forced labor rendered the Malaysian data distortive.[75]

---

[68] *Id*. at 4-5.
[69] *Id*. at 5.
[70] *Id*.
[71] *Id*. at 5-6.
[72] *Id*. at 6.
[73] *See* Ningbo Master's Comments at 1-7.
[74] *Id*. at 1-3.
[75] *Id*. at 2.

- ▪ Not only is 8.7 percent a minor percentage of the entire manufacturing industry, nothing on the record has suggested the impact of this on the labor rate itself.[76]

- ▪ The Verité report specifically said the data are not representative in a statistical sense.

- ▪ The record does not support that the Malaysian labor rate, an official government statistic on labor value is unreliable or distortive; in fact, it is not lower than other rates on the record from economically comparable countries.[77]

- ▪ The Malaysian labor rate best fulfils Commerce's preference for contemporaneous surrogate values and Commerce's strong regulatory preference to rely on all surrogate values from the same primary surrogate country.[78]

- o Commerce is obligated to consider all labor rates on the record.[79]

  - ▪ Not only does the same International Labor Comparisons (ILC) data which contains the Brazilian labor rate also contain a Mexican labor rate, but the INEGI Mexican labor rate can also be relied upon.[80]

- o The Mexican labor rates are superior to the Brazilian labor rate.[81]

  - ▪ The INEGI Mexican labor rate is an industry-specific Mexican labor rate sourced from the Mexican government institute of statistics.[82]

  - ▪ Commerce has a well-established preference for specific surrogate values.[83]

---

[76] *Id.*
[77] *Id.*
[78] *Id.* at 2.
[79] *Id.* at 3-4.
[80] *Id.* at 3.
[81] *Id.* at 5-7.
[82] *Id.* at 5.
[83] *Id.* (citing *Taian Ziyang Food Co. v. United States*, 783 F. Supp. 2d 1292, 1330 (CIT 2011).

- Commerce also prefers to rely upon surrogate values from a country that produces identical merchandise.[84]

- The INEGI Mexican labor rate is sourced from an official government agency, while the ILC does not provide information on the underlying source data.[85]

- Mexico is a producer of identical merchandise, as evidenced by the fact that the petition was against China and Mexico, whereas there is no information on the record that Brazil produces identical merchandise.[86]

- Based on Commerce's preference to rely upon surrogate values from a country that produces identical merchandise, both the INEGI and ILC Mexican labor rates are superior to the Brazil labor rate.[87]

- Although Commerce impugned the INEGI data in the *Final Determination*, it used that exact same data in another case.[88]

- The fact that the INEGI labor rate is higher than the Mexican labor rate from the ILC, which Commerce determined does cover all labor costs, supports a finding that the INEGI Mexican labor rate covers all labor costs.[89]

---

[84] *Id*.

[85] *Id*.

[86] *Id*. at 6.

[87] *Id*. (citing *Chlorinated Isocyanurates from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2014-2015*, 82 FR 4852 (January 17, 2017), and accompanying IDM at Comment 1).

[88] *Id*. (citing the surrogate value memorandum used in *Steel Propane Cylinders from the People's Republic of China: Preliminary Affirmative Determination of Sales at Less Than Fair Value and Postponement of Final Determination Measures*, 83 FR 66675 (December 27, 2018) (*Steel Cylinders from China*), unchanged in final; 84 FR 29161, June 21, 2019), which is on the record in Ningbo Master's Letter, "Refillable Stainless Steel Kegs from China – Final Surrogate Value Submission," dated April 29, 2019 at Exhibit SV2-7.

[89] *Id*.

- The Brazilian labor rate is almost double that of the labor rates from other economically comparable countries, suggesting this rate is abnormal for the industry in question.[90]

**Commerce's Position**:  We continue to find the Malaysian data does not constitute the best available information for valuing Ningbo Master's labor FOPs because it is linked to forced labor.  Ningbo Master ignores the fact that we concluded that *at least* 8.7 percent of employees in the Malaysian manufacturing sector were employed in conditions of forced labor and that over 22 percent of employees in the Malaysian manufacturing sector exhibited characteristics of forced labor.  Thus, the presence of forced labor in the Malaysia manufacturing industry is not necessarily negligible.

