# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| NEW AMERICAN KEG, d/b/a AMERICAN KEG COMPANY, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) ) |
| UNITED STATES, | ) ) ) |
| Defendant, | ) ) |
| and | ) ) |
| NINGBO MASTER INTERNATIONAL TRADE CO., LTD, and GUANGZHOU JINGYE MACHINERY CO., LTD. | ) ) ) ) ) |
| Defendant-Intervenors. | ) ) |

Court No. 20-00008

Hon. M. Miller Baker, Judge

## <u>PROPOSED ORDER</u>

Upon consideration of the Final Results of Redetermination Pursuant to Court Remand filed by the Department of Commerce on ("Commerce") on July 8, 2021, and all other papers and proceedings herein, it is hereby

**ORDERED** that judgment is entered in favor of American Keg Company; and it is further

**ORDERED** that Commerce's selection of a surrogate value for the labor factor of production is remanded for further consideration consistent with this opinion; and it is further

**ORDERED** that Commerce's determination to grant separate rate status to Guangzhou Ulix Industrial & Trading Co., Ltd. is remanded for further consideration consistent with this opinion.

 

_____

M. Miller Baker, Judge

Dated: _____
       New York, New York

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| NEW AMERICAN KEG, d/b/a AMERICAN KEG COMPANY, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Court No. 20-00008 ) |
| UNITED STATES, | ) ) |
| Defendant, | ) Hon. M. Miller Baker, ) Judge |
| and | ) ) |
| NINGBO MASTER INTERNATIONAL TRADE CO., LTD, and GUANGZHOU JINGYE MACHINERY CO., LTD. | ) ) ) ) |
| Defendant-Intervenors. | ) ) |

## PLAINTIFF'S COMMENTS ON FINAL RESULTS OF REDETERMINATION PURSUANT TO COURT REMAND

Whitney M. Rolig
Andrew W. Kentz
Nathaniel Maandig Rickard

**PICARD KENTZ & ROWE LLP**
1750 K Street, N.W.
Washington, DC  20006
(202) 331-4040

*Counsel to American Keg Company*

Dated:  September 20, 2021

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................i

TABLE OF AUTHORITIES ............................................................ iii

GLOSSARY ...............................................................................vi

STATEMENT OF FACTS ..............................................................2

    I.    Surrogate Value for Labor .................................................4

        A.    Data Sources.................................................................4

           (i) 2016 Brazil ILC Data ...........................................4

           (ii)   2018 Malaysian Data ..............................................5

           (iii)  2016 Mexican INEGI Data......................................5

        B.    Investigation Proceedings.............................................6

        C.    Remand Proceedings..................................................11

    II.   ULIX's Separate Rate Status ..........................................15

STANDARD OF REVIEW ............................................................16

SUMMARY OF ARGUMENT .......................................................19

ARGUMENT .............................................................................20

    I.    Commerce's Determinations Regarding Malaysian and Mexican INEGI Labor Data Were Supported by Substantial Evidence .......................................................20

        A.    Malaysian Labor Data Do Not Constitute the Best Available Information ..............................................20

        B.    Mexican INEGI Labor Data Do Not Constitute the Best Available Information .............................................21

    II.   Commerce's Determination to Adjust Mexican Labor Data With A Brazilian Inflator Was Unlawful .........................22

    III.  Commerce's Determination to Rely on ILC Data for Mexico Was an Abuse of Discretion.................................26

    IV.  Commerce's Determination to Grant ULIX Separate Rate Status Was Unlawful.......................................................31

A.    Commerce Requires Respondents to Affirmatively
        Demonstrate Eligibility for a Separate Rate ..............32
B.    ULIX Did Not Affirmatively Demonstrate That It
        Conducts Independent Price Negotiation ...................33

CONCLUSION ................................................................42

# TABLE OF AUTHORITIES

## Cases

Atlantic Sugar, Ltd. v. United States, 744 F.2d 1556 (Fed. Cir. 1984) ................................................................................ 17

Bridgestone Ams., Inc. v. United States, 34 C.I.T. 573 (2010) .......... 29

Burlington Truck Lines, Inc. v. United States, 371 U.S. 156 (1962). 25

Citizens to Preserve Overton Park, Inc v. Volpe, 401 U.S. 402 (1971) ......................................................................... 18, 26, 27

Consol. Edison Co. v. NLRB, 305 U.S. 197 (1938)........................ 17, 21

Freeport Minerals Co. v. United States, 776 F.2d 1029 (Fed. Cir. 1985) ....................................................................... 18, 26, 27

IPSCO, Inc. v. United States, 749 F. Supp. 1147 (Ct. Int'l Trade 1990) ................................................................................ 29

IPSCO, Inc. v. United States, 965 F.2d 1056 (Fed. Cir. 1992) .......... 29

Jiangsu Jiasheng Photovoltaic Tech Co. v. United States, 28 F. Supp. 3d 1317 (Ct. Int'l Trade 2014) .............................................. 17, 26, 41

LTV Steel Co. v. United States, 985 F. Supp. 95 (Ct. Int'l Trade 1997) ................................................................................ 23

Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto Ins., 463 U.S. 29 (1983) ..................................................................... 18, 25

Nakornthai Strip Mill Pub. Co. v. United States, 32 C.I.T. 1272 (2008) ................................................................................ 29

Nat'l Ass'n of Clean Water Agencies v. EPA, 734 F.3d 1115 (D.C. Cir. 2013) ................................................................................ 25

New Am. Keg v. United States, No. 20-00008, Slip Op. 21-30 (Ct. Int'l Trade Mar. 23, 2021) ......................................................... passim

Peer Bearing Co. v. United States, 32 C.I.T. 1307 (2008)................. 32

Qingdao Taifa Group Co., Ltd. v. United States, 33 C.I.T. 1090 (2009) ................................................................................ 23

Tianjin Mach. Import & Export Corp. v. United States, 16 C.I.T. 931 (1992) ............................................................................... 32

**Statutes**

19 U.S.C. § 1516a(b)(1)(B) ................................................... 17

19 U.S.C. § 1677b(c)(1) ........................................................ 24

**Regulations**

19 C.F.R. § 351.309(c)(2) ...................................................... 27

19 C.F.R. § 351.309(d) ......................................................... 27

**Administrative Determinations**

Chlorinated Isocyanurates From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2015-2016, 83 Fed. Reg. 5,243 (Dep't Commerce Feb. 6, 2018) ............... 22

Draft Results of Redetermination Pursuant to Court Remand, New American Keg v. United States, Court No. 20-00008, Slip Op. 21-30 (CIT March 23, 2021), (May 12, 2021) ................................... 3, 12, 28

Final Results of Redetermination Pursuant to Court Remand, New American Keg v. United States, Court No. 20-00008, Slip Op. 21-30 (CIT March 23, 2021), (July 7, 2021) ...................................... passim

Furfuryl Alcohol from the People's Republic of China, 60 Fed. Reg. 22,544 (Dep't Commerce May 8, 1995) (final determ. of sales at less than fair value) .................................................................... 33

Refillable Stainless Steel Kegs From the People's Republic of China, 84 Fed. Reg. 25,745 (Dep't Commerce June 4, 2019) (prelim. aff. determ. of sales at less than fair value, prelim. aff. determ. of critical circumstances, in part, postponement of final determ., and extension of provisional measures) ..................................................... 9

