# UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

| | |
|---|---|
| _____ ) | |
| NEW AMERICAN KEG, d/b/a ) | |
| AMERICAN KEG COMPANY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES, ) | |
| ) | Court No. 20-00008 |
| Defendant, ) | |
| ) | PUBLIC |
| and ) | VERSION |
| ) | |
| NINGBO MASTER INTERNATIONAL ) | |
| TRADE CO., LTD., GUANGZHOU ) | |
| JINYE MACHINERY CO., LTD., ) | |
| ) | |
| Defendant-Intervenors. ) | |
| ) | |
| _____ ) | |

## DEFENDANT'S RESPONSE TO COMMENTS ON THE DEPARTMENT OF <u>COMMERCE'S REMAND REDETERMINATION</u>

BRIAN M. BOYNTON
Acting Assistant Attorney
General

JEANNE E. DAVIDSON
Director

OF COUNSEL:
VANIA WANG
Attorney
Department of Commerce
Office of the Chief Counsel
For Trade Enforcement
& Compliance

PATRICIA M. MCCARTHY
Assistant Director

ASHLEY AKERS
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 353-0521

November 4, 2021

Attorneys for Defendant

# <u>TABLE OF CONTENTS</u>

<u>**PAGES**</u>

BACKGROUND ........................................................................ 2

    I.     Administrative Proceedings .................................... 2

    II.    The Court's Remand Order..................................... 6

    III.   Results Of Remand Redetermination...................... 7

ARGUMENT ......................................................................... 9

    I.     Standard Of Review ............................................. 10

    II.    Commerce's Determination To Use The Mexican
           Data Was A Reasonable Use Of Discretion And
           Supported By Substantial Evidence...................... 11

          A.    Legal Framework........................................ 11

          B.    Commerce Complied With The Court's
                 Remand Order To Reconsider Malaysian
                 Labor Data................................................. 13

          C.    Commerce Reasonably Considered And
                 Used The ILC Mexico Data Over The ILC
                 Brazil Data ................................................. 14

    III.   Commerce's Grant Of Separate Rate Status To
           Guangzhou Ulix Was Supported By Substantial
           Evidence And Is In Accordance With The Law..... 22

          A.    Legal Framework........................................ 22

B.      Commerce's Grant Of Separate Rate
        Status To Guangzhou Ulix Is Supported
        By Substantial Evidence ........................... 24

CONCLUSION ................................................................. 31

# TABLE OF AUTHORITIES

## CASES                                                  PAGES

*Ad Hoc Shrimp Trade Action Comm. v. United States,*
  925 F. Supp. 2d 1315 (Ct. Int'l Trade 2013)........................ 24

*Amanda Foods (Vietnam) Ltd. v. United States,*
  774 F. Supp. 2d 1286 (Ct. Int'l Trade 2011) ........................ 11

*Am. Silicon Techs. v. United States,*
  261 F.3d 1371 (Fed. Cir. 2001)............................................. 29

*Bethlehem Steel Corp. v. United States,*
  223 F. Supp. 2d 1372 (Ct. Int'l Trade 2002) ........................ 10

*Boomerang Tube LLC v. United States,*
  856 F.3d 908 (Fed. Cir. 2017).............................................. 18

*Bridgestone Ams., Inc. v. United States,*
  710 F. Supp. 2d 1359 (Ct. Int'l Trade 2010) ........................ 18

*Diamond Sawblades Mfrs. Coalition v. United States,*
  866 F.3d 1304 (Fed. Cir. 2017)............................................. 24

*Downhole Pipe & Equip., L.P. v. United States,*
  776 F.3d 1369 (Fed. Cir. 2015)............................................. 28

*Fengchi Imp. & Exp. Co. v. United States,*
  98 F. Supp. 3d 1309 (Ct. Int'l Trade 2015)........................... 19

*Fujitsu v. United States,*
  88 F.3d 1034 (Fed. Cir. 1996).............................................. 29

*Huaiyin Foreign Trade Corp. v. United States,*
  322 F.3d 1369 (Fed. Cir. 2003)............................................. 23

*Mittal Steel Point Lisas Ltd. v. United States,*
  548 F.3d 1375 (Fed. Cir. 2008)............................................. 19

*Nakornthai Strip Mill Pub. Co. v. United States,*
    587 F. Supp. 2d 1303 (Ct. Int'l Trade 2008) ....................... 18

*Nation Ford Chem. Co. v. United States,*
    166 F.3d 1373 (Fed. Cir. 1999)........................................... 12

*New American Keg v. United States*,
    Court No. 20-00008, Slip Op. 21-30 (Ct. Int'l Trade March
    23, 2021)............................................................................... 2

*NTN Bearing Corp. v. United States,*
    74 F.3d 1204 (Fed. Cir. 1995)  ..................................... 16, 20

*Pokarna Engineered Stone Limited v. United States,*
    Consol. Ct. No. 20-00127, Slip Op. 21-138 (Oct. 7, 2021 Ct.
    Int'l Trade).......................................................................... 29

*Pro-Team Coil Nail Enterprise, Inc. v. United States,*
    Consol. Court No. 18-00027, ECF No. 71, 100, 127 ............. 18

