A-570-093<br>
Remand<br>
Slip Op. 22-106<br>
POI:  01/01/2018 – 06/30/2018<br>
~~Business Proprietary Document~~<br>
E&C/OI:  TES<br>
**PUBLIC VERSION**

*New American Keg v. United States*,
**Court No. 20-00008, Slip Op. 22-106 (CIT September 13, 2022)**
**Refillable Stainless Steel Kegs from the People's Republic of China**

**FINAL RESULTS OF REDETERMINATION
PURSUANT TO COURT REMAND**

**I.    SUMMARY**

The U.S. Department of Commerce (Commerce) prepared these final results of redetermination pursuant to the remand opinion of the U.S. Court of International Trade (the Court) in *New American Keg v. United States*, Court No. 20-00008, Slip Op. 22-106 (CIT September 13, 2022) (*Remand Opinion*).  These final results of redetermination concern *Refillable Stainless Steel Kegs from the People's Republic of China:  Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part*, 84 FR 57010 (October 24, 2019) (*Final Determination*), and accompanying Issues and Decision Memorandum (IDM), and the *Final Results of Redetermination Pursuant to Court Remand, New American Keg v. United States*, Court No. 20-00008, Slip Op. 21-30 (CIT March 23, 2021), dated July 7, 2021 (*First Redetermination*).[1]

In the *Remand Opinion*, the Court remanded the *First Redetermination* to Commerce to: (1) explain why it was appropriate to inflate a Mexican labor wage rate using Brazilian data and why doing so was superior to using a Brazilian labor wage rate to value the labor factors of production (FOP) of mandatory respondent Ningbo Master International Trade Co., Ltd. (Ningbo

---

[1] The *First Redetermination* is available on Commerce's website at https://access.trade.gov/resources/remands/21-30.pdf.

Master);[2] and (2) identify the evidence in the administrative record that supports granting Guangzhou Ulix Industrial & Trading Co., Ltd. (Guangzhou Ulix) a separate rate.[3]

## II.     BACKGROUND

In the *Final Determination*, Commerce used Malaysian surrogate data to value Ningbo Master's labor FOPs and determined that Guangzhou Ulix was eligible for a separate rate.[4] In the *First Redetermination*, Commerce determined that "Malaysian data does not constitute the best available information for valuing Ningbo Master's labor FOPs because it is linked to forced labor."[5] Commerce further determined that "based on the information on the record, {it} selected the Mexican labor {surrogate value (SV)} from {Conference Board's International Labor Comparisons (ILC)} as the best information available to value Ningbo Master's labor FOPs" and "inflated the Mexican labor SV from ILC to the {period of investigation (POI) using Brazilian inflator} and recalculated Ningbo Master's margin."[6] Commerce also continued to determine that Guangzhou Ulix was eligible for a separate rate.[7] However, after filing the *First Redetermination*, Commerce requested a voluntary remand to explain whether and why the Brazilian inflator used on the Mexican labor wage rate was appropriate.[8] This Court's *Remand Opinion* accordingly ordered Commerce to explain its decision to use a Brazilian labor wage inflator for Mexican labor wage data.[9]

---

[2] *See Remand Opinion* at 9.
[3] *Id.*
[4] *See Final Determination* IDM at Comments 1 and 11.
[5] *See First Redetermination* at 17.
[6] *Id.* at 19.
[7] *Id.* at 22-23.
[8] *See* Memorandum, "Refillable Stainless Steel Kegs from the People's Republic of China:  Final Remand Results Calculation Memorandum for Ningbo Master International Trade Co., Ltd.," dated July 7, 2021 (Final Redetermination Calculation Memorandum), at Attachment B (Surrogate Value Spreadsheet at "Labor" tab); *see also Remand Opinion* at 5-6.
[9] *See Remand Opinion* at 9.

