# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| NEW AMERICAN KEG, d/b/a AMERICAN KEG COMPANY, Plaintiff, v. UNITED STATES, Defendant, and NINGBO MASTER INTERNATIONAL TRADE CO., LTD, and GUANGZHOU JINGYE MACHINERY CO., LTD. Defendant-Intervenors. | Court No. 20-00008 Hon. M. Miller Baker, Judge |

## <u>PROPOSED ORDER</u>

Upon consideration of the Final Results of Redetermination Pursuant to Court Remand filed by the Department of Commerce on ("Commerce") on November 14, 2022, and all other papers and proceedings herein, it is hereby

**ORDERED** that judgment is entered in favor of American Keg Company; and it is further

**ORDERED** that Commerce's determination to disregard Brazilian labor data in favor of ILO data for Mexico is remanded for further consideration consistent with this opinion; and it is further

**ORDERED** that Commerce's determination to grant separate rate status to Guangzhou Ulix Industrial & Trading Co., Ltd. is remanded for further consideration consistent with this opinion.

_____

M. Miller Baker, Judge

Dated: _____
       New York, New York

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| NEW AMERICAN KEG, d/b/a AMERICAN KEG COMPANY, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Court No. 20-00008 ) |
| UNITED STATES, | ) ) |
| Defendant, | ) Hon. M. Miller Baker, ) Judge |
| and | ) ) |
| NINGBO MASTER INTERNATIONAL TRADE CO., LTD, and GUANGZHOU JINGYE MACHINERY CO., LTD. | ) ) ) ) |
| Defendant-Intervenors. | ) ) |

## PLAINTIFF'S COMMENTS ON FINAL RESULTS OF SECOND REDETERMINATION PURSUANT TO COURT REMAND

Whitney M. Rolig
Andrew W. Kentz
Nathaniel Maandig Rickard

**PICARD KENTZ & ROWE LLP**
1750 K Street, N.W.
Washington, DC  20006
(202) 331-4040

*Counsel to American Keg Company*

Dated:  January 26, 2023

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................... i

TABLE OF AUTHORITIES ............................................................ ii

GLOSSARY .................................................................................. v

STATEMENT OF FACTS .............................................................. 2

    I.    Surrogate Value for Labor ................................................ 4
        A.   Investigation Proceedings ........................................... 4
        B.   American Keg I ............................................................ 7
        C.   American Keg II ........................................................... 8
    II.   Ulix's Separate Rate Status .......................................... 11

STANDARD OF REVIEW ............................................................ 13

SUMMARY OF ARGUMENT ....................................................... 16

ARGUMENT ............................................................................... 17

    I.    Commerce's Determination to Rely on ILO Data Was
        Unlawful .................................................................... 17
        A.   Commerce's Determination to Reopen the Record Was
            Unsupported by Substantial Evidence ...................... 19
        B.   Commerce's Decision to Reopen the Record Was
            Arbitrary, Capricious, and an Abuse of Discretion ..... 24
          (i) Commerce's Addition of ILO Data to the Record Was
              Inconsistent With Established Practice ................ 24
          (ii)   Commerce's Discussion of Inflationary Indices
              Misstates Relevant Practice ................................... 29
    II.   Commerce's Determination to Grant Ulix Separate Rate
        Status Was Unlawful .................................................. 33
        A.   Ulix's SRA Does Not Establish the Company's
            Eligibility for a Separate Rate ................................. 34
        B.   Ulix's Rebuttal Statement Does Not Establish the
            Company's Eligibility for a Separate Rate ................. 38

CONCLUSION ........................................................................... 43

# TABLE OF AUTHORITIES

**Cases**

Atlantic Sugar, Ltd. v. United States, 744 F.2d 1556 (Fed. Cir. 1984) ................................................................................... 14

Calgon Carbon Corp. v. United States, 190 F. Supp. 3d 1224 (Ct. Int'l Trade 2016) ................................................. 18

Carpenter Tech. Corp. v. United States, 26 C.I.T. 830 (2002) ........... 18

Citizens to Preserve Overton Park, Inc v. Volpe, 401 U.S. 402 (1971) ........................................................................... 15, 24

Consol. Edison Co. v. NLRB, 305 U.S. 197 (1938) .............................. 13

Dorbest Ltd. v. United States, 35 C.I.T. 136 (2011) ........................... 23

Dorbest Ltd. v. United States, 462 F. Supp. 2d 1262 (Ct. Int'l Trade 2006) ............................................................................... 23

Freeport Minerals Co. v. United States, 776 F.2d 1029 (Fed. Cir. 1985) ............................................................................... 15

Jiangsu Jiasheng Photovoltaic Tech Co. v. United States, 28 F. Supp. 3d 1317 (Ct. Int'l Trade 2014) ...................................... 14, 24, 26, 28

Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto Ins., 463 U.S. 29 (1983) ........................................................................... 16, 32

Nan Ya Plastics Corp., Ltd. v. United States, 810 F.3d 1333 (Fed. Cir. 2016) ......................................................................... 19

New Am. Keg v. United States, No. 20-00008, 2021 WL 1206153 (Ct. Int'l Trade Mar. 23, 2021) ................................. 2, 7, 12, 28

New Am. Keg v. United States, No. 20-00008, 2022 WL 4363320 (Ct. Int'l Trade Sept. 13, 2022) ...................................... passim

Nippon Steel Corp. v. United States, 458 F.3d 1345 (Fed. Cir. 2006) ........................................................................... 14, 35

QVD Food Co. v. United States, 658 F.3d 1318 (Fed. Cir. 2011) ....... 26

Tokyo Kikai Seisakusho, Ltd. v. United States, 529 F.3d 1352 (Fed. Cir. 2008) ......................................................................... 14

<u>Tung Mung Dev. Co., Ltd. v. United States</u>, 25 C.I.T. 752 (2001)..... 19

<u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474 (1951) .................... 14

<u>Vt. Yankee Nuclear Power Corp. v. Natural Resources Def. Council, Inc.</u>, 435 U.S. 519 (1978)....................................................................... 23

## Statutes

19 U.S.C. § 1516a(b)(1)(B) .................................................................... 13

19 U.S.C. § 1677b(c)(1)(B)..................................................................... 20

19 U.S.C. § 1677b(c)(4)........................................................................... 20

## Administrative Determinations

<u>Cast Iron Soil Pipe Fittings From the People's Republic of China</u>, 85 Fed. Reg. 37,832 (Dep't Commerce June 24, 2020) (prelim. results 2018-2019) ......................................................................................... 25

<u>Certain Frozen Warmwater Shrimp From the Socialist Republic of Vietnam</u>, 79 Fed. Reg. 57,047 (Dep't Commerce Sept. 24, 2014) (final results 2012-2013)................................................................... 27

<u>Chlorinated Isocyanurates from the People's Republic of China</u>, 82 Fed. Reg. 4,852 (Dep't Commerce Jan. 17, 2017) (final results 2014-2015) ............................................................................................... 19

Draft Results of Redetermination Pursuant to Court Remand, <u>New American Keg v. United States</u>, Court No. 20-00008, Slip Op. 21-30 (CIT March 23, 2021), (May 12, 2021) ..................................... passim

Draft Results of Redetermination Pursuant to Court Remand, <u>New American Keg v. United States</u>, Court No. 20-00008, Slip Op. 21-30 (CIT September 13, 2022), (Oct. 6, 2022) ................................... 7, 22

<u>Drawn Stainless Steel Sinks from the People's Republic of China</u>, 79 Fed. Reg. 13,019 (Dep't Commerce Feb. 26, 2013) (final determ.) . 26

Final Results of Redetermination Pursuant to Court Remand, <u>New American Keg v. United States</u>, Court No. 20-00008, Slip Op. 21-30 (CIT March 23, 2021), (July 7, 2021) ...................................... passim