Moreover, as explained above, Commerce's practice with respect to claims of aberration via child or forced labor does not enable a quantitative demonstration that labor data is aberrational; nevertheless, "additional considerations may affect a determination as to whether potential surrogate value data constitute the best available information."[91]  In this case, there are multiple pieces of evidence showing a significant presence of forced labor in the Malaysian manufacturing sector.  Because of this, we continue to determine that the demonstrated forced labor from the evidence on the record outweighs our single country and contemporaneity rationale, and therefore we find that the Malaysian labor SV is not the best available information on the record.

With respect to the Mexican labor SV from INEGI, we explained in the IDM that, because we cannot ascertain whether the Mexico SV represents full labor costs, we determine

---

[90] *Id.* at 6.
[91] *See Vietnam Shrimp Second Redetermination* at 8-9.

that it would be inappropriate to rely on the Mexico SV to value Ningbo Master's labor FOPs in this investigation.[92]  Specifically, "'INEGI publishes different datasets that report the cost of labor, not the wage rate, and the difference between the two data sets demonstrates that the average U.S. dollar per hour labor cost in the Mexican chemical industry is US$7.70/hour, whereas the INEGI wage rate submitted by the respondents is only US$4.10/hour ... In this regard, we agree with the petitioners that this provides reasonable evidence that the data submitted by respondents do not represent full labor costs as both sources of data are published by the INEGI.'"[93]  Although Ningbo Master challenges our finding, it did not point to record evidence demonstrating which of the INEGI data sets it had placed on the record.  Accordingly, because it is still not clear from the record which of the INEGI data sets Ningbo Master placed on the record, we determine that it would be inappropriate to rely on the Mexican labor SV from INEGI to value Ningbo Master's labor FOPs.  Moreover, although Ningbo Master cites *Steel Cylinders from China* to support its argument, in that proceeding, the INEGI data was the only usable data on the record.[94]  As discussed below, that is not the case with respect to this proceeding.

However, Ningbo Master correctly observed in its comments on the Draft Results that there is an additional Mexican labor SV on the record.  Specifically, we have ILC data for Mexico from the same source as the Brazilian labor SV.[95]  Thus, we have two remaining rates on the record, a Brazilian labor SV from ILC and a Mexican labor SV from ILC; in fact, both are

---

[92] *See Final Determination* IDM at 9-10; *see also* Comment 1, below.
[93] *See Final Determination* IDM at 9-10 (quoting *Chlorinated Isocyanurates from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2015-2016*, 83 FR 5243 (February 6, 2018), and accompanying IDM at 17).
[94] *See Steel Cylinders from China* Preliminary Decision Memorandum at 26.
[95] *See* Petition at Volume II, Exhibit PRC-AD-11.

from the same document.[96]  Both rates are from 2016,[97] both countries are at the same level of

economic development as China,[98] and both are significant producers of comparable

merchandise.[99]

We have stated that "Departmental policy … indicates a preference to select a surrogate

country that produces identical merchandise over one that only produces comparable

merchandise."[100]  In this case, we know that Mexico is a producer of refillable stainless steel

kegs because the petitioner filed a petition against imports of such merchandise from Mexico[101]

and, in fact, we now have an antidumping duty order on such merchandise.[102]  By contrast, in the

petition, the petitioner has averred that, to the best of its knowledge, "there are no Brazilian

producers of refillable stainless steel kegs."[103]

Accordingly, based on the information on the record, we selected the Mexican labor SV

from ILC as the best information available to value Ningbo Master's labor FOPs.  We inflated

the Mexican labor SV from ILC to the POI and recalculated Ningbo Master's margin for these

final results of redetermination.  Moreover, because the margin for separate rate applicants is

based on the margin calculated for Ningbo Master, we revised the margin for the separate rate

applicants using Ningbo Master's recalculated margin.