Refillable Stainless Steel Kegs From the People's Republic of China, 84 Fed. Reg. 57,010 (Dep't Commerce Oct. 24, 2019) (final aff. determ. of sales at less than fair value and final aff. determ. of critical circumstances, in part) ......................................... 2, 11, 15, 21

Silicon Carbide from the People's Republic of China, 59 Fed. Reg.
  22,585 (Dep't Commerce May 2, 1994) (final determ. of sales at less
  than fair value) .................................................................. 33

Sparklers from the People's Republic of China, 56 Fed. Reg. 20,588
  (Dep't Commerce May 6, 1991) (final determ. of sales at less than
  fair value) ................................................................. 32, 38

**Rules**

Antidumping Methodologies in Proceedings Involving Non-Market
  Economies:  Valuing the Factor of Production:  Labor, 76 Fed. Reg.
  36,092 (Dep't Commerce June 21, 2011) ......................................... 24

## GLOSSARY

| CPI | Consumer Price Index |
|---|---|
| IDM | Issues and Decision Memorandum |
| ILC | The Conference Board, International Labor Comparisons |
| INEGI | Government of Mexico, Institute of Statistics and Geography |
| PDM | Preliminary Decision Memorandum |
| POI | Period of Investigation |
| SV | Surrogate Value |

**Court No. 20-00008**

### <u>PLAINTIFF'S COMMENTS ON FINAL RESULTS OF<br>REDETERMINATION PURSUANT TO COURT REMAND</u>

Plaintiff American Keg Company ("Plaintiff," "American Keg," or "Petitioner") respectfully submits these comments regarding the U.S. Department of Commerce's ("Commerce") final remand redetermination in its antidumping duty investigation of refillable stainless steel kegs from the People's Republic of China, published as Final Results of Redetermination Pursuant to Court Remand, <u>New American Keg v. United States</u>, Court No. 20-00008, Slip Op. 21-30 (CIT March 23, 2021), ECF No. 40, (July 7, 2021) ("<u>Final Remand</u>"), P.R.R. 9, Appx__,.[1] Plaintiff submits these comments in accordance with the Court's order of August 5, 2021, ECF No. 44 (Aug. 5, 2021), and Rule 56.2 of the United States Court of International Trade.

Plaintiff supports Commerce's remand redetermination that neither the 2018 Malaysian labor wage rate nor the 2016 Mexican INEGI data were the best available information on the record for valuing the labor factor of production.  Plaintiff also does not challenge

---

[1] All citations to the administrative remand record are denoted with the item number for the public document index ("P.R.R.") and proprietary document index ("C.R.R.") as appropriate.  Similarly, all citations to the original administrative record are denoted "P.R." and "C.R."

Commerce's determination that minor corrections filed by Ningbo

Master International Trade Co., Ltd. ("Ningbo Master") have been

verified as set forth in the <u>Final Remand</u>.  However, Plaintiff challenges

the following aspects of the <u>Final Remand</u> and respectfully requests

that this Court remand Commerce's determination for further

consideration:

1. Whether Commerce's determination to rely on a Brazilian consumer price index to inflate 2016 Mexican wage data was supported by substantial evidence.

2. Whether Commerce's determination to rely on Mexican wage data published in the Conference Board's International Labor Comparisons was an abuse of discretion.

3. Whether Commerce's determination to grant separate rate status to Guangzhou Ulix Industrial & Trading Co., Ltd. was supported by substantial evidence.

## STATEMENT OF FACTS

Commerce issued its <u>Final Determination</u> in the antidumping

duty investigation of refillable stainless steel kegs from China on

October 24, 2019.  <u>See</u> <u>Refillable Stainless Steel Kegs From the People's</u>

<u>Republic of China</u>, 84 Fed. Reg. 57,010 (Dep't Commerce Oct. 24, 2019)

(final aff. determ. of sales at less than fair value and final aff. determ. of

critical circumstances, in part), P.R. 265, Appx__, and accompanying

**PUBLIC VERSION**                                    **Court No. 20-00008**

IDM, P.R. 251, Appx__.  Following an appeal by American Keg, this

Court remanded three issues:  (1) Commerce's selection of the surrogate

value for the labor factor of production; (2) Commerce's verification of

certain information submitted by the mandatory respondent, Ningbo

Master International Trade Co., Ltd. ("Ningbo Master"); and

(3) Commerce's decision to grant separate rate status to another

respondent, Guangzhou Ulix Industrial & Trading Co., Ltd. ("ULIX").

New Am. Keg v. United States, No. 20-00008, Slip Op. 21-30, at 56 (Ct.

Int'l Trade Mar. 23, 2021), ECF No. 38.

Commerce published its draft redetermination on May 12, 2021,

and provided interested parties seven days to comment.  Draft Results

of Redetermination Pursuant to Court Remand, New American Keg v.

United States, Court No. 20-00008, Slip Op. 21-30 (CIT March 23,

2021), (May 12, 2021) ("Draft Remand"), P.R.R. 4, Appx__.  Commerce

filed its Final Remand with the Court on July 8, 2021, thirteen days

before the deadline set by the Court.  See New Am. Keg, Slip Op. 21-30

at 57.

Given the Court's familiarity with this proceeding and the

remanded issues, Plaintiff does not recite the entirety of the facts and

3

case history below.  However, the facts and circumstances leading to

Commerce's selection of the surrogate value for labor are particularly

relevant for the Court's review of that determination under the abuse of

discretion standard.  Accordingly, Plaintiff presents a detailed overview

of the record, the parties' arguments, and Commerce's varying

determinations with respect to that issue, as well as a general review of

the facts underlying Commerce's separate rate determination with

respect to ULIX.

## I.    Surrogate Value for Labor

### A.    Data Sources

During the investigation, American Keg and Ningbo Master

proposed and submitted comments regarding three potential surrogate

values with which to value the labor factor of production.

### (i)    2016 Brazil ILC Data

As part of its petition for the imposition of antidumping duties,

American Keg proposed using a 2016 hourly wage rate for Brazilian

workers in the manufacturing industry published in the ILC.  <u>See</u>

"Petition for the Imposition of Antidumping Duties on Imports of

Refillable Stainless Steel Kegs from Germany, Mexico, and the People's

Republic of China and Countervailing Duties on Imports of Refillable

Stainless Steel Kegs from the People's Republic of China," A-570-093,

(Sept. 20, 2018) ("Petition"), at Vol. II, Exhibit PRC AD-11, p. 3, P.R. 2,

Appx__.  Because that wage rate preceded the POI, i.e., January

through June 2018, American Keg also provided CPI information for

Brazil for use as an inflator.  See id. at Exhibit PRC AD-8, Appx__.

Commerce accepted and relied on this rate, as adjusted for the POI,

when initiating the antidumping duty investigation.  See "Antidumping

Duty Investigation Initiation Checklist," A-570-093, at 9 (Oct. 10, 2018),

P.R. 22, Appx__.

### (ii)   2018 Malaysian Data

In its first surrogate value submission, Ningbo Master provided

2018 wage data for the Malaysian manufacturing sector published by

the Malaysian Department of Statistics.  See Letter from deKieffer &

Horgan, PLLC, "Preliminary Surrogate Value Submission," A-570-093,

(Feb. 19, 2019) ("Ningbo Master SV Submission"), at Exhibit SV-4, P.R.