*Shandong Huarong Gen. Corp. v. United States,*
    159 F. Supp. 2d 714 (Ct. Int'l Trade 2001).......................... 17

*Sigma Corp. v. United States,*
    117 F.3d 1401 (Fed. Cir. 1997)...................................... 22, 23

*SKF USA Inc. v. United States,*
    254 F.3d 1022 (Fed. Cir. 2001)............................................ 22

*Tianjin Mach. Imp. & Exp. Corp. v. United States,*
    806 F. Supp. 1008 (Ct. Int'l Trade 1992)............................ 23

*United States v. L.A. Tucker Truck Lines, Inc.,*
    344 U.S. 33 (1952)  ............................................................. 19

*Xiamen Int'l Trade & Indus. Co. v. United States,*
    953 F. Supp. 2d 1307 (Ct. Int'l Trade 2013)........................ 12

## STATUTES

19 U.S.C. § 1675(a)(2)(A)................................................................ 11

19 U.S.C. § 1677b(a)(1).................................................................. 11

19 U.S.C. § 1677b(c)(1)................................................................. 11

## ADMINISTRATIVE DETERMINATIONS

*Antidumping Methodologies in Proceedings Involving Non-Market*
    *Economies: Valuing the Factor of Production: Labor,*
    76 Fed. Reg. 36,092, 36,094
    (Dep't of Commerce June 21, 2011)...................................... 21

*Chlorinated Isocyanurates from the People's Republic of China,*
    82 Fed. Reg. 4,852 (Dep't of Commerce January 17, 2017) . 15

*Polyester Staple Fiber From the People's Republic of China,*
    75 Fed. Reg. 1,336 (Dep't of Commerce Jan. 11, 2010)........ 12

*Refillable Stainless Steel Kegs from the People's Republic of*
    *China, the Federal Republic of Germany, and Mexico,*
    83 Fed. Reg. 52,195 (Dep't of Commerce Oct. 16, 2018) ........ 2

*Refillable Stainless Steel Kegs From the People's Republic of*
    *China,*
    84 Fed. Reg. 25,745 (Dep't of Commerce June 4, 2019)......... 5

*Silicon Carbide from the People's Republic of China,*
    59 Fed. Reg. 22,585 (Dep't of Commerce May 2, 1994)........ 23

*Sparklers from the People's Republic of China,*
    56 Fed. Reg. 20,588 (Dep't of Commerce May 6, 1991)........ 23

## GLOSSARY

| ILC | International Labor Comparisons |
|-----|-------------------------------|
| INEGI | Government of Mexico, Institute of Statistics and Geography |
| SV | Surrogate Value |
| CPI | Consumer Price Index |

# UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE M. MILLER BAKER, JUDGE

_____
|  |  )  |  |
|--|--|--|
| NEW AMERICAN KEG, d/b/a | ) |  |
| AMERICAN KEG COMPANY, | ) |  |
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| UNITED STATES, | ) |  |
|  | ) | Court No. 20-00008 |
| Defendant, | ) |  |
|  | ) | PUBLIC |
| and | ) | VERSION |
|  | ) |  |
| NINGBO MASTER INTERNATIONAL | ) |  |
| TRADE CO., LTD., GUANGZHOU | ) |  |
| JINYE MACHINERY CO., LTD., | ) |  |
|  | ) |  |
| Defendant-Intervenors. | ) |  |
|  | ) |  |

_____)

## <u>ORDER</u>

Upon consideration of plaintiff's comments regarding the remand

redetermination, defendant's response thereto, and all other pertinent

papers, it is hereby

ORDERED that the remand redetermination is sustained.

Date:_____                    _____

New York, NY                                              Judge

# UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE M. MILLER BAKER, JUDGE

_____
)
NEW AMERICAN KEG, d/b/a                     )
AMERICAN KEG COMPANY,            )
                                                            )
         Plaintiff,                     )
                                                            )
   v.                                          )
                                                            )
UNITED STATES,                                 )
                                                            )    Court No. 20-00008
         Defendant,                )
                                                            )
and                                                      )    PUBLIC VERSION
                                                            )
NINGBO MASTER INTERNATIONAL)
TRADE CO., LTD., GUANGZHOU       )
JINYE MACHINERY CO., LTD.,           )
                                                            )
     Defendant-Intervenors.          )
                                                            )
_____)

## DEFENDANT'S RESPONSE TO COMMENTS ON THE DEPARTMENT OF COMMERCE'S REMAND REDETERMINATION

Defendant, the United States, respectfully submits this response

to the comments submitted by American Keg Company (American Keg),

concerning the remand redetermination filed by the United States

Department of Commerce (Commerce) pursuant to a remand order by

this Court.  *See* Remand Redetermination (July 7, 2021) (P.R.R. 9), ECF

No. 39, Appx__; American Keg Cmts, ECF No. 45.  As discussed below,

the remand redetermination complies with the Court's remand order in

*New American Keg v. United States*, Court No. 20-00008, Slip Op. 21-30

(Ct. Int'l Trade Mar. 23, 2021) (remand order).  Accordingly, the Court

should sustain Commerce's remand redetermination.