On October 6, 2022, we released the Draft Results to interested parties for comment.[10] On October 13, 2022, we received comments from the American Keg Company LLC (the petitioner).[11]

### III. ANALYSIS

*Labor Surrogate*

In the *Remand Opinion*, the Court remanded the *First Redetermination* to explain why it was appropriate to inflate a Mexican labor wage rate using Brazilian data and why doing so was superior to using a Brazilian labor wage rate.[12] The Mexican labor wage rate we used in the *First Redetermination* was from ILC.[13] After reexamining the issue, we acknowledge that it was improper to inflate the Mexican labor wage rate from the ILC using Brazilian consumer price index (CPI) data.

Notwithstanding, because Mexico has producers of identical merchandise, we continue to determine that Mexican labor wage data is superior to Brazilian labor wage data. Therefore, in order to make an accurate calculation, we re-opened the record and placed data on the record. Considering our stated preference of basing labor cost on International Labour Organization (ILO) data,[14] we placed data from the ILO on the record.[15] Consistent with our stated policy,[16]

---

[10] *See* Draft Results of Remand Redetermination, *New American Keg v. United States*, Consolidated Court No. 20-00008, Slip Op. 22-106 (CIT September 13, 2022), dated October 6, 2022 (Draft Results).
[11] *See* Petitioner's Letter, "Refillable Stainless Steel Kegs from the People's Republic of China: Comments on Draft Results of Redetermination Pursuant to Court Remand," dated October 13, 2022 (Petitioner's Comments).
[12] *See Remand Opinion* at 9.
[13] *See* Final Redetermination Calculation Memorandum at 2 (citing Petitioner's Letter, "Petitions for the Imposition of Antidumping Duties on Imports of Refillable Stainless Steel Kegs from Germany, Mexico, and the People's Republic Of China and Countervailing Duties on Imports of Refillable Stainless Steel Kegs from the People's Republic Of China," dated September 20, 2018 (Petition), at Volume II (Exhibit PRC-AD-11)).
[14] *See Antidumping Methodologies in Proceedings Involving Non-Market Economies: Valuing the Factor of Production: Labor*, 76 FR 36092 (June 21, 2011) (*Labor Methodologies*).
[15] *See* Memorandum, "Refillable Stainless Steel Kegs from the People's Republic of China: Draft Remand (Slip Op. 22-106) Results Calculation Memorandum for Ningbo Master International Trade Co., Ltd.," dated October 6, 2022 (Draft Results Calculation Memorandum), at Surrogate Value Spreadsheet ("ILO Wage Data" tab).
[16] *See Labor Methodologies*.

and because Mexico has producers of identical merchandise, we used the Mexican wage rate from the ILO data for 2018, instead of ILC data, and recalculated Ningbo Master's margin accordingly.[17]  Because the ILO data we used for these final results of redetermination are contemporaneous with the POI, it was not necessary to inflate the wage rate.

*Guangzhou Ulix Separate Rate*

In the *Remand Opinion*, the Court remanded the *First Redetermination* for Commerce to identify the evidence in the administrative record that supports granting Guangzhou Ulix a separate rate.[18]  In its decision, the Court stated that the statements Commerce cited in the *First Redetermination* "refer to past actions by individuals, not present affiliations, and they don't even deny an affiliation between {Guangzhou Ulix} and {[    ]}," that "{w}ithout even a bare denial, there is no evidence on the record from which Commerce could conclude that the companies were not affiliated," and held that, "{b}ecause {Commerce} found that the U.S. customer and {[    ]} are affiliated, there needs to be affirmative evidence on the record that the latter is unaffiliated with {Guangzhou Ulix}."[19]  We explain below the affirmative evidence on the record that [    ] is unaffiliated with Guangzhou Ulix.

In the separate rate application, we asked respondents to "{e}xplain whether your firm made shipments or sales to unaffiliated parties, affiliated parties or both, during the {POI}/review, as defined by Section 771(33) of {the Tariff Act of 1930, as amended (the Act)}."  In response, Guangzhou Ulix checked the box indicating that it made "shipments or sales to unaffiliated parties only."[20]  We also asked respondents:  "As defined by Section 771(33) of the

---

[17] *See* Draft Results Calculation Memorandum.
[18] *See* Remand Opinion at 9.
[19] *Id.* at 8-9.
[20] *See* Guangzhou Ulix's Letter, "Refillable Stainless Steel Kegs from China:  Separate Rate Application," dated November 21, 2018 (Guangzhou Ulix SRA), at 16-17.