Final Results of Redetermination Pursuant to Court Remand, <u>New American Keg v. United States</u>, Court No. 20-00008, Slip Op. 22-106 (CIT September 13, 2022), (Nov. 13, 2022)...................... passim

<u>Furfuryl Alcohol from the People's Republic of China</u>, 60 Fed. Reg. 22,544 (Dep't Commerce May 8, 1995) (final determ. of sales at less than fair value) .................................................................................33

<u>Multilayered Wood Flooring from the People's Republic of China</u>, 85 Fed. Reg. 78,118 (Dep't Commerce Dec. 3, 2020) (final results) ....25

<u>Refillable Stainless Steel Kegs From the People's Republic of China</u>, 84 Fed. Reg. 25,745 (Dep't Commerce June 4, 2019) (prelim. aff. determ. of sales at less than fair value, prelim. aff. determ. of critical circumstances, in part, postponement of final determ., and extension of provisional measures).........................................6, 21, 30

<u>Refillable Stainless Steel Kegs From the People's Republic of China</u>, 84 Fed. Reg. 57,010 (Dep't Commerce Oct. 24, 2019) (final aff. determ. of sales at less than fair value and final aff. determ. of critical circumstances, in part)..................................................3, 6, 12

<u>Silicon Carbide from the People's Republic of China</u>, 59 Fed. Reg. 22,585 (Dep't Commerce May 2, 1994) (final determ. of sales at less than fair value) .................................................................................33

<u>Sparklers from the People's Republic of China</u>, 56 Fed. Reg. 20,588 (Dep't Commerce May 6, 1991) (final determ. of sales at less than fair value) .................................................................................33

<u>Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China</u>, 81 Fed. Reg. 1,396 (Dep't Commerce Jan. 12, 2016) (final results) ...............................25

## Other Authorities

2 Am. Jur. 2d Administrative Law § 575...........................................23

<u>Antidumping Methodologies in Proceedings Involving Non-Market Economies:  Valuing the Factor of Production:  Labor</u>, 76 Fed. Reg. 36,092 (Dep't Commerce June 21, 2011) ................................. passim

Policy Bulletin No. 04.1:  Non-Market Economy Surrogate Country Selection Process, (Mar. 1, 2004) ...............................................20, 21

## GLOSSARY

| AD | Antidumping |
|---|---|
| CPI | Consumer Price Index |
| IDM | Issues and Decision Memorandum |
| ILC | The Conference Board, International Labor Comparisons |
| ILO | International Labor Organization |
| INEGI | Government of Mexico, Institute of Statistics and Geography |
| NME | Non-Market Economy |
| PDM | Preliminary Decision Memorandum |
| POI | Period of Investigation |
| SRA | Separate Rate Application |
| SV | Surrogate Value |

### <u>PLAINTIFF'S COMMENTS ON FINAL RESULTS OF SECOND REDETERMINATION PURSUANT TO COURT REMAND</u>

Plaintiff American Keg Company ("Plaintiff," "American Keg," or "Petitioner") respectfully submits these comments regarding the U.S. Department of Commerce's ("Commerce") second final remand redetermination in its antidumping duty investigation of refillable stainless steel kegs from the People's Republic of China, published as Final Results of Redetermination Pursuant to Court Remand, <u>New American Keg v. United States</u>, Court No. 20-00008, Slip Op. 22-106 (CIT September 13, 2022), ECF No. 74, (Nov. 13, 2022) ("<u>Second Final Remand</u>"), P2RR 5, Appx__.[1]  Plaintiff submits these comments in accordance with the Court's order of December 12, 2022, ECF No. 78 (Dec. 12, 2022), and Rule 56.2 of the United States Court of International Trade.

Plaintiff supports Commerce's determination that using a Brazilian CPI to inflate Mexican labor data was inappropriate.

---

[1]  All citations to the second remand administrative record are denoted with the item number for the public document index ("P2RR") and proprietary document index ("C2RR") as appropriate.  Similarly, all citations to the original and first remand administrative records are denoted "PR" and "CR" and "P1RR" and "C1RR," respectively.

1

However, Plaintiff challenges the following aspects of the <u>Second Final</u>

<u>Remand</u> and respectfully requests that this Court remand Commerce's

determination for further consideration:

1. Whether Commerce's determination to disregard Brazilian labor data in favor of placing ILO labor data for Mexico on the record was supported by substantial evidence.

2. Whether Commerce's determination to disregard Brazilian labor data in favor of placing ILO labor data for Mexico on the record was arbitrary, capricious, and an abuse of discretion.

3. Whether Commerce's determination to grant separate rate status to Guangzhou Ulix Industrial & Trading Co., Ltd. was supported by substantial evidence.

## STATEMENT OF FACTS

Commerce's <u>Second Final Remand</u> follows two prior remand

orders by this Court concerning (1) the surrogate value for the labor

factor of production, and (2) Commerce's grant of separate rate status to

Guangzhou Ulix Industrial & Trading Co., Ltd. ("Ulix"). <u>See</u> <u>New Am.</u>

<u>Keg v. United States</u>, No. 20-00008, 2021 WL 1206153, at *22 (Ct. Int'l

Trade Mar. 23, 2021), ECF No. 38 ("<u>American Keg I</u>"), <u>remanding</u>

<u>Refillable Stainless Steel Kegs From the People's Republic of China</u>, 84

Fed. Reg. 57,010 (Dep't Commerce Oct. 24, 2019) (final aff. determ. of

sales at less than fair value and final aff. determ. of critical

circumstances, in part) ("<u>Final Determination</u>"), PR 265, Appx__, and accompanying IDM, PR 251, Appx__. <u>See also</u> <u>New Am. Keg v. United States</u>, No. 20-00008, 2022 WL 4363320, at *3 (Ct. Int'l Trade Sept. 13, 2022), ECF No. 73 ("<u>American Keg II</u>"), <u>remanding</u> Final Results of Redetermination Pursuant to Court Remand, <u>New American Keg v. United States</u>, Court No. 20-00008, Slip Op. 21-30 (CIT March 23, 2021), ECF No. 40, (July 7, 2021) ("<u>First Final Remand</u>"), P1RR 9, Appx__.

Pursuant to <u>American Keg II</u>, Commerce issued a draft redetermination on October 6, 2022.  Draft Results of Redetermination Pursuant to Court Remand, <u>New American Keg v. United States</u>, Court No. 20-00008, Slip Op. 21-30 (CIT September 13, 2022), (Oct. 6, 2022) ("<u>Second Draft Remand</u>"), P2RR 1, Appx__.  Following comments by American Keg, Commerce filed the <u>Second Final Remand</u> on November 13, 2022.

Notwithstanding the Court's familiarity with this proceeding, Plaintiff reviews below the facts and circumstances preceding the <u>Second Final Remand</u> to highlight Commerce's ongoing cavalier approach to both Plaintiff's concerns and the Court's instructions, which

has once again resulted in an unlawful redetermination that requires
remand.

## I.     Surrogate Value for Labor

### A.     Investigation Proceedings

In the underlying investigation, American Keg and mandatory
respondent Ningbo Master International Trade Co., Ltd. ("Ningbo
Master"), proposed and submitted comments regarding three potential
surrogate values with which to value the labor factor of production:
(1) a 2016 hourly wage rate for Brazilian workers in the manufacturing
industry published in the ILC; (2) 2018 wage data for the Malaysian
manufacturing sector published by the Malaysian Department of
Statistics; and (3) 2016 labor data published by INEGI for the Mexican
manufacturing sector.  <u>See</u> "Petition for the Imposition of Antidumping
Duties on Imports of Refillable Stainless Steel Kegs from Germany,
Mexico, and the People's Republic of China and Countervailing Duties
on Imports of Refillable Stainless Steel Kegs from the People's Republic
of China," A-570-093, at Vol. II, Exhibit PRC AD-11, p. 3, (Sept. 20,
2018) ("Petition"), PR 2, Appx__; Letter from deKieffer & Horgan,
PLLC, "Preliminary Surrogate Value Submission," A-570-093, at

Exhibit SV-4, (Feb. 19, 2019) ("Ningbo Master SV Submission"), PR 129,

Appx__; Letter from deKieffer & Horgan, PLLC, "Final Surrogate Value

Submission," A-570-093, at Exhibit SV2-6, (Apr. 29, 2019) ("Ningbo

Master 2nd SV Submission"), PR 178, Appx__.