---

[96] *Id*.

[97] *Id*.

[98] See *Refillable Stainless Steel Kegs from the People's Republic of China:  Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Affirmative Determination of, Critical Circumstances, in Part, Postponement of Final Determination, and Extension of Provisional Measures*, 84 FR 25745 (June 4, 2019), and accompanying Preliminary Decision Memorandum at 8, unchanged in *Final Determination*.

[99] *Id*. at 9.

[100] See *Chlorinated Isocyanurates from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2014-2015*, 82 FR 4852 (January 17, 2017), and accompanying IDM at 4.

[101] *See* Petition, Volume I at 22.

[102] See *Refillable Stainless Steel Kegs from Mexico:  Antidumping Duty Order*, 84 FR 54591 (October 10, 2019).

[103] *See* Petition, Volume II at 5.

<u>Comment 2:  Whether Guangzhou Ulix Is Eligible for a Separate Rate</u>

*Petitioner's Comments*

- Commerce should reverse its findings with respect to Guangzhou Ulix.[104]

  o Guangzhou Ulix did not adequately rebut the evidence placed on the record by the petitioner.[105]

    ▪ Guangzhou Ulix responded to those exhibits with three assertions, two of which are hearsay, that do not fully rebut the petitioner's allegations (*i.e.*, 1) [


      ]; 2) Guangzhou Ulix "conferred" with [

      ]; and 3) [

      ].[106]

  o Guangzhou Ulix's various assertions in this matter are insufficient to justify its request for a separate rate for at least two reasons.[107]

    ▪ First, Guangzhou Ulix demonstrated an ongoing reticence to provide complete and accurate information to Commerce.[108]

    ▪ Second, [          ] initial affidavit only addressed [

                              ]; the record contains no such statement regarding the relationship between Guangzhou Ulix and [          ].[109]

---

[104] *See* Petitioner's Comments at 7-10.
[105] *Id*. at 7-8.
[106] *Id*. at 8.
[107] *Id*. at 8-9.
[108] *Id*.
[109] *Id*. at 9.

o Guangzhou Ulix demonstrated its ability to obtain affidavits from [          ] and should have been able to present some form of positive evidence demonstrating that no affiliation existed between Guangzhou Ulix and [          ].[110]

o Instead, when presented with clear evidence that [                    ] are affiliated entities, and that [

                    ] with Guangzhou Ulix, Guangzhou Ulix responded with mere assertions [                    ].[111]

o The burden of demonstrating eligibility for a separate rate lies with Guangzhou Ulix, which failed to provide meaningful documentation regarding its relationship with its customer and its customer's affiliates.[112]

   ▪ Commerce has not asserted that it would have been burdensome to Guangzhou Ulix to obtain an additional affidavit from [

                    ], nor has it explained why it is reasonable to rely upon third-party reporting when first party testimony regarding the essential factual assertion made appears to have been readily available.[113]

   ▪ Commerce does not address why the agency elected to not seek confirmation from [                    ] of the claims made regarding [     ] by Guangzhou Ulix.[114]

---

[110] *Id.*
[111] *Id.*
[112] *Id.* at 9-10.
[113] *Id.* at 10.
[114] *Id.*

- Commerce must explain why it is reasonable to accept the third-party claims made by Guangzhou Ulix characterizing the actions of [                    ] when Guangzhou Ulix had previously submitted an affidavit from [        ] attempting to establish the lack of affiliation between [                ] and Guangzhou Ulix.[115]

**Commerce's Position:**  As explained above, the Court remanded the *Final Determination* for Commerce to explain why it found the evidence in American Keg's submissions regarding whether Guangzhou Ulix was eligible for a separate rate to be unconvincing; the Court found that Commerce failed to address American Keg's evidence that the U.S. customer was affiliated with Guangzhou Ulix.  We addressed that evidence in detail above and demonstrated how none of it indicates an affiliation between Guangzhou Ulix and any of [

].  Now that we have done so, the petitioner attempts to shift the terms of the debate by claiming that Guangzhou Ulix's responses were deficient.  As explained below, the petitioner's arguments are unpersuasive.