129, Appx__.

### (iii)  2016 Mexican INEGI Data

In its second surrogate value submission, Ningbo Master provided

2016 labor data published by INEGI for the Mexican manufacturing

sector.  <u>See</u> Letter from deKieffer & Horgan, PLLC, "Final Surrogate

Value Submission," A-570-093, (Apr. 29, 2019) ("Ningbo Master 2nd SV

Submission"), at Ex. SV2-6, P.R. 178, Appx__.  Although this wage rate

preceded the POI, Ningbo Master did not include CPI information for

Mexico that would allow Commerce to adjust that rate to the POI.  <u>Id.</u>

Nevertheless, the company argued that Commerce "can rely upon the

Malaysian labor rate on the record already, but alternatively,

{Commerce} could rely upon this Mexican labor rate{.}"  <u>Id.</u> at 1, P.R.

177, Appx__.  American Keg also submitted rebuttal information

concerning the industry codes used in the INEGI data.  <u>See</u> Letter from

Picard Kentz & Rowe LLP, "Rebuttal Surrogate Value Information,"

A-570-093 (May 6, 2019), P.R. 185, Appx__.

## B.    Investigation Proceedings

Both American Keg and Ningbo Master commented throughout

the investigation regarding the preferable data source for valuing the

labor factor of production in the dumping calculation.  American Keg

advocated for the Brazilian ILC rate in both the petition and its pre-

preliminary determination comments, where it urged Commerce to rely

on that rate given the distortive effect of forced labor in Malaysia and

**Court No. 20-00008**

various deficiencies in the Mexican INEGI data submitted by Ningbo

Master.  <u>See</u> Letter from Picard Kentz & Rowe LLP, "Pre-Preliminary

Determination Comments," A-570-093 (May 10, 2019) ("Petitioner's Pre-

Prelim Comments") at 26-35, P.R. 193, Appx__.

Ningbo Master registered its support for the Malaysian labor rate,

or, alternatively, the Mexican INEGI rate, in its second surrogate value

submission.  Ningbo Master 2nd SV Submission at 1, P.R. 178, Appx__.

Ningbo Master then contrasted the specificity of the Brazilian and

Malaysian labor data in its pre-preliminary determination comments.

<u>See</u>Letter from deKieffer & Horgan, PLLC, "Pre-Preliminary

Comments," A-570-093 (May 9, 2019), at 4-6, P.R. 190, Appx__.

In subsequent comments, Ningbo Master contested American

Keg's arguments with respect to forced labor in Malaysia and asserted

that "the Malaysian labor rate on the record is not a low labor rate, nor

aberrational."  <u>See</u> Letter from deKieffer & Horgan, PLLC, "Rebuttal

Pre-Preliminary Comments," A-570-093 (May 17, 2019) ("Ningbo

Master Rebuttal Comments"), at 4-5, P.R. 200, Appx__.  Ningbo Master

noted that "{t}he Mexican {INEGI} labor rate on the record is {87.95}

pesos/hr."[2] and observed that "Petitioner's {ILC} source provides a labor value in Mexico of 3.91 usd/hr.  Therefore, there is no record evidence that the Malaysian labor rate for overall manufacturing is aberrational or not reliable."  Id.  Neither of Ningbo Master's comparisons acknowledged that the Mexico values were not contemporaneous or indexed to reflect the 2018 POI,[3] and Ningbo Master did not assert, or otherwise even suggest, that the Mexican ILC rate itself was a viable surrogate value.

Ningbo Master further emphasized that, in addition to the Malaysian and Brazilian labor rates, it "provided a Mexican labor rate." Ningbo Master Rebuttal Comments at 6, P.R. 200, Appx__.  The company claimed that the INEGI data were "significantly more comparable {to stainless steel keg production} than an overall manufacturing rate," and that Commerce "should rely upon this rate instead of the Brazilian labor rate, if {Commerce} determines for any reason that it cannot rely upon the Malaysian labor rate."  Id.

---

[2] Ningbo Master's comments erroneously cited the INEGI rate as "7.95 pesos/hr."; however, its surrogate value submission makes clear that the correct figure is 87.95.  Ningbo Master 2nd SV Submission at Ex. SV2-6, P.R. 178, Appx__.

[3] The CPI information in the petition is specific to Brazil.  See Petition at Vol. II, Exhibit PRC AD-8, P.R. 2, Appx__.

In its <u>Preliminary Determination</u>, Commerce's surrogate value analysis focused entirely on Malaysia and Brazil.  See <u>Refillable Stainless Steel Kegs From the People's Republic of China</u>, 84 Fed. Reg. 25,745 (Dep't Commerce June 4, 2019) (prelim. aff. determ. of sales at less than fair value, prelim. aff. determ. of critical circumstances, in part, postponement of final determ., and extension of provisional measures) ("<u>Preliminary Determination</u>"), P.R. 216, Appx__, and accompanying PDM at 10-11, P.R. 203, Appx__.  With respect to labor wage data, Commerce noted that "Brazilian labor . . . surrogates are not contemporaneous with the POI while the Malaysian surrogates are contemporaneous with the POI" before dismissing American Keg's arguments with respect to the distortive effects of forced labor in Malaysia.  <u>Id.</u> at 11, Appx__.  <u>See also</u> <u>id.</u> at 27, Appx__.

American Keg subsequently filed a case brief in which it contested Commerce's dismissal of evidence regarding forced labor in the Malaysian workforce and again advocated for the Brazil ILC rate. Letter from Picard Kentz & Rowe LLP to Commerce, "Case Brief," A-570-093, (Aug. 5, 2019) ("Petitioner's Case Brief"), at 17-18, P.R. 241, Appx__.  American Keg highlighted the fact that "{t}he record

contain{ed} two alternatives to the Malaysian labor data," i.e., the Brazilian ILC rate and the Mexico INEGI rate.  Id. at 26, Appx__. American Keg then reviewed the factors weighing in favor of the Brazilian rate, noting that "the record allow{ed} {Commerce} to inflate the Brazilian data to be contemporaneous with the POI," and discussed the deficiencies in the INEGI data; American Keg also suggested improvements to the INEGI data in the event that Commerce chose to rely on it.  Id. at 28-30, Appx__.

In response, Ningbo Master's rebuttal brief reiterated its prior comments, i.e., that "the Malaysian labor rate on the record is not a low labor rate, nor aberrational" when compared to other data points, and that "Ningbo Master has also provided a Mexican labor rate."  See Letter from deKieffer & Horgan, PLLC, "Rebuttal Brief," A-570-093 (August 12, 2019) ("Ningbo Master Rebuttal Brief"), at 9-10, P.R. 244, Appx__.  Ningbo Master closed with its assertion that Commerce "should continue to rely upon the Malaysian labor rate," but that if it "determine{d} for any reason that it cannot rely upon the Malaysian labor rate, the best available information is the Mexican {INEGI} labor

rate, not the less contemporaneous and less specific Brazilian labor rate." Id. at 11, Appx__.