## BACKGROUND

### I.   Administrative Proceedings

On September 20, 2018, American Keg filed a petition, which

included data from the International Labor Comparisons (ILC) for

Brazil and Mexico.  Petition (September 20, 2018) (P.R. 1-2) (C.R. 1-2).

Commerce initiated an investigation of refillable stainless steel kegs

from China on October 10, 2018.  *See Refillable Stainless Steel Kegs*

*from the People's Republic of China, the Federal Republic of Germany,*

*and Mexico*, 83 Fed. Reg. 52,195 (Dep't of Commerce Oct. 16, 2018)

(LTFV investigation initiation notice) (P.R. 27), Appx__. [1]  Commerce

---

[1] Public documents on the administrative record are designated as
"P.R."  This scope inquiry has an administrative record to reflect the

selected Ningbo Master International Trade Co., Ltd. (Ningbo Master), and Penglai Jinfu Stainless Steel Products (Jinfu) for individual examination as mandatory respondents based on U.S. Customs and Border Protection data.  Respondent Selection Memorandum (Oct. 31, 2018) (P.R. 45) (C.R. 17), Appx__.  On November 26, 2018, Jinfu informed Commerce that it would not participate in the investigation. Jinfu's Withdrawal Letter (Nov. 26, 2018) (P.R. 91), Appx__.

In addition to Ningbo Master, Guangzhou Ulix Industrial & Trading Co, Ltd. (Guangzhou Ulix), filed a separate rate application to attempt to demonstrate the absence of government control in its exporting activities.  Guangzhou Ulix Separate Rate Application (Nov. 21, 2018) (P.R. 90) (C.R. 21), Appx__.  Commerce asks separate rate applicants to provide documentation relating to the "first sale by invoice date of subject merchandise to an unaffiliated customer in the United States during the {period of investigation} for a commercial

---

case number for the antidumping duty order. All P.R. numbers in this brief cite the antidumping duty record.  References to the public documents on the administrative record for the remand redetermination are designated as "P.R.R."

transaction." *See* Remand Redetermination at 10, n.46.  Commerce

issued, and Guangzhou Ulix responded to, supplemental questionnaires

regarding this request.  In its supplemental questionnaire responses,

Guangzhou Ulix explained that it had submitted emails in its initial

separate rate application that constituted written documentation of

telephone communications regarding independent price negotiation

with an unaffiliated customer.  Guangzhou Ulix also submitted an

affidavit to prove that it had conducted independent price negotiation

with an unaffiliated customer.  Guangzhou Ulix Second Supplemental

Response (February 21, 2019) (P.R. 132) (C.R. 52) at 5-6, Appx__;

Guangzhou Ulix Third Supplemental Response (March 14, 2019) (P.R.

154) (C.R. 56), at Exhibit S3-1, Appx__.

American Keg submitted rebuttal information in response to

Guangzhou Ulix's third supplemental separate rate questionnaire

response.  American Keg Third Supplemental Rebuttal (March 25,

2019) (P.R. 163) (C.R. 68), Appx__.  Guangzhou Ulix submitted rebuttal

comments to American Keg's rebuttal information.  Guangzhou Ulix

Rebuttal Cmts (March 28, 2019) (P.R. 164) (C.R. 69), Appx__.

On June 4, 2019, Commerce published its preliminary determination. *See Refillable Stainless Steel Kegs From the People's Republic of China*, 84 Fed. Reg. 25,745 (Dep't of Commerce June 4, 2019) (preliminary determination) (P.R. 216), Appx__, and accompanying decision memorandum (PDM) (P.R. 203), Appx__. Commerce preliminarily determined that Guangzhou Ulix had demonstrated eligibility for a separate rate based on information indicating that it operated free of *de jure* and *de facto* government control. PDM at 12-15, Appx__.

Commerce selected Malaysia as the primary surrogate country and relied on Malaysian data for all factors of production. PDM at 11 (P.R. 203), Appx__. Commerce preliminarily calculated antidumping rates of 2.01 percent for Ningbo Master and the separate rate companies, and 79.71 percent for the China-wide entity. Preliminary Determination at 25,746 (P.R. 216), Appx__.

After considering the interested parties' comments on the preliminary determination, Commerce issued its final determination. *See* Final Determination, 84 Fed. Reg. at 57,010, Appx__. Commerce

continued to use the Malaysia surrogate labor value and to find that

Ulix was eligible for a separate rate.  IDM at 9-12, 21-23, Appx__.

Commerce calculated a *de minimis* antidumping duty rate for Ningbo

and the separate rate respondents, and 77.13 percent for the China-

wide entity.  Final Determination, 84 Fed. Reg. at 57,011, Appx__; IDM

at 4, Appx__.

## II.   <u>The Court's Remand Order</u>

On March 23, 2021, this Court issued an opinion holding that

Commerce's use of the labor data from Malaysia was not supported by

substantial evidence.  Remand Order at 35.  The Court held that

Commerce's analysis of evidence of purported forced labor in Malaysia

was not sufficient.  *Id*.  The Court stated that, in light of the evidence of

forced labor, Commerce had failed to explain why Malaysian labor data

were preferable.  *Id*.  The Court also held that, although Commerce is

not required to verify everything on the record, Commerce acted

unreasonably by failing to verify minor corrections when the

preliminary margin was on the de minimis threshold and the minor

6

corrections were potentially dispositive to Commerce's final determination. *Id.* at 38-40.