4

Tariff Act of 1930, as amended, does the applicant have any affiliates that are located in the United States, or that exported merchandise to the United States which would fall under the description of merchandise covered by the scope of the Proceeding?" In response, Guangzhou Ulix checked the box indicating "No."[21]  We further instructed the respondents that "it would be useful if you would provide a chart demonstrating the ownership and affiliation structure of all of your affiliates that are involved in the production or sale of subject merchandise." In response, Guangzhou Ulix reported that it "is not affiliated with any other exporters of subject merchandise" and that it "has [

]."[22]  Furthermore, we examined the list of shareholders of Guangzhou Ulix, [

].[23]  Not only is there no evidence on the record showing a link between any of these individuals and [

], as required to find an affiliation or evidence of control in accordance with section 771(33) of the Act, the petitioner did not allege to any such link.

As Commerce stated previously, Guangzhou Ulix reported in its rebuttal factual information submission that "[

],"  and "[                                                                                            ]."[24]  However, the Court held that these statements do not constitute a denial of affiliation between Guangzhou Ulix and

---

[21] *Id.* at 17.
[22] *Id.*
[23] *Id.* at Exhibit 9.
[24] *See Final Redetermination* at 11 (citing Guangzhou Ulix's Letter, "Refillable Stainless Steel Kegs from the People's Republic of China – ULIX Rebuttal Comments," dated March 28, 2019 (Guangzhou Ulix Rebuttal Comments), at 2).

[            ] and are insufficient evidence for concluding that the two companies are not affiliated.[25] Thus, on remand, Commerce points to the statements made above and additional statements Guangzhou Ulix made in its rebuttal factual information submission.  Specifically, Guangzhou Ulix reported that it "conferred with [

                                                                                          ]," and "it can be concluded that there is no affiliated relationship between [          ] and Guangzhou ULIX Industrial & Trading Co., Ltd."[26]

Thus, Guangzhou Ulix affirmatively stated that it has no affiliates in the United States and that its [                                                       ].[27]  In its rebuttal comments, Guangzhou Ulix claimed that there is no affiliation between itself and [        ].[28]  We further observe that Guangzhou Ulix's rebuttal comments were submitted on Guangzhou Ulix's own initiative and were not in response to our requests for information.  Moreover, although the petitioner alleged affiliation between Guangzhou Ulix and its unaffiliated customer and the petitioner's information revealed that [                                        ] were potentially affiliated, the petitioner's information did not demonstrate that Guangzhou Ulix was affiliated with [                              ].[29]  Given that:  (a) Guangzhou Ulix had already affirmed in its separate rate application that it [                                           ] and that it was not affiliated with any U.S. companies; and (b) there was no information on the record that contradicted what Guangzhou Ulix reported in its separate rate application regarding its

---

[25] *See Remand Opinion* at 8-9.
[26] *See* Guangzhou Ulix Rebuttal Comments at 2.
[27] *See* Guangzhou Ulix SRA at 16-17.
[28] *See* Guangzhou Ulix Rebuttal Comments at 2.
[29] *See* Petitioner's Letter, "Refillable Stainless Steel Kegs from the People's Republic of China:  Comments on Guangzhou Ulix Industrial & Trading Co., Ltd.'s March 14, 2019, 3rd Supplemental Separate Rate Application Questionnaire Response," dated March 25, 2019, at Exhibits 1 through 22.

affiliation or lack thereof with other entities, we determined that it was not necessary to solicit further information from Guangzhou Ulix during the course of the investigation.

In summary, we conclude that Guangzhou Ulix has met its burden for separate rate status. As instructed in the remand opinion, we have identified the evidence on the record that supports granting Guangzhou Ulix a separate rate. Guangzhou Ulix reported from its initial filing that it was not affiliated with the U.S. customer or any other companies located in the United States and there is no information on the record indicating that Guangzhou Ulix is affiliated with [

] or any company other than [

], by virtue of any of the criteria enumerated in the Act (*e.g.*, ownership, family members, officers, or directors). Moreover, Guangzhou Ulix has otherwise fulfilled the requirements to gain separate rate status.[30] As a result, we continue to find that Guangzhou Ulix is eligible for a separate rate.