The Malaysian data were contemporaneous with the POI, and the

2016 Brazilian ILC data were accompanied by CPI information for

Brazil that could be used to index those data to the POI.  See Petition at

Vol. II, Exhibit PRC AD-8, PR 2, Appx__.  No party provided an

inflationary index for Mexico.

Commerce originally accepted and relied on the Brazilian ILC

data, inflated to the POI, when initiating the AD investigation because

record evidence demonstrated that Brazil was "a significant producer of

comparable merchandise."  See "Antidumping Duty Investigation

Initiation Checklist," A-570-093, at 8-9 (Oct. 10, 2018) ("AD Checklist"),

PR 22, Appx__.  In the Preliminary Determination, Commerce selected

Malaysia (another significant producer of comparable merchandise) as

the primary surrogate country based on various data quality and

availability considerations, including the fact that the record lacked a

complete dataset for Mexico, as well as the fact the Brazilian labor data

had to be indexed to the POI while the Malaysian data did not.

Refillable Stainless Steel Kegs from the People's Republic of China, 84
Fed. Reg. 25,745 (Dep't Commerce June 4, 2019) (prelim. aff. determ. of
sales at less than fair value, prelim. aff. determ. of critical
circumstances, in part, postponement of final determ., and extension of
provisional measures) ("Preliminary Determination"), PR 216, Appx__
and accompanying PDM at 8, 10-11, PR 203, Appx__, Appx__.

Although no party disputed using Malaysia as the primary
surrogate country, Commerce reevaluated each of the three proposed
labor SVs after American Keg argued that the Malaysia data were
distorted.  Investigation IDM at 9-12, PR 251, Appx__.  Commerce
strongly rejected the Mexican INEGI data, explaining that the data
were neither from the primary surrogate country nor contemporaneous,
and that Commerce could not "ascertain whether the Mexico SV
represents full labor costs."  Id. at 10, Appx__.  With respect to Brazil,
Commerce merely reiterated that the data were not from the primary
surrogate country or "fully" contemporaneous with the POI.  Id. at 9-10,
Appx__.  Commerce ultimately relied on the Malaysian labor SV after
finding that the data were not distorted.  Id. at 12, Appx__.

## B.   American Keg I

This Court remanded that determination, faulting Commerce's "perfunctory rejection of" evidence regarding distortions in the Malaysian data and its "talismanic invocation" of data preferences as a substitute for reasoned explanation and analysis.  American Keg I, 2021 WL 1206153, at *12 and *13.

In its draft remand redetermination, Commerce agreed that evidence of distortions in the Malaysian data "outweighed" its original data preferences such that the Malaysian labor data were "not the best available information on the record."  Draft Results of Redetermination Pursuant to Court Remand, New American Keg v. United States, Court No. 20-00008, Slip Op. 21-30 (CIT September 13, 2022), at 6 (Oct. 6, 2022) ("First Draft Remand"), P1RR 4, Appx__.  The agency then confirmed the deficiencies that precluded use of the INEGI data and "selected the only remaining labor SV on the record, the Brazilian labor SV from 2016."  Id. at 7, Appx__.  Commerce inflated that value to the POI using the Brazilian CPI information from the petition and recalculated Ningbo Master's rate, resulting in a new margin of 4.23 percent.  Id. at 7, 12, Appx__, Appx__.

Following comments by interested parties, however, Commerce changed course to find that a fourth data source, i.e., 2016 Mexican data published in the ILC, was "the best information available to value Ningbo Master's labor FOPs" in light of Mexico's established status as a producer of the subject merchandise and the agency's "preference to select a surrogate country that produces identical merchandise over one that only produces comparable merchandise." First Final Remand at 19, P1RR 9, Appx__ (internal citation omitted).  Commerce inflated the Mexican ILC value using the only temporally relevant inflator on the record, the Brazilian CPI information, and determined that Ningbo Master's recalculated dumping margin was de minimis.  Id. at 19, 24, Appx__, Appx__.

### C.   **American Keg II**

This Court rejected Commerce's approach:

> Commerce used an inflator specific to a different country, a suspect choice, and then it failed to explain that choice. That alone would justify remand in view of Commerce's published guidance . . . In other words, Commerce needs to explain how the Brazilian consumer price index is relevant to Mexican data.

American Keg II, 2022 WL 4363320, at *2.  The Court further observed that "it appears that the Department didn't give much thought to this

switch in view of the necessity for another remand" and instructed

Commerce to "explain why it was appropriate to inflate a Mexican labor

wage rate using Brazilian data and why doing so was superior to using

a Brazilian labor wage rate." Id. at *3.

Commerce conceded that "it was improper to inflate the Mexican

labor wage rate from the ILC using Brazilian {CPI} data." Second Draft

Remand at 3, P2RR 1, Appx__.  However, the agency postulated,

without citation to any existing practice, that

> {Because the} ILC data for both Brazil and Mexico was
> denominated in U.S. dollars . . . it would also be
> inappropriate to use the Brazilian CPI data, which measure
> the increases of prices denominated in Brazilian real, on the
> record to inflate the Brazilian labor wage rate from the ILC,
> which was denominated in U.S. dollars.

Id.  Commerce consequently found that it could not "properly inflate

either of the ILC rates for Mexico or Brazil" and reopened the

administrative record to add an entirely new labor data source, 2018

data for "Manufacturing" labor in Mexico published by the ILO, citing

the agency's "stated preference of basing labor cost on {ILO} data." Id.

at 3-4 (citing Antidumping Methodologies in Proceedings Involving

Non-Market Economies:  Valuing the Factor of Production:  Labor, 76

Fed. Reg. 36,092, 36,094 (Dep't Commerce June 21, 2011) ("Labor

Methodologies")), Appx__.  The new labor data resulted in a *de minimis*

rate for Ningbo Master.  Id. at 8, Appx__.

American Keg responded with an extensive overview of Commerce

precedent explaining that the agency's policy was, in fact, to inflate

data for a given country with the CPI for that country, <u>even if the data</u>

<u>were denominated in U.S. dollars</u>.  See Letter from Picard Kentz &

Rowe LLP, "Comments on Draft Results of Redetermination Pursuant

to Court Remand," A-570-093, at 5-8 (Oct. 13, 2022) ("Petitioner's

Second Draft Remand Comments"), P2RR 5, Appx__.  American Keg

requested that Commerce reverse its approach in the final remand

redetermination and rely instead on the "vetted and complete labor

wage data for Brazil" that Commerce had already accepted and used

twice.  Id. at 3, Appx__.

In response, Commerce acknowledged that it "mischaracterized

the applicability of using Brazilian CPI data for inflating a Brazilian

surrogate denominated in U.S. dollars," but insisted that "Mexico is

superior to Brazil as a surrogate for the factors of production of the

subject merchandise" given its production of identical merchandise.