As a preliminary matter, we agree with the petitioner that a separate-rate applicant has the burden of demonstrating that it is eligible for a separate rate.  We determine that Guangzhou Ulix has done so in this proceeding.  Guangzhou Ulix responded to every request we made of it and, because we found no evidence of *de jure* government control or *de facto* government control,[116] we find that Guangzhou Ulix is eligible for a separate rate.

---

[115] *Id.*

[116] *See Refillable Stainless Steel Kegs from the People's Republic of China:  Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Affirmative Determination of, Critical Circumstances, in Part, Postponement of Final Determination, and Extension of Provisional Measures*, 84 FR 25745 (June 4, 2019), and accompanying Preliminary Decision Memorandum at 13-15, unchanged in *Final Determination*.

Although the petitioner asserts that Guangzhou Ulix did not adequately rebut the evidence the petitioner placed on the record, that evidence does not demonstrate an affiliation between Guangzhou Ulix and its U.S. customer.  As described above, Guangzhou Ulix responded to every request for information.  Given that there is no evidence anywhere on the record indicating that Guangzhou Ulix is affiliated with [                                    ], we are satisfied with Guangzhou Ulix's statement that it is not affiliated with these companies.

The petitioner also notes that [          ] initial affidavit only addressed [          ] but did not address the relationship between Guangzhou Ulix and [          ].  However, Guangzhou Ulix submitted that affidavit in response to a specific request for information.  Namely, we asked Guangzhou Ulix to "provide an affidavit from the unaffiliated U.S. customer testifying that the independent price negotiation was conducted by telephone."[117]  Guangzhou Ulix provided the affidavit we requested.[118]  Although the affidavit confirmed that [          ] was not affiliated with Guangzhou Ulix,[119] because, as described above, we had before us no evidence on the record indicating Guangzhou Ulix and [          ] were affiliated, we did not request an additional affidavit addressing the relationship between Guangzhou Ulix and [          ].

Accordingly, we continue to find that Guangzhou Ulix is eligible for a separate rate.

## V.    FINAL RESULTS OF REDETERMINATION

In accordance with the Court's *Remand Order*, Commerce has, as discussed above, revised certain aspects of its dumping analysis.  Based on these changes, Commerce determines that the following weighted-average dumping margins exist:

---

[117] *See* Commerce's Letter, "provide an affidavit from the unaffiliated U.S. customer testifying that the independent price negotiation was conducted by telephone," dated March 7, 2019 at 1.
[118] *See* Ulix SQR3 at 2 and Exhibit S3-1.
[119] *Id.*

23

| Exporter | Producer | Estimated Weighted-Average Dumping Margin (percent *ad valorem*) | Cash Deposit Rate (Adjusted for Subsidy Offsets) (percent *ad valorem*) |
|---|---|---|---|
| Ningbo Master International Trade Co., Ltd. | Ningbo Major Draft Beer Equipment Co., Ltd. | *0.00 | 0.00 |
| Guangzhou Jingye Machinery Co., Ltd. | Guangzhou Jingye Machinery Co., Ltd. | 0.00 | 0.00 |
| Guangzhou Ulix Industrial & Trading Co., Ltd. | Guangzhou Jingye Machinery Co., Ltd. | 0.00 | 0.00 |

*(*de minimis*)

    Should the Court affirm the final results of redetermination, the cash-deposit rates will

not have changed from those we calculated in the *Final Determination*.

7/7/2021

X  _James Maeder_____

Signed by: JAMES MAEDER

_____
James Maeder
Deputy Assistant Secretary
  for Antidumping and Countervailing Duty Operations