In its Final Determination, Commerce found that it had "three labor SVs on the record," i.e., from the Malaysian Department of Statistics, the Brazilian ILC wage rate, and the Mexican INEGI rate. IDM at 9, P.R. 251, Appx__. Commerce specifically noted that "the Brazil and Mexico SVs are both from 2016, two years prior to the POI," but found that the INEGI data had a number of additional deficiencies that precluded their use as a surrogate value. Id. at 9-10, Appx__. Commerce then found that it "must select from the Malaysia SV or the Brazil SV" and ultimately relied upon the Malaysian data. Id. at 10, 12, Appx__, Appx__.

### C.   Remand Proceedings

In its March 2021 opinion, this Court held that

> Commerce {had} not explained—apart from its talismanic invocation of its single-country surrogate and contemporaneity preferences—why the Malaysian data under this forced labor cloud are preferable to the Brazilian dataset.  On remand, Commerce must do so.  Insofar as Commerce opts on remand to use the Brazilian data rather than Malaysian data, it must reconsider Ningbo Master's dumping margin accordingly.

New Am. Keg, Slip Op. 21-30 at 35.

Commerce issued a draft remand in response to that opinion which concluded that

> the evidence on this record shows that forced labor is widespread through{out} the Malaysian E&E subsector and given that subsector's size in terms of number of employees relative to the Malaysian manufacturing sector, the demonstrated forced labor from this record evidence outweighs our single country and contemporaneity rationale, and therefore we find the Malaysian labor SV is not the best available information on the record.

Draft Remand at 6, P.R.R. 4, Appx__.

Commerce then reiterated the deficiencies that precluded its use of the INEGI data and "selected the only remaining labor SV on the record, the Brazilian labor SV from 2016." Draft Remand at 7, P.R.R. 4, Appx__. Commerce inflated that value to the POI using the Brazilian CPI information from the petition and recalculated Ningbo Master's rate, resulting in a new margin of 4.23 percent. Id. at 7, 12, Appx__, Appx__. See also Memorandum to the File, "Draft Remand Results Calculation Memorandum for Ningbo Master International Trade Co., Ltd.," A-570-093, at Att. C ("Labor") (May 12, 2021) ("Draft Calc Memo"), P.R.R. 6, Appx__.

In unsolicited comments prior to the issuance of the Draft Remand, Ningbo Master stated that it "never abandoned the Mexico

labor source in the underlying investigation," and urged Commerce to "select the Mexico {INEGI} labor rate over the Brazil labor rate" if Commerce chose not to use Malaysian data.  <u>See</u> Letter from deKieffer & Horgan, PLLC, "Letter re Labor SV," A-570-093 (April 15, 2021) ("Ningbo Master April 15 Comments"), at 2, P.R.R. 3, Appx__, citing Ningbo Master 2nd SV Submission, at Ex. SV2-6, P.R. 178, Appx__. Ningbo Master further noted that both the Brazilian ILC data and INEGI data were from 2016 such that there was "not a contemporaneity difference between the sources," but, critically, failed to acknowledge the lack of relevant CPI information on the record of the proceeding for the Mexican data.  Ningbo Master April 15 Comments at 2, P.R.R. 3, Appx__.

Following the <u>Draft Remand</u>, Ningbo Master for the first time urged consideration of both the INEGI data <u>and</u> Mexican data published in the ILC.  <u>See</u> Letter from deKieffer & Horgan, PLLC, "Comments on Draft Remand Results," A-570-093, (May 19, 2021), at 3, P.R.R. 7, Appx__.  Ningbo Master criticized Commerce for "fail{ing} to even consider the ILC Mexican labor rate at all," even though no party had <u>ever</u> suggested it as a data source, and, again for the first time,

argued that the rate was "more reliable than the ILC Brazil labor rate because it is from a country that produced identical merchandise and is corroborated by other labor rates." Id. at 4, 7, Appx__, Appx. __.

Even though American Keg had supported Commerce's draft redetermination with respect to the labor surrogate value, see Letter from Picard Kentz & Rowe LLP, "Comments on Draft Results of Redetermination Pursuant to Court Remand," A-570-093 (May 19, 2021) ("Petitioner's Draft Remand Comments"), at 2, P.R.R. 8, Appx__, Commerce did not provide any further opportunities for the parties to comment. Nevertheless, in the Final Remand, Commerce changed course and accepted Ningbo Master's novel argument that the Mexican ILC data was "the best information available to value Ningbo Master's labor FOPs" in light of Mexico's established status as a producer of the subject merchandise and the agency's "preference to select a surrogate country that produces identical merchandise over one that only produces comparable merchandise." Final Remand at 19, P.R.R. 9, Appx__ (internal citation omitted). Commerce then inflated the Mexican ILC value using the Brazilian CPI information on the administrative record and determined that Ningbo Master's

14

recalculated dumping margin was <u>de minimis</u>.  <u>Id.</u> at 19, 24, Appx__,

Appx__.  <u>See also</u> Memorandum to the File, "Final Remand Results

Calculation Memorandum for Ningbo Master International Trade Co.,

Ltd.," A-570-093, at Att. B ("Labor") (July 7, 2021) ("Final Calc Memo"),

P.R.R. 11, Appx__.

## II.  ULIX's Separate Rate Status

In the investigation, Commerce granted separate status to ULIX

based on its finding that "the record establishes that Ulix conducted an

independent price negotiation with its unaffiliated U.S. customer."

IDM at 23, P.R. 251, Appx__.  The agency provided further explanation

in a confidential memorandum:

> The record establishes that the owner of the unaffiliated
> U.S. customer [                    ] also owns another U.S.
> company, [            ].  However, the record establishes that
> there is no relationship between Ulix, and [              ],
> the individual who owns both [                    ]
> and [          ] and thus there is no basis to find affiliation
> between Ulix and its U.S. customer or its U.S. customer's
> affiliate.

Memorandum to the File, "Separate Rate Analysis," A-570-093, (Oct.

17, 2019), at 4, P.R. 255, C.R. 160, Appx__.

On appeal, this Court found that "Commerce simply failed to

address American Keg's evidence that the U.S. customer was affiliated

with Ulix" and directed Commerce to reconsider its separate rate

determination in light of that evidence.  <u>New Am. Keg</u>, Slip Op. 21-30 at

48-49.  Commerce proceeded to review that evidence in its <u>Final</u>

<u>Remand</u> but ultimately found that although the record establishes that

[                                                         ] "are affiliated," and that these

companies "may be affiliated" with [                             ], neither

information submitted by American Keg "nor any other information on

the record of this investigation, indicates that there is any ownership or

familial connection between the owners of Guangzhou Ulix on the one

hand and the owners of [                                                             ]

on the other."  <u>Final Remand</u> at 12, P.R.R. 9, C.R.R. 14, Appx__.

Commerce therefore continued to grant separate rate status to ULIX.

<u>Id.</u> at 23, Appx__.

**STANDARD OF REVIEW**

The statute sets forth the following standard of review for this

Court with respect to final antidumping duty determinations:

> The Court shall hold unlawful any determination, finding, or
> conclusion, found . . . to be unsupported by substantial
> evidence on the record, or otherwise not in accordance with
> law.

19 U.S.C. § 1516a(b)(1)(B).  The Supreme Court has defined substantial

evidence as "such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion."  Consol. Edison Co. v. NLRB, 305

U.S. 197, 229 (1938) (citations omitted).  Thus, the Court must consider

whether a reasonable person could conclude that the evidence relied

upon by Commerce actually supports the agency's determination.