The Court next held that Commerce had not addressed evidence of potential affiliation when it granted separate rate status to Guangzhou Ulix. *Id.* at 49-50. The Court ordered Commerce to explain why it had found the evidence in American Keg's submissions regarding Guangzhou Ulix's eligibility for a separate rate to be unconvincing. *Id.*.

III. **Results Of Remand Redetermination**

On May 12, 2021, Commerce issued a draft remand redetermination. Commerce determined that Malaysia labor data were not the best available information on the record and, thus, used the ILC Brazil labor data. Draft Remand Redetermination (May 12, 2021) (P.R.R. 4) (C.R.R. 10) at 7, Appx__. Commerce also identified the record evidence that supported granting Guangzhou Ulix separate rate status. *Id.* at 11, Appx__.

In response, on May 19, 2021, American Keg and Ningbo Master timely submitted comments. American Keg Draft Comment (May 19, 2021) (P.R.R. 8) (C.R.R. 13), Appx__; Ningbo Master Draft Comment

(May 19, 2021) (P.R.R. 7), Appx__.  In its draft comments regarding Commerce's use of the labor data, Ningbo Master observed that there is an additional Mexican labor surrogate value on the record from the same source as the Brazilian labor surrogate value.  *See* Remand Redetermination at 18.

On July 7, 2021, Commerce issued its final remand redetermination.  After re-examining the evidence, Commerce found that Malaysia labor data were not the best available information on the record.  Commerce compared the ILC Mexico labor data with the ILC Brazil labor data and determined that the ILC Mexico labor data constituted the best information available to value Ningbo Master's labor factors of production.  After comparing the ILC Mexico labor data and the ILC Brazil labor data, Commerce explained that Mexico produces identical merchandise, whereas Brazil produces only comparable merchandise.  *See* Remand Redetermination at 17-19, Appx__.

In the final remand redetermination, Commerce continued find that record evidence supported granting Guangzhou Ulix separate rate status. *Id*. at 12., Appx\_\_.

## **ARGUMENT**

Commerce complied with the Court's remand order and its remand redetermination is supported by substantial evidence. First, Commerce reconsidered the evidence of labor abuse in Malaysia. Remand Redetermination at 2-7. In compliance with the Court's remand order, Commerce verified certain minor corrections using an in-lieu-of-verification questionnaire. In its redetermination, Commerce found that Malaysian labor data are not the best available information on the record. Commerce's redetermination complied with the Court's remand order and American Keg does not challenge this determination. Thus, the Court should sustain Commerce's redetermination.

Commerce also reevaluated other evidence on the record to determine which labor data constitute the best available information. Commerce determined that the ILC Mexico data were the best information available to value Ningbo Master's labor factors of

production because Mexico produces identical merchandise, whereas Brazil produces only comparable merchandise.  American Keg fails to articulate a legal theory that undermines this determination or otherwise demonstrate error.

Finally, Commerce continued to grant Guangzhou Ulix separate rate status.  *Id.* at 12, Appx__.  Commerce complied with the Court's remand order and considered all of the evidence and arguments made by American Keg regarding Guangzhou Ulix's eligibility for separate rate, and adequately explained why that evidence failed to undermine Commerce's determination.  As such, Commerce complied with the remand order and its determination is supported by substantial evidence and is otherwise in accordance with law.

## I.   <u>Standard Of Review</u>

"The same standard of review applies to the review of a remand determination as to the review of the original determination." *Bethlehem Steel Corp. v. United States*, 223 F. Supp. 2d 1372, 1375 (Ct. Int'l Trade 2002).  Accordingly, the "court will sustain {Commerce's} determination upon remand if it complies with the court's remand

order, is supported by substantial evidence on the record, and is

otherwise in accordance with law." *Amanda Foods (Vietnam) Ltd. v.*

*United States*, 774 F. Supp. 2d 1286, 1290 (Ct. Int'l Trade 2011).

## II.   Commerce's Determination To Use The Mexican Data Was A Reasonable Use Of Discretion And Supported By Substantial Evidence

### A.   Legal Framework

In an antidumping proceeding, Commerce must determine

whether subject merchandise is or is likely to be sold at less than fair

value in the United States by comparing the export price (*i.e.*, the price

of the goods sold in the United States) and the normal value of

merchandise.  19 U.S.C. § 1675(a)(2)(A).  Normal value is usually

determined by reference to sales of merchandise in the home market,

sales of merchandise in a third country, or a constructed value of the

merchandise.  *See* 19 U.S.C. § 1677b(a)(1), (4).  However, in cases

involving nonmarket economy countries, such as China, Commerce

must determine normal value by using the "best available information"

from market economy countries to value the factors of production of the

subject merchandise.  19 U.S.C. § 1677b(c)(1).