**IV.     INTERESTED PARTY COMMENTS**

Comment 1:  Selection of Labor SV

*Petitioner's Comments*

- Commerce should rely on Brazilian labor wage data in the final results of redetermination.[31]
    - The Draft Results contradict established agency practice.[32]
        - Commerce's position that Brazilian wage data denominated in U.S. dollars requires a U.S. dollar CPI contains no citation to practice and, in fact, contradicts the agency's established methodology of applying a CPI for the source country to the relevant dataset even if denominated in U.S. dollars.[33]

---

[30] *See Refillable Stainless Steel Kegs from the People's Republic of China:  Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Affirmative Determination of Critical Circumstances, in Part, Postponement of Final Determination, and Extension of Provisional Measures*, 84 FR 25745 (June 4, 2019), and accompanying Preliminary Decision Memorandum, at 14-15; and *First Redetermination* at 9-12 and 22-23.
[31] *See* Petitioner's Comments at 2-12.
[32] *Id*. at 3-8.
[33] *Id*. at 5-8 (citing, *e.g.*, *Glycine from the People's Republic of China:  Preliminary Results of Antidumping Duty Administrative Review and Partial Rescission of Antidumping Duty Administrative Review*, 77 FR 21738, 21742-43 (April 11, 2012); *Glycine from the People's Republic of China:  Final Results of Antidumping Duty*

- Commerce has explained that it "revised its practice with respect to applicable inflator indices" in 2005 when it found that,

  "although surrogate values quoted in U.S. dollars have been inflated using the U.S. PPI in past cases, in recent cases we have reviewed our inflation methodology and find that U.S. dollar-denominated surrogate values should be inflated based on the country in which the expense was incurred, not the currency in which it was reported'" because the "'use of the U.S. PPI to inflate a dollar-denominated rate reflects the economic situation in the United States and not that in . . ." the home country, or the surrogate country, in this case.[34]

  o Commerce correctly determined that it is improper to inflate Mexican data with a Brazilian index.[35]
  o Commerce should value labor inputs with Brazilian wage and CPI data already on the record.[36]

**Commerce's Position:**

We have continued to use the Mexican ILO data for these final results of redetermination. Although we acknowledge that we mischaracterized the applicability of using Brazilian CPI data for inflating a Brazilian surrogate denominated in U.S. dollars in one of our statements, the fact remains that Mexico is superior to Brazil as a surrogate for the factors of production of the subject merchandise. As described in the *First Redetermination*, refillable stainless steel kegs were actually produced in Mexico during the POI whereas there is no evidence that they were manufactured in Brazil during the POI.[37]

Although the petitioner argues that Commerce must use the Brazil ILC data because the only inflator on the record is the Brazil CPI, Commerce applies a hierarchy in selecting the most

---

*Administrative Review*, 77 FR 64100 (October 18, 2012), and accompanying IDM, at Comment 8.; *Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam: Final Results of Antidumping Duty Administrative Review, 2012-2013*, 79 FR 57047 (September 24, 2014) (*Shrimp from Vietnam*), and accompanying IDM, at Comment 4; and *Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam: Final Results of Antidumping Duty Administrative Review, 2013-2014*, 80 FR 55328 (September 15, 2015), and accompanying IDM, at Comment 4.
[34] *Id*. at 6 (citing *Shrimp from Vietnam* IDM at Comment 4).
[35] *Id*. at 8-9.
[36] *Id*. at 9-12.
[37] *See First Redetermination* at 19.

appropriate labor values, does not typically consider the inflator determinative of which data to select, and may place inflators on the record during an administrative proceeding when necessary.[38]  Ordinarily, Commerce determines how to inflate the data (if necessary) after the data has been selected.[39]  Moreover, because we have a mandate to calculate margins as accurately as possible,[40] we conclude it is appropriate to place data on the record in order to inflate the Mexican surrogate.  Had it not been for our stated preference for ILO data, the appropriate course of action would have been to place Mexican CPI data on the record and use it to inflate the Mexican ILC rate as the SV for labor.  However, because, as described above, we do have a preference for ILO data over other sources, we have continued to use the ILO data for Mexico that we placed on the record, which has the additional benefit of being contemporaneous with the POI.  Accordingly, we did not change our calculation of the antidumping duty margin for Ningbo Master for these final results of redetermination.