<u>Second Final Remand</u> at 8, P2RR 6, Appx__.  Commerce dismissed

American Keg's focus on available inflators as misplaced because "{o}rdinarily, Commerce determines how to inflate the data (if necessary) after the data has been selected," and stated that, in any event, "because {Commerce has} a mandate to calculate margins as accurately as possible . . . it is appropriate to place data on the record in order to inflate the Mexican surrogate." Id. at 9, Appx__.  Commerce further asserted that "{h}ad it not been for {its} stated preference for ILO data, the appropriate course of action would have been to place Mexican CPI data on the record and use it to inflate the Mexican ILC rate as the SV for labor." Id.  Given that preference, however, Commerce "continued to use the ILO data for Mexico . . . which has the additional benefit of being contemporaneous with the POI." Id.

## II.   **Ulix's Separate Rate Status**

In the underlying investigation and first remand proceedings, Commerce granted separate rate status to Ulix based on the agency's determination that the company "conducted an independent price negotiation with its unaffiliated U.S. customer," and its corollary determination that "the record does not support a finding that {Ulix} is affiliated with" that customer ([                          ], or "Company A")

or the customer's affiliates ([                                    ]).

Investigation IDM at 23, PR 251, Appx__; First Final Remand at 12,

P1RR 9, C1RR 14, Appx__.

 This Court ordered Commerce to reconsider its original

determination because "Commerce simply failed to address American

Keg's evidence that the U.S. customer was affiliated with Ulix."

American Keg I, 2021 WL 1206153 at *19.  When presented with

Commerce's new analysis in the First Final Remand, the Court again

remanded because "there needs to be affirmative evidence on the record

that {Company A} is unaffiliated with Ulix.  There is no such evidence."

American Keg II, 2022 WL 4363320, at *3.  The Court further dismissed

Commerce's reliance on "statements {that} refer to past actions by

individuals, not present affiliations" and that "don't even deny an

affiliation between Ulix and Company A."  Id.  The Court concluded

that, "{w}ithout even a bare denial, there is no evidence on the record

from which Commerce could conclude that the companies were not

affiliated," which meant that "Ulix {had} not carried its burden to show

a lack of affiliation."  Id.

In the <u>Second Final Remand</u>, Commerce highlighted a number of statements from Ulix's original SRA that the agency claimed constituted affirmative evidence that the Ulix was not affiliated with its customer.  <u>Id.</u> at 4-5, P2RR 6, C2RR 6, Appx__.  Commerce also relied on a rebuttal statement by Ulix that it had "conferred" with [

         ] that purportedly confirmed the lack of affiliation, as well as the factual certifications by a Ulix representative that accompanied each submission.  <u>Id.</u> at 6, 14, Appx__, Appx__.  Commerce subsequently concluded that Ulix satisfied its burden in qualifying for a separate rate.  <u>Id.</u> at 14, Appx__.

## STANDARD OF REVIEW

The statute states that:

> The Court shall hold unlawful any determination, finding, or conclusion, found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law.

19 U.S.C. § 1516a(b)(1)(B).  The Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  <u>Consol. Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938) (citations omitted).  Thus, the Court must consider whether a reasonable person could conclude that the evidence relied

upon by Commerce actually supports the agency's determination.

Atlantic Sugar, Ltd. v. United States, 744 F.2d 1556, 1563 (Fed. Cir.

1984).  In addition, "{t}he substantiality of evidence must take into

account whatever in the record fairly detracts from its weight."

Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951).  The

question for this Court is therefore whether, given the evidence on the

"record as a whole," the agency's conclusion was reasonable.  Nippon

Steel Corp. v. United States, 458 F.3d 1345, 1351 (Fed. Cir. 2006).

Legal precedent also requires that Commerce exercise its

discretion in a reasonable manner.  Specifically:

> {W}here the agency is vested with discretion to set the
> procedures by which it administers its governing statute, the
> court reviews such decisions for abuse of discretion.   An
> abuse of discretion occurs where the decision is based on an
> erroneous interpretation of the law, on factual findings that
> are not supported by substantial evidence, or represents an
> unreasonable judgment in weighing relevant factors.   In
> abuse of discretion review, an agency action is arbitrary
> when the agency offers insufficient reasons for treating
> similar situations differently.

Jiangsu Jiasheng Photovoltaic Tech Co. v. United States, 28 F. Supp. 3d

1317, 1323 (Ct. Int'l Trade 2014).  See also Tokyo Kikai Seisakusho,

Ltd. v. United States, 529 F.3d 1352, 1360-61 (Fed. Cir. 2008) (holding

that although an agency's "power to reconsider is inherent in the power

to decide," it "may not reconsider in a manner that would be arbitrary, capricious, or an abuse of discretion") (internal citations omitted).

Further, to the extent that the statute affords Commerce discretion as to how to conduct its investigation, courts have explained that "the grant of discretionary authority to an agency implies that the exercise of discretion be predicated upon a judgment anchored in the language and spirit of the relevant statutes and regulations." Freeport Minerals Co. v. United States, 776 F.2d 1029, 1031 (Fed. Cir. 1985).

In order to make a finding that an agency's action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," a reviewing body

> must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971). Similarly, this Court may remand a decision for being arbitrary and capricious if

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for

its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto Ins., 463 U.S. 29, 43 (1983).

## SUMMARY OF ARGUMENT

Commerce's <u>Second Final Remand</u> complied with the Court's instructions to reconsider the application of a Brazilian CPI to a Mexican labor rate. As with the <u>First Final Remand</u>, however, Commerce's latest redetermination presents yet another failure by the agency to engage with relevant evidence and administrative precedent, and yet another failure by the agency to exercise its discretion in a reasonable manner.

Specifically, although Commerce reasonably determined that a Brazilian CPI could not be used to inflate Mexican labor data, the agency offered unsupported and arbitrary justifications for its refusal to rely on the available Brazilian labor data, leading to its use of newly-added ILO data for Mexico that appears to have been unavailable at the time of the investigation. This determination is an abuse of discretion,

and Commerce's articulated rationale remains arbitrary and

unsupported by substantial evidence.

In addition, Commerce has failed to identify affirmative evidence

that Ulix is unaffiliated with its customer as directed by this Court.  Its

determination to once again grant Ulix a separate rate is therefore

unsupported by substantial evidence.

## ARGUMENT

## I.     Commerce's Determination to Rely on ILO Data Was Unlawful

Commerce premised its draft and final determinations to reopen

the record for ILO data on a failure to understand its own

methodologies and a complete disregard for agency practice.

Commerce's determination also unlawfully discounted its own factual

findings from the underlying investigation and first remand proceeding.

As such, Commerce's reliance on the ILO data was unsupported by

substantial evidence and constitutes an abuse of discretion.

As detailed above, Commerce initially determined that "an

accurate calculation" required reopening the record because neither the

Brazilian nor Mexican ILC labor rate, each of which was denominated

in U.S. dollars, could be inflated to the POI using the Brazilian CPI on

the record.  <u>Second Draft Remand</u> at 3, P2RR 1, Appx__.  This finding

wholly contradicted the agency's decade-long methodology of applying a

CPI for the source country to the relevant dataset even if denominated

in U.S. dollars.  <u>See</u> Petitioner's Second Draft Remand Comments at 5-

8, P2RR 5, Appx__ (internal citations omitted).

Commerce conceded this fact in the <u>Second Final Remand</u>.  <u>Id.</u> at

8, P2RR 6, Appx__.  But, rather than reversing its erroneous

determination, the agency offered an alternative justification for

continuing to rely on the ILO data:  because Mexico was a producer of

subject merchandise and Brazil was not, "Mexico {was} superior to

Brazil as a surrogate" and the agency's "mandate to calculate margins

as accurately as possible" required opening the record to facilitate the

use of Mexican data.  <u>Id.</u> at 8-9, Appx__.  This declaration is

impermissibly results-oriented and again disregards the facts of this

investigation and the agency's usual practice for selecting SVs.  <u>See</u>

<u>Calgon Carbon Corp. v. United States</u>, 190 F. Supp. 3d 1224, 1240 (Ct.