Atlantic Sugar, Ltd. v. United States, 744 F.2d 1556, 1563 (Fed. Cir.

1984).

Legal precedent also requires that Commerce exercise its

discretion in a reasonable manner.  Specifically:

> {W}here the agency is vested with discretion to set the
> procedures by which it administers its governing statute, the
> court reviews such decisions for abuse of discretion.   An
> abuse of discretion occurs where the decision is based on an
> erroneous interpretation of the law, on factual findings that
> are not supported by substantial evidence, or represent an
> unreasonable judgment in weighing relevant factors.   In
> abuse of discretion review, an agency action is arbitrary
> when the agency offers insufficient reasons for treating
> similar situations differently.

Jiangsu Jiasheng Photovoltaic Tech Co. v. United States, 28 F. Supp. 3d

1317, 1323 (Ct. Int'l Trade 2014).

Further, to the extent that the statute affords Commerce

discretion as to how to conduct its investigation, courts have explained

that "the grant of discretionary authority to an agency implies that the

exercise of discretion be predicated upon a judgment anchored in the

language and spirit of the relevant statutes and regulations." Freeport

Minerals Co. v. United States, 776 F.2d 1029, 1031 (Fed. Cir. 1985).

In order to make a finding that an agency's action is "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with

law," a reviewing body

> must consider whether the decision was based on a
> consideration of the relevant factors and whether there has
> been a clear error of judgment. Although this inquiry into
> the facts is to be searching and careful, the ultimate
> standard of review is a narrow one. The court is not
> empowered to substitute its judgment for that of the agency.

Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416

(1971). Similarly, this Court may remand a decision for being arbitrary

and capricious if

> the agency has relied on factors which Congress has not
> intended it to consider, entirely failed to consider an
> important aspect of the problem, offered an explanation for
> its decision that runs counter to the evidence before the
> agency, or is so implausible that it could not be ascribed to a
> difference in view or the product of agency expertise.

Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto Ins., 463 U.S. 29,

43 (1983).

## SUMMARY OF ARGUMENT

Commerce's <u>Final Remand</u> complied with the Court's instructions to reconsider record evidence with respect to forced labor and its wage-distorting effects in Malaysia, and Commerce reasonably determined that Mexican INEGI data were not a viable alternative to the Malaysian labor data.  However, in a case that has presented repeated failures by Commerce to meaningfully engage with the administrative record and exercise its discretion in a reasonable manner, the <u>Final Remand</u> represents yet another instance of the agency's disregard for the evidence on the administrative record.

Specifically, although Commerce reasonably determined, based on substantial evidence, that the Malaysian labor data were distorted and not suitable for use as a surrogate value for labor in this proceeding, Commerce's determination to rely on the Mexican ILC labor wage rate was unsupported by substantial evidence, arbitrary, and, ultimately, an abuse of discretion.

Moreover, although Commerce has now addressed evidence of ULIX's affiliation with its customer as directed by this Court, the agency did not support its ultimate determination to grant ULIX a

separate rate with substantial evidence, and its analysis of the issue

constitutes an abuse of discretion.

## ARGUMENT

I.    **Commerce's Determinations Regarding Malaysian and Mexican INEGI Labor Data Were Supported by Substantial Evidence**

A.    **Malaysian Labor Data Do Not Constitute the Best Available Information**

This Court's remand order directed Commerce to reevaluate the

administrative record with respect to forced labor in Malaysia, its

effects on the country's overall manufacturing labor wage rate, and the

implications of those effects for Commerce's selection of a surrogate

value.  New Am. Keg, Slip Op. 21-30 at 35-36.

Commerce undertook that reevaluation in its Final Remand and

presented a thorough and reasoned determination that the prevalence

of forced labor in Malaysia meant that Malaysian manufacturing labor

data were not the best available information for valuing Ningbo

Master's labor inputs.  Final Remand at 2-7, 17, P.R.R. 9, Appx__,

Appx__.  Specifically, Commerce reviewed each of the documents and

data sources identified by this Court and found them to be reliable

evidence of forced labor that "outweighs {Commerce's} single country

and contemporaneity rationale" such that "the Malaysian labor SV is not the best available information on the record."  Id. at 7, Appx__.

The detailed review presented by Commerce, and its resulting determination with respect to the unsuitability of Malaysian labor as a surrogate value source, rely on "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Consol. Edison Co., 305 U.S. at 229.  Accordingly, the Court should affirm this aspect of the Final Remand.

## B.   Mexican INEGI Labor Data Do Not Constitute the Best Available Information

Having determined that the Malaysian labor data were not suitable for use as a surrogate value, Commerce reasonably exercised its discretion in this remand proceeding to review its findings with respect to the Mexican INEGI labor data.  Final Remand at 7, 17-18, P.R.R. 9, Appx__, Appx__.  That review confirmed the agency's findings from the investigation that Commerce "{could not} ascertain whether the Mexico {INEGI} SV represents full labor costs."  IDM at 10, P.R. 251, Appx__.  See also Final Remand at 17-18, P.R.R. 9, Appx__, citing id. and Chlorinated Isocyanurates From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2015-2016,

83 Fed. Reg. 5,243 (Dep't Commerce Feb. 6, 2018) and accompanying

IDM at 17.  Commerce's review also confirmed that no party had

identified any record evidence demonstrating that the dataset on record

included those full costs.  Final Remand at 18, P.R.R. 9, Appx__.  Given

these deficiencies and the presence of other useable data on the record,

Commerce found that "it would be inappropriate to rely on the Mexican

labor SV from INEGI to value Ningbo Master's labor FOPs."  Id.

This determination was also reasonable and supported by

substantial evidence.  As with its remand analysis of the Malaysian

labor data, Commerce's findings with respect to the INEGI data reflect

a reasoned weighing of the evidence, and the Court should affirm those

conclusions.

## II.    Commerce's Determination to Adjust Mexican Labor Data With A Brazilian Inflator Was Unlawful

As discussed above, Commerce's Draft Remand relied on the 2016

Brazilian labor wage rate published in the ILC to value Ningbo

Master's labor inputs and inflated that value to be contemporaneous

with the POI using the Brazilian CPI information placed on the record

by American Keg.  Draft Calc Memo at Att. C ("Labor"), P.R.R. 6,

Appx__.  American Keg tailored its comments on the Draft Remand to

**Court No. 20-00008**

the agency's proposed redetermination.  <u>See</u> Petitioner's Draft Remand

Comments at 3-6, P.R.R. 8, Appx\_\_.  The administrative record of the

proceeding did not include Mexican CPI information and no party had

previously advocated for the use of Mexican ILC data as the basis for

the labor wage rate surrogate value.  Thus, because Commerce declined

to provide any party the opportunity to rebut the comments on the

<u>Draft Remand</u> submitted by any other interested party, American Keg's

first opportunity to comment on Commerce's erroneous action in the

final remand results submitted to the Court is through these

comments.[4]

Because the 2016 Mexican ILC labor wage rate was not

contemporaneous with the POI, Commerce inflated the value using a

CPI.  Final Calc Memo at Att. B ("Labor"), P.R.R. 11, Appx\_\_.  However,

---

[4] Plaintiff is raising its arguments on this matter for this first time with this Court rather than Commerce, but respectfully submits that exhaustion of these issues was not required under these circumstances.  <u>See</u> <u>Qingdao Taifa Group Co., Ltd. v. United States</u>, 33 C.I.T. 1090, 1093 (2009), citing <u>LTV Steel Co. v. United States</u>, 985 F. Supp. 95, 120 (Ct. Int'l Trade 1997) (holding that "{a} party may seek judicial review of an issue that it did not raise in a case brief if Commerce did not address the issue until its final decision, because in such a circumstance the party would not have had a full and fair opportunity to raise the issue at the administrative level.").

the CPI that Commerce used was specific to—and labeled as—"Brazil,"
not Mexico.  See Petition at Exhibit PRC AD-8, P.R. 2, Appx__.