11

Commerce has broad discretion in selecting this information. *See Nation Ford Chem. Co. v. United States*, 166 F.3d 1373, 1377 (Fed. Cir. 1999) ("While {section} 1677b(c) provides guidelines to assist Commerce in this process, this section also accords Commerce wide discretion in the valuation of factors of production in the application of those guidelines."). Commerce's practice when selecting the best available information for valuing factors of production is to select, to the extent practicable, surrogate values that are product-specific, representative of a broad-market average, publicly available, contemporaneous with the period of review or investigation, and free of any taxes or duties. *See, e.g., Polyester Staple Fiber From the People's Republic of China*, 75 Fed. Reg. 1,336 (Dep't of Commerce Jan. 11, 2010); *see also Xiamen Int'l Trade & Indus. Co. v. United States*, 953 F. Supp. 2d 1307, 1312 (Ct. Int'l Trade 2013) (explaining that Commerce has established these criteria "because no statute or regulation defines the best available information").

**B.    Commerce Complied With The Court's Remand Order To Reconsider Malaysian Labor Data**

In its remand order, the Court directed Commerce to reevaluate its determination with respect to forced labor in Malaysia, its effects on the country's overall manufacturing labor wage rate, and the implications of those effects for Commerce's selection of a surrogate value.  Remand Order at 35-36.  Commerce complied with the Court's order.  As American Keg acknowledges, Commerce reviewed all of the record evidence and made a "thorough and reasoned determination" that the Malaysia labor rates are not the best available information on the record.  American Keg Cmts at 20.  Because Commerce complied with the Court's remand order and the parties agree that Commerce's conclusion is supported by substantial evidence, the Court should affirm this aspect of the remand redetermination.

Commerce also reasonably considered and rejected the Mexican INEGI labor data.  Remand Redetermination at 7.  American Keg agrees.  *See* American Keg Cmts at 21-22.  Commerce determined that it could not ascertain whether the Mexico INEGI SV represents full labor costs and, thus, it determined that it would be inappropriate to

13

rely on this particular Mexico surrogate value to value Ningbo Master's
labor factors of production in this investigation.  Remand
Redetermination at 7.

###   C.   Commerce's Reasonably Considered And Used The ILC Mexico Data Over The ILC Brazil Data

After determining that the Malaysian labor data and Mexico
INEGI were not suitable for use as a surrogate value, two remaining
labor surrogate values were left on the record:  ILC data for Brazil and
for Mexico from 2016.  Remand Redetermination at 7.

Commerce reviewed and analyzed both the ILC data for Brazil
and for Mexico from 2016, and selected the Mexican labor SV to value
Ningbo Master's labor factors of production.  *Id*.  This determination is
supported by substantial evidence.

Commerce explained that both rates were placed on the record in
the same document, both rates are from 2016, both countries are at the
same level of economic development as China, and both countries are
significant producers of comparable merchandise.  *Id*. at 18-19.  Despite
these similarities, Commerce has a "preference to select a surrogate
country that produces identical merchandise over one that only

14

produces comparable merchandise."  Remand Redetermination at 19
(quoting *Chlorinated Isocyanurates from the People's Republic of China*,
82 Fed. Reg. 4,852 (Dep't of Commerce Jan. 17, 2017)), and
accompanying Issues and Decision Memorandum at 4), Appx__.

Here, Mexico produces identical subject merchandise, whereas the
petitioner averred in its petition that "there are no Brazilian producers
of refillable stainless steel kegs."  Remand Redetermination at 19
(quoting Petition Volume II at 5), Appx__.  Thus, Commerce reasonably
selected the ILC Mexico data over the ILC Brazil data as "the best
information available to value Ningbo Master's labor {factors of
production}." *Id.*

After selecting the Mexican labor SV from ILC, Commerce inflated
the Mexican labor SV from ILC to the period of investigation and
recalculated Ningbo Master's margin for the final results.  Remand
Redetermination at 7.

American Keg raises several arguments to challenge Commerce's
use of the Mexican ILC data as an abuse of discretion.  First, American
Keg argues that Commerce's determinations ran afoul of the "spirit" of

15

its regulations, because Commerce adopted a surrogate value for which no party had advocated until after the issuance of the draft remand results.  American Keg at 27, 28-29.  This argument does not entitle American Keg to relief.  American Keg is, or should be, well aware that, like preliminary determinations, draft remand redeterminations are subject to change, and that Commerce can and should make changes in response to draft remand comments when appropriate.  *See, e.g.*, *NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1208 (Fed. Cir. 1995) ("However, preliminary determinations are 'preliminary' precisely because they are subject to change.").  These changes do not render Commerce's determination unsupported by substantial evidence or unlawful, nor do they run afoul of Commerce's regulations.

Additionally, Commerce can and should change its determination, if appropriate, when it becomes aware of information that it previously failed to consider during the original proceeding.  American Keg has not argued that Commerce intentionally disregarded this information previously or otherwise determined that it was inapplicable.  Thus, its consideration was proper.  *See, e.g.*, *Shandong Huarong Gen. Corp. v.*

*United States*, 159 F. Supp. 2d 714, 849 (Ct. Int'l Trade 2001)
("Plaintiffs have not demonstrated anything that would cause the Court
to conclude Commerce either intentionally disregarded the submitted
information or in its discretion determined it was inapplicable.").