Comment 2:  Whether Guangzhou Ulix Is Eligible for a Separate Rate

*Petitioner's Comments*

- Guangzhou Ulix has not established its eligibility for a separate rate.[41]
    - Guangzhou Ulix's separate rate application does not establish eligibility for a separate rate.[42]
        - Guangzhou Ulix's description of its own price negotiations with its U.S. customer, [          ], proved unreliable from the start, which led to multiple supplemental inquiries from Commerce and a request for confirmation from the customer as to which version of events was correct.[43]
        - In response to Guangzhou Ulix's claim that [                                                                    ], the petitioner submitted evidence that:  (1) [               ] was affiliated with [     ]; and (2) both [               ] may be affiliated with [                                                        ].[44]

---

[38] *See Labor Methodologies*, 76 FR at 36094.
[39] *Id.*
[40] *See An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*, 317 F. Supp. 3d 1304, 1310 (CIT 2018).
[41] *See* Petitioner's Comments at 12-17.
[42] *Id*. at 13-14.
[43] *Id.*
[44] *Id*. at 14.

9

- - Taken as a whole, this evidence and the shifting narrative from Guangzhou Ulix called into question the accuracy of Guangzhou Ulix's claims that it was unaffiliated with its U.S. customer (or any affiliates of its U.S. customer).[45]
  - Consequently, Guangzhou Ulix's original statements, on their own, do not constitute substantial evidence that Guangzhou Ulix is unaffiliated with its U.S. customer.[46]
  - Guangzhou Ulix's March 28, 2019, rebuttal evidence does not establish eligibility for a separate rate.[47]
    - The claim by Guangzhou Ulix that "it can be concluded that there is no affiliated relationship between [     ] and Guangzhou ULIX Industrial & Trading Co., Ltd." reflects a legal conclusion that Guangzhou Ulix was not entitled to make – particularly in light of the Court's subsequent holding that the other two factual assertions preceding that conclusion do not constitute affirmative evidence that [     ] is unaffiliated with Guangzhou Ulix.[48]
    - There are no direct statements from [     ] addressing [     ]; there is only a summary by Guangzhou Ulix of an otherwise undocumented conversation with [     ], which, as the Court observed, does not "even deny an affiliation between {Guangzhou Ulix} and {[     ]}."[49]
    - As a result, there is no affirmative evidence demonstrating that Guangzhou Ulix is unaffiliated with [     ] (and, by extension, [         ]).[50]
  - The petitioner does not bear the burden of establishing affiliation.[51]
    - The petitioner submitted evidence that Guangzhou Ulix's claims regarding independent price negotiation were likely inaccurate and, as such, required further documentation and investigation.[52]
    - That evidence, which has since been corroborated in part by Guangzhou Ulix, demonstrated that the U.S. customer had an affiliate [          ], and that [
          
          ].[53]
    - While this information on its own may not amount to substantial evidence that an affiliation existed between any of these companies and Guangzhou Ulix, Guangzhou Ulix had the burden of proving otherwise once this evidence was presented.[54] Guangzhou Ulix failed to do so and instead responded to Petitioner's evidence with a series of hearsay statements that have already been rejected, in part, by the Court.[55]

---

[45] *Id*.
[46] *Id*.
[47] *Id*. at 14-16.
[48] *Id*. at 15.
[49] *Id*. at 15-16.
[50] *Id*. at 16.
[51] *Id*. at 16-17.
[52] *Id*. at 16.
[53] *Id*. at 16-17.
[54] *Id*. at 17.
[55] *Id*.

**Commerce's Position:**

We continue to find that Guangzhou Ulix is eligible for a separate rate.  As explained above, Guangzhou Ulix affirmatively reported that:  (a) it did not have any affiliates that were located in the United States; and (b) it has [

].