Int'l Trade 2016) (remanding where "the absence of reasoning {gave} the

appearance of being results-oriented"); <u>Carpenter Tech. Corp. v. United</u>

<u>States</u>, 26 C.I.T. 830, 840-41 (2002) (remanding because Commerce's

"explanation appear{ed} results-oriented"). <u>See also</u> <u>Tung Mung Dev.</u>

<u>Co., Ltd. v. United States</u>, 25 C.I.T. 752, 773 n.35 (2001) (agreeing that

"a results oriented approach would be improper"). This Court should

again remand that determination.

### A. Commerce's Determination to Reopen the Record Was Unsupported by Substantial Evidence

As an initial matter, Commerce's insistence that "accuracy"

required sourcing labor data from Mexico instead of Brazil is

unsupported. The Court of Appeals for the Federal Circuit has

explained that "a Commerce determination . . . is 'accurate' if it is

correct as a mathematical and factual matter, thus supported by

substantial evidence." <u>Nan Ya Plastics Corp., Ltd. v. United States</u>, 810

F.3d 1333, 1344 (Fed. Cir. 2016). And, while Commerce is correct that

it typically prioritizes data from countries with production of identical

merchandise over those producing comparable merchandise, application

of that preference is highly case-specific. <u>See</u>, <u>e.g.</u>, <u>Chlorinated</u>

<u>Isocyanurates from the People's Republic of China</u>, 82 Fed. Reg. 4,852

(Dep't Commerce Jan. 17, 2017) (final results 2014-2015) and

accompanying IDM at Comment 1. The record of this investigation

demonstrates that, as a factual matter, the Brazilian data satisfied

Commerce's criteria for use as an SV, therefore facilitating an accurate

margin calculation and leaving Commerce's refusal to rely on that data

without record support.

The statute states that "valuation of the factors of production shall

be based on the best available information regarding the values of such

factors," 19 U.S.C. § 1677b(c)(1)(B), and that Commerce "shall utilize <u>to

the extent possible</u>" prices from countries that are economically

comparable and significant producers of comparable merchandise, 19

U.S.C. § 1677b(c)(4).  This analysis requires balancing numerous

considerations; for example, countries satisfying both criteria may not

have sufficient data available, justifying a wider definition of the

criteria, or it may be appropriate to place more emphasis on the

production of comparable merchandise over economic comparability.

<u>See</u> Policy Bulletin No. 04.1:  Non-Market Economy Surrogate Country

Selection Process, (Mar. 1, 2004).

The analysis does <u>not</u> require disregarding data from a significant

producer of comparable merchandise simply because data from a

producer of identical merchandise might be available.  To the contrary,

Commerce's policy states that "{i}f considering a producer of identical merchandise leads to data difficulties, {Commerce} may consider countries that produce a broader category of reasonably comparable merchandise." Id.

In this case, Malaysia, Brazil, and Mexico were all found to be economically comparable and significant producers of comparable merchandise. PDM at 8-9, PR 203, Appx__. However, Commerce determined that data quality and availability were more important in selecting a primary surrogate country than a country's actual production of the subject merchandise. Id. at 10, Appx__. Because complete data were not available for Mexico, Commerce limited its consideration to Malaysia and Brazil and ultimately chose Malaysia. Id. at 10-11, Appx__. That is, Commerce determined that placing SV information for Mexico on the record was not necessary for calculating a dumping margin as accurately as possible, even though the primary surrogate country did not produce identical merchandise.[2]

---

[2] As discussed in the following section, Commerce's reliance on the factual record constructed by the interested parties was consistent with its approach in nearly all SV cases.

In addition, Commerce twice determined that Brazilian labor data were accurate for purposes of calculating a dumping margin: first when initiating the underlying investigation, and again in the <u>First Draft Remand</u>. <u>See</u> AD Checklist at 8-9, PR 22, Appx__; <u>First Draft Remand</u> at 7, P1RR 4, Appx__. These determinations were supported by substantial record evidence and consistent with agency practice, as the data not only satisfied Commerce's general SV criteria but were based on the same industry-specific classifications as ILO Chapter 6A data and reflected both direct and indirect costs in accordance with Commerce's preferences. <u>See</u> Letter from Picard Kentz & Rowe LLP, "Case Brief," A-570-093, at 27-28 (Aug. 5, 2019) ("Petitioner's Investigation Case Brief"), PR 241, Appx__ (citing Petition at Vol. II, Exhibit PRC AD-11, Table 1, Note 1, Table 3, Note 1, PR 2, Appx__, Appx__). <u>See also</u> <u>Labor Methodologies</u>, 76 Fed. Reg. at 36,093.

In fact, Commerce relied on Brazilian data rather than Mexican INEGI data in the <u>First Draft Remand</u> specifically because the INEGI data as submitted by Ningbo Master were of a lower quality. <u>Id.</u> at 6-7, P1RR 4, Appx__. Had Commerce's paramount concern been accuracy based on using data from a country producing identical merchandise,

22

the agency should have placed ILO data for Mexico on the record at that time.[3]  But Commerce did not do so, because the Brazilian data satisfied the agency's criteria and, consistent with well-established practice, were suitable for calculating an accurate dumping margin.

Accordingly, Commerce's established practice for selecting SVs and its conduct in this case demonstrate that Brazil did, in fact, facilitate an accurate dumping calculation and was therefore the best information available on the record when Commerce undertook this second remand proceeding.  Commerce's insistence that accuracy required opening the record for additional SV data is therefore unsupported by substantial evidence.

---

[3]  In placing ILO data on the record, Commerce did not explain how that information would have been available to parties at the time of the investigation. Instead, the "ILO Wage Data" tab of the surrogate value worksheet states only that the information was "Downloaded from ILOSTAT.  Last update on 11SEP22."  See Memorandum to the File, "Draft Remand (Slip Op 22-106) Results Calculation Memorandum for Ningbo Master International Trade Co., Ltd.," A-570-093, at "Surrogate Value Spreadsheet," (Oct. 6, 2022), P2RR 3, Appx__.  Without some explanation, Commerce cannot now rely on data that would not have been available to the parties during the course of the administrative proceeding that is the basis for this appeal.  See Dorbest Ltd. v. United States, 462 F. Supp. 2d 1262, 1299-1300 (Ct. Int'l Trade 2006) (citing Vt. Yankee Nuclear Power Corp. v. Natural Resources Def. Council, Inc., 435 U.S. 519, 555 (1978)) (holding that "available" in the context of "best information available" "must mean 'available during the investigation'"). See also Dorbest Ltd. v. United States, 35 C.I.T. 136, 145 (2011) (citing 2 Am. Jur. 2d Administrative Law § 575) (holding that "{r}emand proceedings do not grant parties the right to a new {AD} investigation from the current date").

### B.   Commerce's Decision to Reopen the Record Was Arbitrary, Capricious, and an Abuse of Discretion

Commerce's <u>Second Final Remand</u> reflects an unjustified and unexplained departure from its well-established practice for selecting SVs.  See <u>Jiangsu Jiasheng</u>, 28 F. Supp. 3d at 1323 ("An abuse of discretion occurs where the decision is based on an erroneous interpretation of the law, on factual findings that are not supported by substantial evidence, or represents an unreasonable judgment in weighing relevant factors.").  <u>See also</u> <u>Overton Park</u>, 401 U.S. at 416 (holding that reviewing courts "must consider whether the decision was based on consideration of the relevant factors and whether there has been a clear error of judgment").  The agency's findings should therefore be remanded as unlawful.