Commerce's published practice states that it will "inflate{} the
selected earnings data to the year that covers the majority of the period
of the proceeding using the relevant Consumer Price Index."
Antidumping Methodologies in Proceedings Involving Non-Market
Economies:  Valuing the Factor of Production:  Labor, 76 Fed. Reg.
36,092, 36,094 (Dep't Commerce June 21, 2011) (emphasis added).
However, Commerce did not explain why CPI information specific to
Brazil was a relevant or appropriate means of inflating a Mexican labor
wage rate, nor did the agency explain why a Mexican labor wage rate
inflated with a different country's CPI was superior to a Brazilian labor
wage rate inflated with its own CPI.  See 19 U.S.C. § 1677b(c)(1)
(requiring Commerce to use "the best available information" to value
the factors of production in a nonmarket economy).  Indeed, it does not
appear that Commerce considered the source of the CPI information at
all or consider the ramifications of switching, after issuing the Draft
Remand, to a data source that had not been previously considered.
Final Remand at 7, 19, P.R.R. 9, Appx__, Appx__.

As discussed in the following section, this result could have been avoided had Commerce limited its remand reconsideration to the three wage rates that were timely-argued and actually under consideration during the investigation and appeal, or had Commerce invited interested parties to comment on its novel approach before filing its Final Remand with the Court.  In any case, Commerce's failure "to consider an important aspect of the problem" renders its determination arbitrary and capricious.  See Motor Vehicle Mfrs., 463 U.S. at 43. Moreover, the agency's failure to "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made'" has once again left the Court to "only guess why" Commerce adopted this particular approach and, thus, leaves Commerce's determination unsupported by substantial evidence.  See id., quoting Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168 (1962); see also New Am. Keg, Slip Op. 21-30 at 28, citing Nat'l Ass'n of Clean Water Agencies v. EPA, 734 F.3d 1115, 1154 (D.C. Cir. 2013).  The Court should therefore remand Commerce's calculation of the surrogate value for labor for a second time.

### III.   Commerce's Determination to Rely on ILC Data for Mexico Was an Abuse of Discretion

The "abuse of discretion" standard of review centers on the exercise of sound judgment.  Courts have described an abuse of discretion in various ways, i.e., an "unreasonable judgment in weighing relevant factors," Jiangsu Jiasheng, 28 F. Supp. 3d at 1323, or "a clear error of judgment," Citizens to Preserve Overton Park, 401 U.S. at 416. The Federal Circuit, in particular, has emphasized that an agency must exercise "judgment anchored in the language and spirit of the relevant statutes and regulations."  Freeport Minerals, 776 F.2d at 1031.

In this case, Commerce abused its discretion in the Final Remand by adopting a surrogate value for which no party previously advocated—and that Commerce itself did not consider—during the investigation.  As is clear from the paucity of explanation provided in the Final Remand, Commerce settled on this approach while ignoring basic, relevant factors affecting the agency's calculation, once again requiring the Court to expend resources to address an issue that warranted substantially more serious consideration at the agency level. This abuse of discretion merits a remand by this Court.

First, as discussed above, Commerce acknowledged that the 2016 ILC data were not contemporaneous with the POI and inflated the Mexican labor rate to the first half of 2018. Final Remand at 19, P.R.R. 9, Appx__. Commerce's failure to recognize that its chosen inflator was specific to Brazil and wholly unrelated to Mexico is a "clear error of judgment." Citizens to Preserve Overton Park, 401 U.S. at 416.

Second, Commerce's determination was not anchored in the "spirit" of its regulations, i.e., the agency's requirement that parties "present all arguments that continue to be in the submitter's view to be relevant to the Secretary's final determination" in their administrative case brief, 19 C.F.R. § 351.309(c)(2), or that they respond to relevant arguments in their rebuttal brief, 19 C.F.R. § 351.309(d). See also Freeport Minerals, 776 F.2d at 1031. By adopting a surrogate value for which no party advocated until after the issuance of the Draft Remand, Commerce essentially mooted its own requirements regarding timely-submitted arguments and took upon itself the responsibility to vet and validate the arguments presented by Ningbo Master.

Third, Commerce's approach disregarded the full, engaged participation of American Keg, the petitioner in a matter of incredible

importance to its business operations.  As discussed in detail above,
American Keg consistently addressed Ningbo Master's arguments and
evidence with respect to the labor surrogate value throughout the
investigation, and likewise responded to Commerce's <u>Preliminary
Determination</u> regarding the surrogate value for labor in its
administrative case brief.  In addition, in the course of this remand
proceeding, American Keg provided a fulsome response to both Ningbo
Major's unsolicited April 2021 comments and the <u>Draft Remand</u> itself in
accordance with Commerce's instructions.  And yet, despite American
Keg's full participation, evinced through extensive submissions of
relevant evidence and arguments over the course of more than two
years, Commerce selected a surrogate value that was never before at
issue which had the singular effect of reducing Ningbo Master's
dumping margin from 4.23 percent in the <u>Draft Remand</u> to a <u>de
minimis</u> level in the <u>Final Remand</u>.  <u>See</u> <u>Draft Remand</u> at 12, P.R.R. 4,
Appx__; <u>Final Remand</u> at 24, P.R.R. 9, Appx__.

Commerce could have refused to consider arguments and evidence
advanced for the first time on remand, but did not.  <u>See</u>, <u>e.g.</u>,
<u>Nakornthai Strip Mill Pub. Co. v. United States</u>, 32 C.I.T. 1272, 1281-

82 (2008) (holding that "Commerce acted within its discretion, and in compliance with the agency's own regulations, to limit its remand consideration to the timely-submitted arguments and evidence" from the original proceeding); Bridgestone Ams., Inc. v. United States, 34 C.I.T. 573, 579 (2010) (citing id. and holding that "Commerce might have chosen to evaluate" an argument raised on remand that could have been raised in the underlying proceeding "but was under no regulatory obligation to do so.").  That choice meant that American Keg had no opportunity to comment on the agency's approach, no opportunity to highlight the manifest error in that approach, and no opportunity to meaningfully defend its substantial interest in the outcome of an issue that has been at the heart of this case since early 2019.  This Court should not countenance such a blatant disregard for fairness to the parties.  See Bridgestone Ams., 34 C.I.T. at 579 quoting IPSCO, Inc. v. United States, 749 F. Supp. 1147, 1150 (Ct. Int'l Trade 1990), aff'd in relevant part, 965 F.2d 1056, 1061-62 (Fed. Cir. 1992) (holding that "{j}udicial economy, fairness to the parties and the need to fulfill Congress's intent . . . requires that errors . . . be raised from the outset.").