Second, American Keg argues that Commerce's determination to
rely on Mexican ILC data was an abuse of discretion because American
Keg had advocated strongly for a different position.  *See* American Keg
Cmts at 27-28.  This argument provides no basis for relief.  American
Keg's desire for a different result from the one that Commerce reached
does not undermine Commerce's determination.  Indeed, American Keg
has cited no specific evidence that Commerce failed to consider or that
undermines Commerce's determination.  That American Keg "provided
a fulsome response" and made "extensive submissions of relevant
evidence," American Keg Cmts at 28, does not compel Commerce to
reach a determination in accordance with American Keg's preferences.

American Keg also complains that Commerce "could have refused
to consider arguments and evidence advanced for the first time on
remand, but did not."  American Keg Cmts at 28-29 (citing *Nakornthai*

17

*Strip Mill Pub. Co. v. United States*, 587 F. Supp. 2d 1303 (Ct. Int'l Trade 2008); *Bridgestone Ams., Inc. v. United States*, 710 F. Supp. 2d 1359 (Ct. Int'l Trade 2010).   Just because Commerce could have declined to consider new arguments and evidence does mean it acted unlawfully or improperly by not.   As established in the cases that American Keg cites, Commerce has discretion to consider arguments and evidence made for the first time on remand.  *See id.*

American Keg next contends that because Commerce considered new evidence and arguments on remand, Commerce did not provide American Keg an opportunity to comment on the agency's approach. American Keg Cmts at 23, 29.   American Keg has not demonstrated that Commerce erred, acted unlawfully, or contrary to its practice. Commerce does not ordinarily invite rebuttal comments to draft remand comments.  *See, e.g.*, *Pro-Team Coil Nail Enterprise, Inc. v. United States*, Consol. Court No. 18-00027, ECF No. 71, 100, 127.  And, when changes are made between the preliminary and final determinations, Commerce is not obligated to notify the parties, let alone allow additional rounds of briefing. *See Boomerang Tube LLC v. United*

*States,* 856 F.3d 908, 912 (Fed. Cir. 2017) (reversing the Court of International Trade's determination that Commerce is required to "expressly notify interested parties any time it intends to change its methodology between its preliminary and final determinations").

However, had American Keg wished to provide rebuttal comments, it should have requested the opportunity to submit its additional comments after the draft remand comments were submitted. Because American Keg failed to do so, it is now too late for American Keg to claim error. *Mittal Steel Point Lisas Ltd. v. United States*, 548 F.3d 1375, 1383–84 (Fed. Cir. 2008) ("Simple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against *objection made at the time appropriate under its practice*.") (emphasis added) (quoting *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952)). *See also Fengchi Imp. & Exp. Co. v. United States*, 98 F. Supp. 3d 1309, 1315 (Ct. Int'l Trade 2015) ("The remand proceeding is an administrative proceeding . . . .").

Third, American Keg argues that Commerce's consideration of the Mexican ILC data "ran afoul of the Court's interest in judicial economy." American Keg Cmts at 30-31. American Keg reasons that Commerce's determination now provides more work for the Court because the use of the Mexican ILC data has not been extensively briefed and therefore Commerce's determination risks creating delay, additional remands, and unnecessary litigation. American Keg Cmts at 30. As previously explained, draft remand redeterminations are subject to change and such changes do not render Commerce's determination unsupported or unlawful. *See, e.g.*, *NTN Bearing*, 74 F.3d at 1208 ("{P}reliminary determinations are 'preliminary' precisely because they are subject to change.").

Fourth, American Keg challenges Commerce's reliance on the Mexican ILC data on the ground that Commerce improperly used the Brazil Consumer Price Index (CPI) to inflate the Mexican ILC data. American Keg contends that Commerce failed to recognize that its chosen inflator was specific to Brazil and wholly unrelated to Mexico. American Keg Cmts at 22-33.

American Keg does not cite any authority that establishes Commerce must consider the inflator as a factor when determining which country's data to use for surrogate value. At most, American Keg cites the *Antidumping Methodologies in Proceedings Involving Non-Market Economies: Valuing the Factor of Production: Labor*, 76 Fed. Reg. 36,092, 36,094 (Dep't of Commerce June 21, 2011), to argue that Commerce failed to explain why the CPI information specific to Brazil was a relevant or appropriate means of inflating a Mexican labor wage. This notice, however, does not treat the inflator as a determining factor for which labor data to use.

As we have explained, Commerce's use of the ILC Mexico data was reasonable and supported by substantial evidence and should be affirmed. However, American Keg correctly identifies that Commerce did not explain in the remand redetermination why it applied the inflator specific to Brazil. *See* American Keg Cmts at 27. Thus, to the extent, if any, that this explanation is relevant or necessary to Commerce's use of the Mexican ILC data, then we would respectfully request a voluntary remand for Commerce to explain whether and why

the inflator used on the Mexican ILC data was appropriate. *See SKF USA Inc. v. United States*, 254 F.3d 1022, 1029 (Fed. Cir. 2001) (explaining that a voluntary remand may be appropriate where the agency requests a remand without confessing error to reconsider its previous position).