Contrary to the petitioner's allegations, Guangzhou Ulix's description of its price negotiations with its U.S. customer was not shown to be unreliable nor was there a "shifting narrative" from Guangzhou Ulix.  Guangzhou Ulix reported from the very beginning that its U.S. customer was [          ] and provided price negotiation documentation pursuant to Commerce's separate rate application.[56]  While it is true that we issued three supplemental questionnaires, these were requests for clarification and additional documentation and not because of any inconsistencies in Guangzhou Ulix's responses.  Specifically, in our first supplemental questionnaire, we asked for clarification as to who an individual named in the emails was and regarding the timing of the sale.[57]  Guangzhou Ulix explained that the person is the manager for ULIX's unaffiliated U.S. customer [          ] and that, although the "terms of sale were preliminarily negotiated in [      ]," "the final transaction for quantity and value were subject to the commercial invoice, which was issued on [

]."[58]  We were (and are) satisfied with Guangzhou Ulix's answers, and there is no evidence on the record contesting their probity.

---

[56] *See* Guangzhou Ulix SRA at 4 and Exhibit 10.
[57] *See* Commerce's Letter, "Antidumping Duty Investigation on Refillable Stainless Steel Kegs from the People's Republic of China:  Separate Rate Application Questionnaire," dated December 12, 2018, at 1-2.
[58] *See* Guangzhou Ulix's Letter, "Refillable Stainless Steel Kegs from China:  Supplemental Separate Rate Application Questionnaire Response," dated December 18, 2018, at 1-2 and 3-4.

In our second supplemental questionnaire, we requested that, to the extent that the price negotiation emails provided by Guangzhou Ulix in the Guangzhou Ulix SRA were incomplete, that Guangzhou Ulix provide all emails associated with the price negotiations for the sale.[59] Guangzhou Ulix explained that, regarding the sale, "the customer had communicated with [

] by telephone on the product specifications, quantity, and price of the order," that it "confirmed the price and quantity by sending the {proforma invoice}, which can be regarded as an order confirmation," and that it "submitted all written documentation of the communications between ULIX and its customer in Exhibit 10 of the Initial SRA."[60]  We were (and are) satisfied with Guangzhou Ulix's answers and there is no evidence on the record contesting their probity.

Finally, in our third (and final) supplemental questionnaire, we requested that Guangzhou Ulix provide an affidavit from its U.S. customer as requested in the separate rate application.[61] In response, Guangzhou Ulix provided the affidavit as requested.[62]  We were (and are) satisfied with the affidavit provided by Guangzhou Ulix.

Thus, contrary to the petitioner's characterizations, there was no shifting narrative nor is there any record evidence suggesting that Guangzhou Ulix's responses were anything but responsive to our requests for information.  While the petitioner did place information on the record suggesting that [                                                           ] are likely affiliated with each other, as described in the *First Redetermination*, there is not a scintilla of evidence on the record suggesting that any of these companies or [      ] are affiliated with Guangzhou Ulix based on

---

[59] *See* Commerce's Letter, "Antidumping Duty Investigation on Refillable Stainless Steel Kegs from the People's Republic of China:  Separate Rate Application Second Supplemental Questionnaire," dated February 7, 2019, at 2.
[60] *See* Guangzhou Ulix's Letter, "Refillable Stainless Steel Kegs from China:  2nd Supplemental Separate Rate Application Questionnaire Response," dated February 21, 2019, at 6.
[61] *See* Commerce's Letter, "Antidumping Duty Investigation on Refillable Stainless Steel Kegs from the People's Republic of China:  Separate Rate Application Third Supplemental Questionnaire," dated March 7, 2019, at 1.
[62] *See* Guangzhou Ulix's Letter, "Refillable Stainless Steel Kegs from China:  Third Supplemental Separate Rate Application Questionnaire Response," dated March 14, 2019, at 2 and Exhibit S3-1.

any of the statutory criteria defining "affiliated persons" in section 771(33) of the Act (*e.g.*, ownership of shares or stock, familial ties, common board members, officers, or management).[63]