### (i)   Commerce's Addition of ILO Data to the Record Was Inconsistent With Established Practice

Commerce does not reopen administrative records simply because it has a default preference for valuing labor with ILO data.  To the contrary, Commerce has explained in numerous proceedings that it may

PUBLIC VERSION


rely on other data sources provided by interested parties regardless of

whether ILO data are on the record:

> In <u>Labor Methodologies</u>, the Department decided to change
> to the use of ILO Chapter 6A from the use of ILO Chapter
> 5B data, on the rebuttable presumption that Chapter 6A
> data better account for all direct and indirect labor costs.
> <u>The Department did not, however, preclude all other sources
> for evaluating labor costs in {NME AD} proceedings.</u> Rather,
> we continue to select the best available information to
> determine SVs for inputs such as labor.

<u>Tapered Roller Bearings and Parts Thereof, Finished and Unfinished,
from the People's Republic of China</u>, 81 Fed. Reg. 1,396 (Dep't

Commerce Jan. 12, 2016) (final results) and accompanying IDM at

Comment 4 (selecting between two non-ILO data sources placed on the

record by interested parties) (emphasis added).  <u>See also</u>, <u>e.g.</u>,

<u>Multilayered Wood Flooring from the People's Republic of China</u>, 85

Fed. Reg. 78,118 (Dep't Commerce Dec. 3, 2020) (final results) and

accompanying IDM at Comment 2 (selecting between two non-ILO

sources placed on the record by interested parties and explaining that

"{a}lthough Commerce stated a preference for ILO data, it did not

preclude reliance on data from another source"); <u>Cast Iron Soil Pipe

Fittings From the People's Republic of China</u>, 85 Fed. Reg. 37,832

(Dep't Commerce June 24, 2020) (prelim. results 2018-2019) and

**PUBLIC VERSION**                                    **Court No. 20-00008**

rely on other data sources provided by interested parties regardless of

whether ILO data are on the record:

> In <u>Labor Methodologies</u>, the Department decided to change
> to the use of ILO Chapter 6A from the use of ILO Chapter
> 5B data, on the rebuttable presumption that Chapter 6A
> data better account for all direct and indirect labor costs.
> <u>The Department did not, however, preclude all other sources
> for evaluating labor costs in {NME AD} proceedings.</u> Rather,
> we continue to select the best available information to
> determine SVs for inputs such as labor.

<u>Tapered Roller Bearings and Parts Thereof, Finished and Unfinished,
from the People's Republic of China</u>, 81 Fed. Reg. 1,396 (Dep't

Commerce Jan. 12, 2016) (final results) and accompanying IDM at

Comment 4 (selecting between two non-ILO data sources placed on the

record by interested parties) (emphasis added).  <u>See also</u>, <u>e.g.</u>,

<u>Multilayered Wood Flooring from the People's Republic of China</u>, 85

Fed. Reg. 78,118 (Dep't Commerce Dec. 3, 2020) (final results) and

accompanying IDM at Comment 2 (selecting between two non-ILO

sources placed on the record by interested parties and explaining that

"{a}lthough Commerce stated a preference for ILO data, it did not

preclude reliance on data from another source"); <u>Cast Iron Soil Pipe

Fittings From the People's Republic of China</u>, 85 Fed. Reg. 37,832

(Dep't Commerce June 24, 2020) (prelim. results 2018-2019) and

accompanying PDM at 22 (same).  Accord Drawn Stainless Steel Sinks from the People's Republic of China, 79 Fed. Reg. 13,019 (Dep't Commerce Feb. 26, 2013) (final determ.) and accompanying IDM at Comment 3 (finding that a second data source was superior to the ILO data on the record).

In none of these cases did Commerce reject otherwise usable labor data in favor of placing its own ILO data on the record.  This was for good reason—it is well-established that "the burden of creating an adequate record lies with {interested parties} and not with Commerce," QVD Food Co. v. United States, 658 F.3d 1318, 1324 (Fed. Cir. 2011), and Commerce is not required to disregard usable information that facilitates an accurate margin calculation simply because it has articulated a general preference for a different source that is not on the record.  Here, notwithstanding its misdirected claims regarding "accuracy," Commerce has not explained why it was necessary or appropriate to assume the burden of adding ILO data to the record when it has not done so in similar cases.  See Jiangsu Jiasheng, 28 F. Supp. 3d at 1323 ( "an agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently").

Indeed, Commerce offered no justification for its departure from this practice of relying on the "best information available" as submitted by interested parties beyond a general finding that "Mexico is superior to Brazil as a surrogate for the factors of production" because "refillable stainless steel kegs were actually produced in Mexico during the POI." Second Final Remand at 8, P2RR 6, Appx__.  But while this may be the case as a general principle, the actual record before Commerce during the underlying investigation, the first remand proceeding, and at the beginning of this second remand proceeding had only two SVs from Mexico, both of which were fundamentally flawed:  INEGI data that did not represent "full labor costs" and were therefore unusable, and ILC data that could not be indexed to the POI.  By contrast, the Brazilian labor data were comparable to the labor costs reported by the ILO, in accordance with Commerce's preference, and could be indexed to the POI based on existing record evidence in accordance with Commerce's practice.  See Petitioner's Investigation Case Brief at 28, PR 241, Appx__; see also, e.g., Certain Frozen Warmwater Shrimp From the Socialist Republic of Vietnam, 79 Fed. Reg. 57,047 (Dep't Commerce Sept. 24, 2014) (final results 2012-2013) and accompanying IDM at

Comment 4 (explaining that "U.S. dollar-denominated surrogate values
should be inflated based on the country in which the expense was
incurred, not the currency in which it was reported."). The record
therefore did not support a finding that "Mexico is superior to Brazil."

In short, the agency's well-established practice should have
resulted in one clear outcome: Commerce would rely on the best
information available on the original investigation record. No party
claimed or demonstrated that the Brazilian data were unusable for any
reason and, indeed, Commerce has never articulated such concerns in
any of its determinations. To the contrary, Commerce has chosen to
rely on the Brazilian data on two separate occasions. Its refusal to do so
in this second remand proceeding—and its latest determination to open
the record for ILO data when its practice is to rely on other usable
sources when submitted by interested parties—represents yet another
"talismanic invocation of data preferences as a substitute for reasoned
explanation" that is arbitrary and capricious. See American Keg I, 2021
WL 1206153, at *13; see also Jiangsu Jiasheng, 28 F. Supp. 3d at 1323.
This court should therefore remand Commerce's determination as an
abuse of discretion and require the agency to explain why, as a matter

of fact and law, the record established during the investigation was

unsuitable for supporting an accurate dumping calculation.

### (ii)   Commerce's Discussion of Inflationary Indices Misstates Relevant Practice

Commerce responded to American Keg's argument that Brazilian

data were the only data that could be inflated to the POI using existing

record evidence with the following statement:

> Commerce applies a hierarchy in selecting the most appropriate labor values, does not typically consider the inflator determinative of which data to select, and may place inflators on the record during the administrative proceeding when necessary.  Ordinarily, Commerce determines how to inflate the data (if necessary) after the data has been selected.

Second Final Remand at 8-9 (citing Labor Methodologies, 76 Fed. Reg.

at 36,094), P2RR 6, Appx__.  However, these observations are not

germane to the determinations made by Commerce in the investigation.

First, other than the preference articulated for ILO Chapter 6A

labor data, the only hierarchy appearing on the cited page of Labor

Methodologies relates to the manner in which Commerce "sorts the ILO

data based on data parameters."  76 Fed. Reg. at 36,094 n.11.  But, as

discussed above, Commerce's practice is to rely on other labor data

sources submitted by interested parties if ILO data is not on the record.

**PUBLIC VERSION**                                    **Court No. 20-00008**

Moreover, the hierarchy for sorting ILO data was entirely irrelevant to the question before Commerce, i.e., which SV constituted the "best available information":  non-contemporaneous Mexican data without an inflator or Brazilian data that could be inflated using information on the record.  To the extent that Commerce was referring to its general criteria for selecting SVs, those criteria are not a hierarchy, and they do not support the agency's refusal to give weight to the fact that none of the Mexican data on the record satisfied Commerce's criteria.  See PDM at 10 ("When evaluating SV data, Commerce considers several criteria including whether the SV data are publicly available, contemporaneous with the period under consideration, broad-market averages, tax and duty-exclusive, and specific to the inputs being valued.  There is no hierarchy among these criteria."), PR 203, Appx__.