Fourth, Commerce's approach runs afoul of the Court's interest in judicial economy.  Commerce's selection of a surrogate value for labor in this remand proceeding could have and should have been straightforward:  the agency was to reevaluate the record with respect to forced labor in Malaysia, and, pending the outcome of that reevaluation, review the merits of the alternative surrogate values that had been thoroughly briefed before the agency throughout the investigation.  The Court would then have been able to examine Commerce's decision with the benefit of fully developed evidence and arguments.  Instead, the Court is now in a position of having to examine a determination that has at least one clear and easily avoidable error, and that was adopted without any input from the petitioning domestic industry.

There is, of course, no guarantee that this Court would have upheld a different determination, e.g., one consistent with Commerce's Draft Remand.  But Commerce's ill-considered approach in the Final Remand carried an obvious risk of delay, additional remands, and unnecessary litigation, and the agency's apparent failure to take such a

risk into account further supports a finding that Commerce abused its discretion in this matter.

In sum, Commerce did not exercise its judgment in a reasonable manner when it disregarded the Brazilian ILC data in favor of an untested and ultimately erroneous labor wage rate for which no party advocated throughout the entirety of the investigation, to which American Keg had no opportunity to respond, and which will require yet more time and resources on the part of this Court. The Court should therefore remand that decision as an abuse of discretion.

### IV.   Commerce's Determination to Grant ULIX Separate Rate Status Was Unlawful

Commerce complied with the Court's remand instructions by reviewing and addressing evidence that ULIX and its U.S. customer, [                              ] were affiliated through [                              ] affiliate, [                ].  Final Remand at 9-12, P.R.R. 9, C.R.R. 14, Appx__.  However, Commerce's determination that ULIX was "eligible for a separate rate" despite that evidence remains unsupported by substantial evidence and amounts to an abuse of discretion.

### A.   Commerce Requires Respondents to Affirmatively Demonstrate Eligibility for a Separate Rate

Both Commerce and American Keg agree that "a separate-rate applicant has the burden of demonstrating that it is eligible for a separate rate." Final Remand at 22, P.R.R. 9, Appx__.  That applicant must "affirmatively demonstrate" eligibility by proving "an absence of central government control, both in law and in fact." Tianjin Mach. Import & Export Corp. v. United States, 16 C.I.T. 931, 935 (1992) (emphasis added); Peer Bearing Co. v. United States, 32 C.I.T. 1307, 1309 (2008).

Among other criteria for establishing a company's freedom from de facto government control, Commerce requires that a respondent affirmatively demonstrate its "independent authority to negotiate and sign export contracts and other agreements," i.e., that it "conducts independent price negotiation." See Letter from deKieffer & Horgan, PLLC, "Separate Rate Application," A-570-093 (Nov. 21, 2018) ("ULIX SRA"), at 13, P.R. 90, Appx__.  See also Sparklers from the People's Republic of China, 56 Fed. Reg. 20,588, 20,589 (Dep't Commerce May 6, 1991) (final determ. of sales at less than fair value) ("Sparklers from

China"), citing <u>Silicon Carbide from the People's Republic of China</u>, 59 Fed. Reg. 22,585, 22,586-87 (Dep't Commerce May 2, 1994) (final determ. of sales at less than fair value) and <u>Furfuryl Alcohol from the People's Republic of China</u>, 60 Fed. Reg. 22,544, 22,545 (Dep't Commerce May 8, 1995) (final determ. of sales at less than fair value) (considering whether "prices are set by, or are subject to the approval of, a government agency," and whether "companies have "authority to negotiate and sign contracts and other agreements"). Such a claim must be supported with documentation such as "email correspondence between {the} applicant and unaffiliated U.S. customer," or with an "affidavit testifying to independent price negotiation . . . signed and dated by an <u>unaffiliated U.S. customer</u>." ULIX SRA at 13 (emphasis added), P.R. 90, Appx__.

### B. ULIX Did Not Affirmatively Demonstrate That It Conducts Independent Price Negotiation

ULIX provided incomplete and inconsistent information regarding its claims of independent price negotiation throughout the investigation. Despite initially providing "price negotiation emails" to support its assertions of that independence, <u>see</u> ULIX SRA at 13, P.R. 90, Appx__, ULIX revealed three months later that it negotiated prices

with [                                    ] "by telephone," <u>see</u> Letter from deKieffer &

Horgan, PLLC, "2nd Supplemental Separate Rate Application

Questionnaire Response," A-570-093, (Feb. 21, 2019) ("ULIX 2nd Supp.

SRA"), at 6, P.R. 132, C.R. 52, Appx__.  Consequently, and consistent

with the separate rate application's requirements, Commerce required

ULIX to "provide an affidavit from the unaffiliated U.S. customer

testifying that the independent price negotiation was conducted by

telephone."  <u>See</u> Letter from deKieffer & Horgan, PLLC, "Third

Supplemental Separate Rate Application Questionnaire Response,"

A-570-093 (Mar. 14, 2019) ("ULIX 3rd Supp. SRA"), at 1-2, P.R. 154,

Appx__.  ULIX responded with an affidavit signed by [

                                    ] testifying to that fact as

well as the claim that "[

                                    ]." <u>Id.</u> at Exhibit S3-1,

P.R. 154, C.R. 56, Appx__.

    This affidavit spurred American Keg's submission of evidence that

[                              ] has a [                                    ]

and clear links to a company named [                    ]. <u>See</u> Letter from

Picard Kentz & Rowe LLP, "Comments on Guangzhou Ulix Industrial &

Trading Co., Ltd.'s March 14, 2019 3rd Supplemental Separate Rate

Application Questionnaire Response," A-570-093, (Mar. 25, 2019)

("Petitioner's Comments on ULIX 3rd SQR"), at 5-11, P.R. 163, C.R. 68,

Appx__.  These connections were notable not only because of the

[                                                    ], but because

[

            ]. Id. at 9 and Exhibit 21, Appx__, Appx__.  American Keg

therefore urged Commerce to solicit "a detailed explanation of the

relationship between {ULIX} and its U.S. customer," specifically

addressing the evidence regarding [                              ]. Id.

at 12, Appx__.

    Commerce did not do so, but ULIX responded on its own with four

assertions:

    1. "There is no equity or control relationship between" ULIX
       and [                        ];

    2. [

                                     ];

    3. Guangzhou Ulix "conferred" with [

                               ]; and

    4. [

                     ]

Letter from deKieffer &, PLLC, to the Department, "ULIX Rebuttal Comments," A-570-093, (Mar. 28, 2019) ("ULIX SRA Rebuttal"), at 1-2, P.R. 164, C.R. 69, Appx__.

ULIX's assertions are insufficient to justify its request for a separate rate.  First, the company repeatedly submitted incomplete or inaccurate information to Commerce that required multiple supplemental questionnaires from the agency.  It was therefore arbitrary and capricious for Commerce to accept, without obtaining objective confirmation, ULIX's undocumented claims regarding its recollection of events or conferrals with [          ] in its March 2019 comments.  See New Am. Keg, Slip Op. 21-30 at 41 (noting that Commerce should "trust but verify" information submitted by respondents with "the opportunity and the motive to engage in informed gamesmanship").