**III.    Commerce's Grant of Separate Rate Status To Guangzhou Ulix Was Supported By Substantial Evidence And Is In Accordance With the Law**

**A.    Legal Framework**

In proceedings involving non-market economy countries, Commerce uses a rebuttable presumption that all companies within the country are subject to government control and should be assessed a single antidumping duty rate. *Huaiyin Foreign Trade Corp. v. United States*, 322 F.3d 1369, 1372 (Fed. Cir. 2003); *Sigma Corp. v. United States*, 117 F.3d 1401, 1404-06 (Fed. Cir. 1997). Under this presumption, a respondent receives the non-market economy countrywide rate unless it affirmatively demonstrates an absence of both *de jure* and *de facto* control by the Chinese government. *Sigma*,

117 F.3d at 1405 (quoting *Tianjin Mach. Imp. & Exp. Corp. v. United States*, 806 F. Supp. 1008, 1013-14 (Ct. Int'l Trade 1992)).

To assess whether a company has demonstrated *de facto* independence from governmental control, Commerce considers whether: (1) the export prices are set by, or subject to the approval of, a governmental authority; (2) the respondent has authority to negotiate and sign contracts and other agreements; (3) the respondent has autonomy from the central, provincial and local governments in making decisions regarding the selection of its management; and (4) the respondent retains the proceeds of its export sales and makes independent decisions regarding disposition of profits or financing of losses. *See Sparklers from the People's Republic of China*, 56 Fed. Reg. 20,588 (Dep't of Commerce May 6, 1991), *as modified in Silicon Carbide from the People's Republic of China*, 59 Fed. Reg. 22,585 (Dep't of Commerce May 2, 1994); *see also* Policy Bulletin 05.1.

Commerce relies on an applicant's comprehensive submissions to determine its independence from a non-market economy entity. Policy Bulletin on the Topic of Separate Rates Practice and Application of

23

Combination Rates in Antidumping Investigations Involving Non-Market Economy Countries (Apr. 5, 2005) (Policy Bulletin 05.1), available at http://enforcement.trade.gov/policy/bull05-1.pdf.4; *see also, e.g., Diamond Sawblades Mfrs. Coalition v. United States*, 866 F.3d 1304, 1311-12 (Fed. Cir. 2017).  When a company receives "separate rate status," it is granted a company-specific rate separate from the rate assigned to the country-wide entity.  *See, e.g.*, *Ad Hoc Shrimp Trade Action Comm. v. United States*, 925 F. Supp. 2d 1315, 1320 (Ct. Int'l Trade 2013).

## B.   Commerce's Grant Of Separate Rate Status To Guangzhou Ulix Is Supported By Substantial Evidence

Commerce's remand redetermination to grant Guangzhou Ulix separate rate status is supported by substantial evidence and complies with the Court's remand order.  In the remand order, the Court held that Commerce "failed to address American Keg's evidence that the U.S. customer was affiliated with {Guangzhou} Ulix."  Remand Order at 49-50.  The Court instructed Commerce to address this evidence on remand.

On remand, Commerce complied with the Court's order and reexamined all of evidence on the record and determined that the evidence American Keg submitted did not demonstrate affiliation between Guangzhou Ulix and its customer, and thus did not undermine or defeat Guangzhou Ulix's eligibility for a separate rate. Remand Redetermination at 11-12, Appx__.

As Commerce explained, Guanzhou Ulix demonstrated that it conducted independent price negotiation with an unaffiliated customer. Guangzhou Ulix provided an affidavit from the unaffiliated U.S. customer, [███████████████], testifying to its independent price negotiation. Remand Redetermination at 10 (citing Separate Rate Application at 4 and Guangzhou Ulix Third Supplemental Response at Exhibit S3-1, Appx__).

Commerce evaluated and considered the rebuttal information submitted by American Keg. For example, American Keg submitted information that showed [█████████████████████████████████████ ███████████████████████████████████████████] and that [██████████████████████████████████████████████]

25

████████████████████████████████████████████████ ]. *Id.*
Appx__.   American Keg also submitted information that demonstrated
that [████████████████████████ ] may also be affiliated with
[████████████████████ ].  *Id.* at 12.

Commerce explained that the information submitted by American
Keg established an affiliation between [████████████████████
████████████████████████████████████████
████████ ].  *See* Remand Redetermination at 10-11 (citing American Keg
Third Supplemental Rebuttal).   However, Commerce determined that
this information did not demonstrate that there is any ownership or
familial connection between the owners of *Guangzhou Ulix* and the
owners of [████████████████████████ ].  *Id.* at 12.
Therefore, Commerce reasonably and appropriately determined that
American Keg's evidence does not undermine its determination that
Guangzhou Ulix is eligible for a separate rate.