We agree with the petitioner that petitioners do not bear the burden of establishing affiliation and that Guangzhou Ulix bore the burden of proving that it is entitled to a separate rate.  However, the petitioner contends that it "provided, in its role as an interested party to the proceeding, … evidence that Guangzhou Ulix's claims regarding independent price negotiation were likely inaccurate and, as such, required further documentation and investigation."[64]  We disagree.  As explained above and in the *First Redetermination*, none of the evidence the petitioner placed on the record suggested that Guangzhou Ulix's responses were "likely inaccurate."  Indeed, we did not send a fourth supplemental questionnaire to Guangzhou Ulix precisely because none of the information the petitioner placed on the record suggested that Guangzhou Ulix was in a position to control [

], nor did it suggest that any of these entities were in a position to control Guangzhou Ulix.

Although we did not issue a fourth supplemental questionnaire, Guangzhou Ulix provided additional information in its Guangzhou Ulix Rebuttal Comments.  While the petitioner asserts the statements in the Guangzhou Ulix Rebuttal Comments do not constitute an affirmative demonstration that Guangzhou Ulix is unaffiliated with [      ],[65] they do provide additional evidence supporting Guangzhou Ulix's original response that it was not affiliated with any U.S. company.  Moreover, although the way Guangzhou Ulix characterized its lack of affiliation with [     ][66] may not be artfully worded, it does not indicate that Guangzhou Ulix actually is affiliated with [      ], especially in light of its original response that:  (a) it was not

---

[63] *See First Redetermination* at 9-12 and 22-23.
[64] *See* Petitioner's Comments at 16.
[65] *Id*. at 15.
[66] *See* Guangzhou Ulix Rebuttal Comments at 2 ("it can be concluded that there is no affiliated relationship…").

affiliated with any U.S. company; and (b) it had only one affiliate which was located in [          ].

Although the petitioner claims that the affirmative evidence that Commerce identified cannot be affirmative evidence and is hearsay, Guangzhou Ulix's submissions were accompanied by a certification as to their accuracy and there is no evidence that would call into question the accuracy of its submissions. We do not find it reasonable in this instance to require a party to further demonstrate that it is not affiliated with a party with which it is not affiliated, as there would be no existing documentation to prove this lack of affiliation. Thus, the affirmative evidence identified by Commerce is sufficient to demonstrate non-affiliation.

Finally, while it is true that Guangzhou Ulix bore the burden of proving that it is entitled to a separate rate, for the reasons stated in the *Final Determination*, the *First Redetermination*, and above, we conclude that Guangzhou Ulix met that burden. In this investigation, Guangzhou Ulix provided complete responses to all our requests for information. Because we conclude that Guangzhou Ulix met its burden of demonstrating that it is eligible for a separate rate, we have continued to grant a separate rate to Guangzhou Ulix.

## V.    FINAL RESULTS OF REDETERMINATION

In accordance with the Court's *Remand Opinion*, Commerce has, as discussed above, revised certain aspects of its dumping analysis. Based on these changes, Commerce determines that the following weighted-average dumping margins exist for the POI:

| Exporter | Producer | Estimated Weighted-Average Dumping Margin (percent) | Cash Deposit Rate (Adjusted for Subsidy Offsets) (percent) |
|---|---|---|---|
| Ningbo Master International Trade Co., Ltd. | Ningbo Major Draft Beer Equipment Co., Ltd. | 0.00* | 0.00* |
| Guangzhou Jingye Machinery Co., Ltd. | Guangzhou Jingye Machinery Co., Ltd. | 0.00* | 0.00* |
| Guangzhou Ulix Industrial & Trading Co., Ltd. | Guangzhou Jingye Machinery Co., Ltd. | 0.00* | 0.00* |

*(*de minimis*)

Should the Court affirm these final results of redetermination, the cash deposit rates will have not changed from those we calculated in the *Final Determination*.

11/10/2022

X _____

Signed by: RYAN MAJERUS

Ryan Majerus
Deputy Assistant Secretary
  for Policy and Negotiations