Second, Commerce cited Labor Methodologies for its contention that it does not consider the inflator determinative of which data to select.  Second Final Remand at 9 (citing 76 Fed. Reg. at 36,094), P2RR 6, Appx__.  This statement appears to be the result of agency confusion as to Plaintiff's position and citation to that notice in its own argumentation.

30

Plaintiff's position is <u>not</u> that <u>Labor Methodologies</u> requires Commerce to treat the availability of an inflationary index as "determinative" overall.  See <u>Second Final Remand</u> at 9, P2RR 6, Appx__.  Rather, Plaintiff has consistently stated its position that Brazilian ILC data constituted the best information available because (1) Malaysia labor data were distorted, (2) Mexico INEGI data were incomplete, and (3) the record lacked information that would allow Commerce to inflate <u>any</u> Mexican data to the POI.  See Petitioner's Investigation Case Brief at 26-29, PR 241, Appx__; Letter from Picard Kentz & Rowe LLP, "Comments on Draft Results of Redetermination Pursuant to Court Remand," A-570-093, at 4-6 (May 19, 2021), P1RR 8, Appx__; "Plaintiff's Comments on Final Results of Redetermination Pursuant to Court Remand," at 20-26, ECF. No. 46, (Sept. 20, 2021) ("Pl.'s First Rem. Comments"); Petitioner's Second Draft Remand Comments at 9-12, P2RR 5, Appx__.  It was in that context that Plaintiff cited <u>Labor Methodologies</u> in its comments to this Court regarding the <u>First Final Remand</u> for the proposition that any index used to inflate "earnings data" must be "relevant," a fact that rendered

application of a Brazilian CPI to Mexican data unlawful.  See Pl.'s First Rem. Comments at 24.

But the fact that Labor Methodologies does not compel Commerce to consider inflators at the outset is not relevant to the agency's failure to "consider an important aspect of the problem." Motor Vehicle Mfrs., 463 U.S. at 43.  As stated above, the question before the agency was which dataset constituted the best information available.  See American Keg II, 2022 WL 4363320, at *3.  Over the course of the investigation and first remand proceeding, interested parties submitted and argued in favor of four alternatives, and Brazilian ILC data remain the only SV that satisfied all of Commerce's criteria for use in an accurate dumping calculation on the record of the investigation.  Commerce's insistence that inflationary indices are not dispositive does not explain or justify its refusal to rely on Brazilian data when all other available sources were materially deficient; it merely confirms that the agency continues to misstate or disregard its own practice for selecting SVs in pursuit of a result that the original record simply did not support.  This constitutes an abuse of discretion.

## II.    Commerce's Determination to Grant Ulix Separate Rate Status Was Unlawful

As detailed throughout these remand proceedings, Commerce's separate rate analysis requires companies to affirmatively demonstrate their "independent authority to negotiate and sign export contracts and other agreements." See Letter from deKieffer & Horgan, PLLC, "Separate Rate Application," A-570-093, at 13 (Nov. 21, 2018) ("Ulix SRA"), PR 90, Appx__. See also Sparklers from the People's Republic of China, 56 Fed. Reg. 20,588, 20,589 (Dep't Commerce May 6, 1991) (final determ. of sales at less than fair value) ("Sparklers from China"), citing Silicon Carbide from the People's Republic of China, 59 Fed. Reg. 22,585, 22,586-87 (Dep't Commerce May 2, 1994) (final determ. of sales at less than fair value) and Furfuryl Alcohol from the People's Republic of China, 60 Fed. Reg. 22,544, 22,545 (Dep't Commerce May 8, 1995) (final determ. of sales at less than fair value) (considering whether "prices are set by, or are subject to the approval of, a government agency," and whether "companies have "authority to negotiate and sign contracts and other agreements"). Companies must establish this independence with documentation such as "email correspondence between {the} applicant and unaffiliated U.S. customer," or with an

"affidavit testifying to independent price negotiation . . . signed and dated by an <u>unaffiliated U.S. customer</u>."  Ulix SRA at 13 (emphasis added), PR 90, Appx__.

This Court directed Commerce to "identify the evidence in the administrative record that supports granting Ulix a separate rate" given the above framework.  <u>American Keg II</u>, 2022 WL 4363320, at *3. Commerce has responded with (1) statements and evidence from Ulix's SRA that preceded American Keg's rebuttal evidence of affiliation, and (2) a narrative certified by Ulix's business manager describing the company's conversation with [

].  <u>Second Final Remand</u> at 4-6, P2RR 6, C2RR 6, Appx__.  As discussed below, however, this evidence remains insufficient in light of evidence submitted by American Keg that fairly detracts from Commerce's conclusion.  Commerce's grant of a separate rate to Ulix therefore remains unsupported by substantial evidence.

### A.    Ulix's SRA Does Not Establish the Company's Eligibility for a Separate Rate

Commerce highlighted the following statements and evidence from Ulix's SRA as affirmative evidence establishing the company's entitlement to a separate rate:

1.  Ulix's affirmation that it made "shipments or sales to unaffiliated parties only;"

2.  Ulix's statement that it did not have affiliates in the United States or that exported subject merchandise to the United States; and

3.  Ulix's statement that it "is not affiliated with any other exporters of subject merchandise" and that its [

    ].

4.  Ulix's list of shareholders, which did not appear to "show{} a link between any of these individuals and . . . [
    ].

<u>Second Final Remand</u> at 5, P2RR 6, C2RR 6, Appx__ (citing Ulix SRA at 16-17, Exhibit 9, PR 90, CR 21, Appx__, Appx__).  But while these statements may have sufficed if read in isolation, the record as a whole cast significant doubt on whether Ulix's statements and evidence were accurate and complete.  <u>See</u> <u>Nippon Steel</u>, 458 F.3d at 1351.

For example, Ulix's original response regarding managers and board members omitted half of the relevant personnel, including [

    ].

*Compare* Ulix SRA at 14, PR 90, CR 21, Appx__, *with* Letter from deKieffer & Horgan, PLLC, "Supplemental Separate Rate Application Questionnaire Response," A-570-093, at 1, 3 (Dec. 18, 2018), PR 113, CR

34, Appx__, Appx__.  In addition, as Plaintiff has previously highlighted, Ulix's narrative with respect to the price negotiation in question was incomplete, with the company originally providing "price negotiation emails" in its SRA but later explaining that price negotiations were actually conducted by telephone—a fact which should have been disclosed from the outset.  <u>See</u> Petitioner's Second Draft Remand Comments at 13-14, P2RR 5, Appx__; Pl.'s First Rem. Comments at 33-34.  <u>See also</u> Ulix SRA at 13 (requiring "logs of negotiations conducted over the telephone" or an affidavit from the customer in the absence of written documentation of such negotiations), PR 90, Appx__.  It was only when Ulix provided the requisite affidavit from the customer four months later that American Keg had enough information to probe further into potential, previously undisclosed affiliations.

The resulting evidence submitted by American Keg directly challenged Ulix's initial claims of negotiating independence by demonstrating that Ulix's customer, Company A, was affiliated with [                                                            ].  The [                                                            ] was striking on its own, but American Keg also

**Court No. 20-00008**

demonstrated that Company A [

          ]. <u>See</u> Letter from Picard Kentz & Rowe LLP,

"Comments on Guangzhou Ulix Industrial & Trading Co., Ltd.'s March

14, 2019 3rd Supplemental Separate Rate Application Questionnaire

Response," A-570-093, at 5-11 and Exhibit 21 (Mar. 25, 2019), PR 163,

CR 68, Appx__, Appx__.  This evidence alone did not affirmatively

demonstrate that Company A and Ulix were affiliated, but it did raise a

substantial question about whether Ulix's initial reporting was accurate

and complete, regardless of whether a Ulix official certified to the

accuracy of that reporting.