Second, [          ] affidavit only addressed [

          ].  ULIX 3rd Supp. SRA at Exhibit S3-1, P.R. 154, C.R. 56, Appx__.  The record contains no such statement regarding the relationship between ULIX and [

          ] outside of ULIX's undocumented claims—indeed, the

**Court No. 20-00008**

record contains no direct statements by [          ] concerning [

          ] at all.

Commerce ultimately rejected American Keg's arguments that

ULIX failed to adequately rebut evidence of an affiliation between the

company and its customer and stated that, "{g}iven that there is no

evidence anywhere on the record indicating that {ULIX} is affiliated

with [                                          ], we are satisfied

with {ULIX's} statement that it is not affiliated with these companies."

Final Remand at 23, P.R.R. 9, C.R.R. 14, Appx__.

These findings are neither consistent with the established burden

of proof for separate rate eligibility nor supported by substantial

evidence.  As an initial matter, although Commerce complained in its

Final Remand that American Keg was "shifting the terms of the debate"

by continuing to highlight deficiencies in ULIX's questionnaire

responses, American Keg's entire focus with respect to ULIX's separate

rate has been ULIX's failure to affirmatively demonstrate its eligibility

for that separate rate as a consequence of its deficient questionnaire

responses.  See Petitioner's Comments on ULIX 3rd SQR at 1-12, P.R.

163, C.R. 68, Appx__; Petitioner's Case Brief at 11-14, P.R. 241, C.R.

155, Appx__; Pl's Aff. Br. at 27-31, ECF No. 20 (June 23, 2020); Pl's

Reply Br. at 11-14, ECF No. 26 (Oct. 13, 2020).  The fact that Commerce

has now addressed evidence in the administrative record as required by

the Court does not mean that its resulting conclusions are inherently

supported by substantial evidence.

    Indeed, Commerce's conclusions were <u>not</u> supported by

substantial evidence because its analysis misplaced the burden for

establishing separate rate eligibility.  Commerce's presumption

regarding nonmarket economies required ULIX to affirmatively

demonstrate that it conducted independent price negotiations with an

unaffiliated customer.  <u>See</u> <u>Sparklers from China</u>, 56 Fed. Reg. at

20,589 (internal citations omitted).  American Keg rebutted ULIX's

initial claims to independence with evidence indicating that ULIX and

its customer may be affiliated.  <u>See</u> Petitioner's Comments on ULIX 3rd

SQR, P.R. 163, C.R. 68, Appx__.  Rather than respond to this

information with documentation of its own, ULIX submitted a series of

hearsay statements that included second-hand summaries of

conversations with [                    ] that were not on the administrative

**Court No. 20-00008**

record and remained uncorroborated by [                    ]. <u>See</u>

ULIX SRA Rebuttal, P.R. 164, C.R. 69, Appx__.

As American Keg repeatedly noted for Commerce, ULIX had

already demonstrated its ability to obtain affidavits from [              ]

and should have been able to present some form of positive evidence

demonstrating that no affiliation existed between Guangzhou Ulix and

[              ]. <u>See</u> Petitioner's Draft Remand Comments at 9, P.R.R. 8,

C.R.R. 13, Appx__, citing Petitioner's Case Brief at 13, P.R. 241, C.R.

155, Appx__.  The absence of such evidence left an open question as to

the relationship between ULIX and [              ].  When American Keg

expressed criticism of the agency for its failure to require positive

evidence in support of ULIX's claims, <u>see</u> Petitioner's Draft Remand

Comments at 10, P.R.R. 8, Appx__, Commerce again mischaracterized

the legal allocation of burdens on the various parties, stating that it had

"no evidence on the record indicating {ULIX} and [              ] were

affiliated," and therefore it had no reason to "request an additional

affidavit addressing the relationship." <u>Final Remand</u> at 23, P.R.R. 9,

C.R.R. 14, Appx__.

This approach turned the agency's separate rate framework on its head.  The burden of demonstrating eligibility for a separate rate lay with ULIX and despite multiple opportunities, on the record of this investigation, ULIX did not provide documentation supporting its claims regarding its relationship with [          ], a confirmed affiliate of [          ].  See Final Remand at 12, P.R.R. 9, C.R.R. 14, Appx__.  Rather than requiring ULIX to provide that documentation as the separate rate applicant, Commerce flipped the evidentiary burden on its head, and criticized American Keg for failing to establish, through positive evidence, that ULIX's customer was affiliated.  Id. at 23, Appx__.

Commerce's determination was therefore unsupported by substantial evidence, as the agency approved ULIX's separate rate status despite evidence suggesting an affiliation between ULIX and [          ], and despite lacking documentation from ULIX that supported its statements to the contrary.  Commerce's determination also constituted an abuse of discretion, as its decision to rely on ULIX's unsupported statements was inconsistent with the agency's own requirement that separate rate applicants affirmatively demonstrate

their freedom from <u>de facto</u> government control through documentation

of independent price negotiations with an unaffiliated customer.  <u>See</u>

<u>Jiangsu Jiasheng</u>, 28 F. Supp. 3d at 1323 (requiring agencies to exercise

reasonable judgment in weighing relevant factors).

## CONCLUSION

For all of these reasons, Plaintiff respectfully requests that this Court sustain Commerce's <u>Final Remand</u> with respect to the 2018 Malaysian labor data and the 2016 Mexican INEGI data, and, further, that this Court grant the relief requested in the proposed order with respect to the agency's selection of the surrogate value for labor and the separate rate status of ULIX.

Respectfully submitted,

<u>/s/ Whitney M. Rolig</u>
Whitney M. Rolig
Andrew W. Kentz
Nathaniel Maandig Rickard

**PICARD KENTZ & ROWE LLP**
1750 K Street, N.W.
Suite 800
Washington, DC 20006
(202) 331-4040

*Counsel to American Keg Company*

Dated:  September 20, 2021

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| **NEW AMERICAN KEG, d/b/a AMERICAN KEG COMPANY,** ) ) ) ) | |
| **Plaintiff,** ) ) | |
| **v.** ) ) | **Court No. 20-00008** |
| **UNITED STATES,** ) ) ) | |
| **Defendant,** ) ) | **Hon. M. Miller Baker, Judge** |
| **and** ) ) | |
| **NINGBO MASTER INTERNATIONAL TRADE CO., LTD, and GUANGZHOU JINGYE MACHINERY CO., LTD.** ) ) ) ) ) | |
| **Defendant-Intervenors.** ) ) | |

## <u>CERTIFICATE OF COMPLIANCE WITH THE WORD LIMITATION</u>

I, Whitney M. Rolig, hereby certify that this brief, exclusive of the table of contents, table of authorities, glossary, certifications of counsel, and counsel's signature block, but including headings, footnotes, and quotations contains 7,796 words, according to the word count function of the word processing program used to prepare this brief, and therefore

**PUBLIC VERSION**                              **Court No. 20-00008**

complies with the word limitations as set forth in ¶ 2(B) of the Standard

Chambers Procedures of this Court, as amended on October 3, 2016.

/s/ Whitney M. Rolig
Whitney M. Rolig
**PICARD KENTZ & ROWE LLP**

*Counsel to American Keg Company*