American Keg now argues that Commerce "flipped the evidentiary
burden on its head," American Keg Cmts at 40, because Guangzhou
Ulix did not affirmatively demonstrate that it conducts independent

price negotiations.  This is wrong.  Commerce cited evidence, such as

the affidavit submitted by Guangzhou Ulix, that affirmatively

establishes Guangzhou Ulix conducted independent price negotiation

with an unaffiliated customer, which is part of the analysis to assess

whether Guangzhou Ulix is free from *de facto* government control.  *See*

Remand Redetermination at 10, n.46; *id.* at 11.  No evidence on the

record undermines that affirmative evidence and thus Commerce

appropriately relied on it.

   Commerce also explained that Guangzhou Ulix submitted rebuttal

information to American Keg's information, which demonstrated there

is "no equity or control relationship between" Guangzhou Ulix and

[███████████], that [███████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

██████████████████████] that [████████████████████

██████] and that Guangzhou Ulix has had prior business

relationships with [██████] but that it is not affiliated with [████

██]."  Remand Redetermination at 11-12.  This evidence, in addition to

27

the affidavit submitted by Guangzhou Ulix, constitutes substantial evidence that supports Commerce's determination that Guangzhou Ulix is entitled to a separate rate, and it squarely defeats American Keg's argument that Guangzhou Ulix did not affirmatively meet its burden to rebut the presumption of *de facto* government control.

American Keg's remaining arguments amount to nothing more than an improper invitation for the Court to reweigh the evidence. *See, e.g.*, *Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1376-77 (Fed. Cir. 2015) ("While Appellants invite this court to reweigh this evidence, this court may not do so."). For example, American Keg argues that its evidence is more persuasive than the evidence submitted by Guangzhou Ulix, because it shows that the [████████████████████ ████████████████████] and it shows that [████████████████████ ████████████████████████████████]. American Keg Cmts at 35. Commerce has adequately addressed this argument. Commerce explained that it does not view the fact that the companies share part of their names as an indicator of affiliation. Separate Rate Memorandum (October 27, 2021) (P.R. 255) (C.R. 160) at 4, Appx__.

28

Moreover, American Keg failed to explain how the fact that [███████

███████████████████████████████████████ ]

demonstrated that [██████████████████ ] are affiliated with

Guangzhou Ulix.  Whatever the significance, the Court should reject

American Keg's improper invitation to reweigh evidence that Commerce

has already reasonably and adequately considered.

The Court should also reject American Keg's arguments entailing

its own interpretation of evidence.  *See, e.g.*, American Keg Cmts at 38-

39 (arguing that it rebutted Guangzhou Ulix's evidence with its own

evidence).  Even if American Keg's interpretation of the evidence were

reasonable, that would not render Commerce's findings unreasonable or

unsupported by substantial evidence.  *See Am. Silicon Techs. v. United

States*, 261 F.3d 1371, 1376 (Fed. Cir. 2001) ("Even if it is possible to

draw two inconsistent conclusions from evidence in the record, such a

possibility does not prevent Commerce's determination from being

supported by substantial evidence.") (citing *Fujitsu*, 88 F.3d at 1044);

*Pokarna Engineered Stone Limited v. United States*, Consol. Ct. No. 20-

00127, Slip Op. 21-138 (Oct. 7, 2021 Ct. Int'l Trade) ("A party's ability to

29

point to an alternative, reasonable finding on the agency record does not provide a basis for the court to set aside an agency's determination.").

Finally, American Keg argues that Commerce should not have credited Guangzhou Ulix's information as reliable because Commerce had to follow up with Guangzhou Ulix by issuing multiple supplemental questionnaires. American Keg Comment at 36, 40. This argument is nonsensical. American Keg cites no authority and makes no sound argument demonstrating that the issuance of supplemental questionnaires somehow renders evidence submitted in response incredible. If anything, Commerce was able to collect additional information in response to supplemental questionnaires that made its determination more comprehensive and complete.

In summary, Commerce considered all of the record information and reasonably determined that Guangzhou Ulix met its burden to establish eligibility for a separate rate because it rebutted the presumption of *de facto* government control. Remand Redetermination at 23, Appx__; IDM at 23, Appx__. The Court should sustain this determination.

30

## **CONCLUSION**

For these reasons, we respectfully request that the Court sustain

Commerce's remand redetermination.

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney
General

JEANNE E. DAVIDSON
Director

/s/ Patricia M. McCarthy
PATRICIA M. MCCARTHY
Assistant Director

OF COUNSEL:                        /s/ Ashley Akers
VANIA WANG                         ASHLEY AKERS
Attorney                           Trial Attorney
Department of Commerce             U.S. Department of Justice
Office of the Chief Counsel        Civil Division
  for Trade Enforcement           Commercial Litigation Branch
  & Compliance                    P.O. Box 480
                                   Ben Franklin Station
                                   Washington, D.C.  20044
                                   Tel: (202) 353-0521

November 4, 2021                   Attorneys for Defendant

31

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 4th day of November, 2021, I electronically filed a copy of the foregoing using the CM/ECF system, which sent a notification of such filing to counsel of record.

/s/ Ashley Akers

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing brief complies with the word-count limitation, in that it contains 5,306 words according to the word-count function of the word-processing software used to prepare the memorandum, including text, footnotes, and headings.

/s/ Ashley Akers