    Commerce has not questioned the veracity of American Keg's

evidence and, in fact, has conceded the relationships between [

          ]. <u>First Final Remand</u> at 12, P1RR 9, C1RR 14, Appx__.

But Commerce has again insisted that American Keg's failure to prove

affiliation between Ulix and its customer with its rebuttal evidence

meant that Ulix's original statements were sufficient for obtaining a

separate rate.  <u>See</u> <u>Second Final Remand</u> at 6 ("the petitioner's

information did not demonstrate that Guangzhou Ulix was affiliated

with [                                                      ]"), P2RR 6, C2RR 6,

Appx__; <u>see also</u> <u>id.</u> at 13 ("none of the information the petitioner placed

on the record suggested that Guangzhou Ulix was in a position to

control [                                                  ]"),

Appx__.

     This Court has held that Commerce must base its determinations

on affirmative evidence while also contending with evidence that fairly

detracts from its conclusion.  <u>American Keg II</u>, 2022 WL 4363320, at *3.

Commerce cannot absolve questions about Ulix's SRA by requiring

American Keg to prove affiliation or control; such a standard flips the

evidentiary burden for obtaining a separate rate on its head.  Rather,

Commerce must resolve credible questions about Ulix's SRA statements

by obtaining additional information <u>from Ulix</u> that satisfactorily rebuts

the evidence that detracts from its representations.  As discussed in the

following section, Commerce failed to do so, and the additional

statements provided by Ulix remain insufficient.

### B.    Ulix's Rebuttal Statement Does Not Establish the Company's Eligibility for a Separate Rate

     Commerce did not issue any follow up questions to Ulix pertaining

to American Keg's evidence, but Ulix submitted its own rebuttal

comment.  <u>See</u> Letter from deKieffer &, PLLC, to the Department, "Ulix

Rebuttal Comments," A-570-093, (Mar. 28, 2019) ("Ulix SRA Rebuttal"),

at 1-2, PR 164, CR 69, Appx__.  This Court previously rejected

Commerce's reliance on two statements concerning [            ] within

that submission, but, undeterred, Commerce now cites the remaining

statements as affirmative evidence that Ulix had no affiliation with

[            ]:

> ULIX has in the meantime conferred with [
>
>                              ] . . . According to the reasons
> stated above, it can be concluded that there is no affiliated
> relationship between [            ] and {Ulix}.

Second Final Remand at 6, P2RR 6, C2RR 6, Appx__ (citing ULIX SRA

Rebuttal at 2, PR 164, CR 69, Appx__).  See also id. at 13-14, Appx__.

Plaintiff has repeatedly explained that this statement is not

affirmative evidence that the two entities are unaffiliated.  First, the

statement does not come from a sworn affidavit by the customer but is,

instead, an undocumented summary of Ulix's conversation [

].  See Pl.'s First Rem. Comments at 36.  Such hearsay

statements cannot constitute substantial evidence in light of Ulix's

history of imprecise claims regarding its own business operations.

Indeed, given that Commerce required Ulix to submit an affidavit from

Company A concerning their price negotiations and their claims of being unaffiliated, it is unclear why Commerce did not require the same "bare denial" from [            ] once American Keg raised the issue.  See Letter from deKieffer & Horgan, PLLC, "Third Supplemental Separate Rate Application Questionnaire Response," A-570-093, at 1-2 (Mar. 14, 2019), PR 154, Appx__.

Second, Ulix's "conclusion" reflects a legal assessment that the company was not entitled to make, particularly in light of this Court's prior holding that two of the factual assertions supporting that conclusion, i.e., that [

                                                          ] and that [

                                        ], had no bearing on "present affiliations" and did not "deny an affiliation between Ulix and Company A."  See Petitioner's Second Draft Remand Comments at 15, P2RR 5, C2RR 5, Appx__.  See also American Keg II, 2022 WL 4363320, at *3.  Commerce's SRA does require respondents to exercise their own judgment about the definition of "affiliation" when making their initial declarations, see, e.g., Ulix SRA at 16-17, PR 90, Appx__, but Commerce's rebuttable presumption of control meant that Ulix was

required to provide affirmative evidence in support of its declarations

once American Keg countered those claims with its own evidence.  A

summary of a conversation that [

                                                              ] hardly qualifies as

such evidence.

Finally, Commerce insists that there is no reason to question the

accuracy of Ulix's statement because it was accompanied by a factual

certification from Ulix.  <u>Second Final Remand</u> at 14, P2RR 6, Appx__.

The agency also declares that it was not reasonable to require a further

demonstration of independence by Ulix because "there would be no

existing documentation to prove this lack of affiliation."  <u>Id.</u>  But, as

noted above, Commerce does not allow respondents to rest on mere

assertions with respect to price negotiations even when accompanied by

factual certifications; rather, they are required to submit relevant

documentation or affidavits from their customers.  <u>See</u> Ulix SRA at 13,

PR 90, Appx__.  Neither does the record of this proceeding demonstrate

that Commerce was reasonable in relying on Ulix's self-certified

narratives when the company had repeatedly erred in its description of

material facts in prior submissions.  Contrary to Commerce's position,

then, what the law and agency practice required was not "artful wording" from Ulix, <u>see</u> <u>Second Draft Remand</u> at 14, P2RR 1, Appx__, but substantial affirmative evidence that directly addressed the relationships, or lack thereof, between Ulix, Company A, [

             ].  Commerce has not identified that evidence, and its determination to grant Ulix a separate rate without such evidence must again be remanded.

**Court No. 20-00008**

## CONCLUSION

For all of these reasons, Plaintiff respectfully requests that this Court sustain Commerce's <u>Second Final Remand</u> with respect to its finding that inflating 2016 Mexican data with a Brazilian CPI was inappropriate but that this Court once again remand Commerce's determination with respect to the agency's selection of the surrogate value for labor and the separate rate status of Ulix.

Respectfully submitted,

/s/ Whitney M. Rolig
Whitney M. Rolig
Andrew W. Kentz
Nathaniel Maandig Rickard

**PICARD KENTZ & ROWE LLP**
1750 K Street, N.W.
Suite 800
Washington, DC 20006
(202) 331-4040

*Counsel to American Keg Company*

Dated:  January 26, 2023

43

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| **NEW AMERICAN KEG, d/b/a AMERICAN KEG COMPANY,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Court No. 20-00008** |
| ) | |
| **UNITED STATES,** ) | |
| ) | **Hon. M. Miller Baker,** |
| **Defendant,** ) | **Judge** |
| ) | |
| **and** ) | |
| ) | |
| **NINGBO MASTER INTERNATIONAL TRADE CO., LTD, and GUANGZHOU JINGYE MACHINERY CO., LTD.** ) | |
| ) | |
| **Defendant-Intervenors.** ) | |

## <u>CERTIFICATE OF COMPLIANCE WITH THE WORD LIMITATION</u>

I, Whitney M. Rolig, hereby certify that this brief, exclusive of the table of contents, table of authorities, glossary, certifications of counsel, and counsel's signature block, but including headings, footnotes, and quotations, contains 8,222 words, according to the word count function of the word processing program used to prepare this brief, and therefore

complies with the word limitations as set forth in ¶ 2(B) of the Standard

Chambers Procedures of this Court, as amended on October 3, 2016.

/s/ Whitney M. Rolig
Whitney M. Rolig
**PICARD KENTZ & ROWE LLP**

*Counsel to American Keg Company*